**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SHERRON PAIGE, individually and ON
BEHALF OF HER MINOR CHILD, K.D.;
JAHLISA GREENE, individually and ON
BEHALF OF HER MINOR CHILD, J.W.;
EVELYN GRAY, individually and ON
BEHALF OF HER MINOR CHILD, P.G.;
TANEEQUA CARRINGTON, individually
and ON BEHALF OF HER MINOR CHILD,
N.C.; on their own behalf and on behalf of all
others similarly situated,

            Plaintiffs,

    v.

NEW YORK CITY HOUSING AUTHORITY;
CITY OF NEW YORK; SHOLA OLATOYE;
BILL de BLASIO; MARY TRAVIS
BASSETT, M.D.; MARIA TORRES-
SPRINGER; MICHAEL KELLY; ALICIA
GLENN; BRIAN CLARKE; JAY KRANTZ;
LUIS PONCE; HERMINA POLACIO; ATC
ASSOCIATES, INC.; and ATC GROUP
SERVICES, LLC

            Defendants.

No. 1:17-CV-07481-WHP

JURY TRIAL DEMANDED

## PLAINTIFFS' FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, MONEY DAMAGES, AND JURY DEMAND

*"No safe blood lead level in children has been identified. Even low levels of lead in blood have been shown to affect IQ, ability to pay attention, and academic achievement. And effects of lead exposure cannot be corrected. The most important step parents, doctors, and others can take is to **prevent lead exposure before it occurs.**"* – Centers for Disease Control

*"The buck stops at City Hall from now on when it comes to NYCHA ... because I consider myself ultimately responsible for what we do at NYCHA."* – Mayor Bill de Blasio, February 8, 2014

*"Everything we do will be focused on improving the quality of life for our tenants, especially protecting their safety."* – Shola Olatoye, February 8, 2014

## INTRODUCTORY STATEMENT

1.      This class action is pursued on behalf of approximately **600,000** individuals who either reside in New York City public housing or receive government assistance with rent in private housing located in New York City. The victims of Defendants' unconstitutional and unlawful conduct – children and adults – who from as late as January 2012 to the present (the "Class Period"), have experienced and will continue to experience serious civil rights violations, personal injuries and property damage caused by Defendants' deliberate, reckless, and negligent misconduct.

2.      Defendants violated plaintiffs' civil and constitutional rights and caused a public health crisis by failing to follow federal, state and local laws that require inspections of thousands of residences for lead-based paint and lead-based paint hazards; by creating multiple schemes that purposefully decimated all meaningful requirements to inspect for and repair/remediate lead-based paint hazards; and by promoting the use of unqualified and unlicensed inspectors and workers to perform reparations and/or remediation.

3.      Defendants also exacerbated the crisis by concealing and misrepresenting its scope; by failing to take effective remedial action to eliminate it; and by lying about it to cover up their misconduct.

4.      Two groups of defendants are responsible for the severe harm suffered by plaintiffs. A group of government officials and bodies, including the New York City Housing Authority ("NYCHA"), the City of New York, Chair and Chief Executive Officer of NYCHA – Shola Olatoye, Mayor Bill de Blasio, Mary Travis Bassett, MD, Maria Torres-Springer, Michael Kelly, Alicia Glenn, Brian Clarke, Jay Krantz, Luis Ponce and Hermina Palacio. At least two

private companies – ATC Associates, Inc. and ATC Group Services, LLC also played a significant role in causing the harm.

## SUMMARY OF THE CONSTITUTIONAL AND CIVIL RIGHTS VIOLATIONS CAUSED BY DEFENDANTS

5.    *Due process based on state created danger doctrine*: Plaintiffs and the Class have sustained violations of their substantive due process rights, including their fundamental right to not have the state create, inflict and/or exacerbate dangers through the culpable actions of public officials.

6.    *Due process based on bodily integrity doctrine*: Plaintiffs and the Class have sustained violations of their substantive due process rights, including their fundamental right to not have their bodily integrity violated.

7.    *Equal protection, race*: Defendants' various schemes, including a scheme that purposefully decimated all meaningful requirements to inspect for and remediate lead-based paint hazards and promoted the use of unqualified and unlicensed inspectors and workers in instances where repair and remediation work was performed, would not have occurred if the affected community was predominately white; but it was created in no small part because the affected community was predominately African American.

8.    *Equal protection, wealth:* Defendants' various schemes, including the scheme that purposefully decimated all meaningful requirements to inspect for and remediate lead-based paint hazards and promoted the use of unqualified and unlicensed inspectors and workers in instances where repair and remediation work was performed, would not have occurred if the affected community was affluent; but it was created in no small part because the affected community was predominately poor.

9.    *Monell Claim*: Plaintiffs and the Class have sustained violations of their fundamental substantive due process rights, including their right to bodily integrity, their right to be protected from state created danger, and their right to equal protection of the laws, all pursuant to the customs, policies, and/or practices of defendant City of New York, defendant NYCHA, and those defendants sued in their official capacities.

10.    *Violation of 42 U.S.C. § 1985(3):* Plaintiffs and the Class have sustained serious injuries as a result of the conspiracy of two or more of defendants to directly or indirectly conspire to violate Plaintiffs' constitutional rights, said conspiracy being based on invidious racial animus. The conspiracy occurred between governmental defendants of various agencies and included the private defendants.

11.    *Substantive Due Process, Access to Judicial Remedy:* Plaintiffs' and the Class' rights under the Due Process Clause of the Fourteenth Amendment include the right to access an effective judicial process. Defendants violated this right by taking individual and official actions that suppressed, concealed, and/or created false and misleading evidence and public records.

12.    *Procedural Due Process:* Defendants have deprived plaintiffs and the Class of minimum procedural protections for their rights as tenants under New York State and City laws, by concealing, suppressing, and falsifying evidence related to defendant NYCHA's compliance with federal, state, and local lead paint laws. Defendants' actions thus deprived plaintiffs and the Class of safe habitation and enjoyment of, and safe ingress and egress to their apartments, which they leased from NYCHA.

13.    *First Amendment Violations:* The governmental defendants, by suppressing, concealing, and falsifying information and documents related to NYCHA's lead paint activities, have undermined plaintiffs' and the Class' access to accurate information regarding government

4

activities and chilled their ability to meaningfully comment and speak out regarding the governmental defendants policies and actions.

14.     *Fair Housing Act Discrimination, Familial Status:* Defendants' knowing failure to inspect for lead paint hazards, employ licensed and trained personnel, and repair, remediate and/or abate lead paint hazards created a disproportionately hazardous and unsafe condition for families with young children.

15.     *Failure to Disclose Lead Paint Activities, 42 U.S. Code § 4852d*: By failing to inspect, and by performing unqualified inspections, defendants violated plaintiffs' and the Class' rights to receive truthful and accurate disclosures related to lead paint activities, inspections, testing, abatement, and remediation for both their individual units and as it relates to the common areas in the NYCHA buildings in which plaintiffs and the class reside.

16.     *Professional Negligence in Services Related to Inspections for Lead-Based Paint Hazards*: Plaintiffs and the Class have sustained serious harm as a result of the private defendants' professional negligence in their duties relating to required inspections for lead-based paint hazards.

## JURISDICTION AND VENUE

17.     This is a civil action brought pursuant to 42 U.S.C. § 1983 seeking, *inter alia*, injunctive and declaratory relief together with monetary damages against governmental defendants for violations of the Fourteenth Amendments of the United States Constitution, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, et seq.

18.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331, which authorizes federal courts to decide cases concerning federal questions; 28 U.S.C. § 1343(a)(3) and (4), which

authorizes federal courts to hear civil rights cases; and 28 U.S.C. § 2201, the Declaratory Judgment Act.

19.    The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

20.    This Court has personal jurisdiction over defendants because defendants reside in this District and the acts that form the basis for this Complaint occurred, in substantial part, in this District.

21.    Venue is proper in this District under 28 U.S.C. § 1391(b)–(c) because defendants reside in this District and a substantial part of the acts or omissions that give rise to this action occurred in this District.

22.    To the extent the private defendants may claim to be non-residents, the Court has personal jurisdiction over them because they have availed themselves of the benefits and protections of the State of New York. The private defendants conducted business and committed torts in New York, by themselves, their agents and/or alter egos, which caused plaintiffs and the Class to suffer severe personal and property injuries in New York.

## **PLAINTIFFS**

23.    Plaintiff Sherron Paige ("Paige") is an individual residing in New York City. Paige is the mother of a minor child, K.D. From birth through the present, Paige and K.D. have resided at 791 Hicks Street, Apt. 5a, New York, New York 11231 ("791 Hicks Street").

24.    K.D. is an individual minor child residing in New York City. K.D. was born in July 2013 and, at all relevant times, has resided with his mother at 791 Hicks Street.

25.    K.D. was lead poisoned at 791 Hicks Street. Had defendants properly inspected the apartment and the common areas associated therewith, pursuant to federal, state and municipal regulations, the child would not have been lead poisoned, or at a minimum his lead

poisoning would have been significantly mitigated.

26.     Plaintiff Jahlisa Greene ("Greene") is an individual residing in New York City. Greene is the mother of a minor child, J.W. From birth through the present, Greene and J.W. resided at 2382 Dean Street, Apt. 1, Brooklyn, NY 11233 ("2382 Dean Street"). Greene and J.W. receive assistance from the Housing Choice Voucher Program of the Housing and Community Development Act of 1978 ("Section 8"). Thus, 2382 Dean Street is a Section 8 property administered by NYCHA.

27.     J.W. is an individual minor child residing in New York City. J.W. was born in July 2012 and resided with Greene at 2382 Dean Street from birth until June 29, 2016.

28.     J.W. was lead poisoned at 2382 Dean Street. Had defendants properly inspected the apartment and the common areas associated therewith, pursuant to federal, state and municipal regulations, the child would not have been lead poisoned, or at a minimum his lead poisoning would have been significantly mitigated.

29.     Plaintiff Evelyn Gray ("Gray") is an individual residing in New York City.  Gray is the mother of a minor child, P.G. Gray and P.G. previously resided at 1460 Bronx River Avenue, Apt 1A, Bronx, NY 10472 ("1460 Bronx River Ave"), a property owned and managed by NYCHA.

30.     P.G. is an individual minor child residing in New York City. P.G. was born in October 2009 and resided with Gray at 1460 Bronx River Ave from birth until August 2017.

31.     P.G. was lead poisoned at 1460 Bronx River Ave. Had defendants properly inspected the apartment and the common areas associated therewith, pursuant to federal, state and municipal regulations, the child would not have been lead poisoned, or at a minimum his lead poisoning would have been significantly mitigated.

32.     Taneequa Carrington ("Carrington") is an individual residing in New York City. Carrington is the mother of a minor child, N.C. Carrington resides at 569 East 108th Street, Apt 2A, Brooklyn, NY 11236 ("569 108th Street"), a property owned and managed by NYCHA, from 1997 through the present.

33.     N.C. is an individual minor child residing in New York City. N.C. was born in January 2015 and has resided with Carrington at 569 108th Street from birth through the present.

34.     N.C. was lead poisoned at 569 108th Street. Had defendants properly inspected the apartment and the common areas associated therewith, pursuant to federal, state and municipal regulations, the child would not have been lead poisoned, or at a minimum his lead poisoning would have been significantly mitigated.

<u>**GOVERNMENTAL DEFENDANTS**</u>

35.     The individually named governmental defendants are sued in their individual and/or official capacities as indicated below.

36.     Defendant NYCHA is a New York state public-benefit corporation organized under the Public Housing Law. NYCHA is the largest public housing authority in the United States with 326 housing developments throughout the five boroughs of New York City and more than 400,000 residents. NYCHA also administers Section 8 for approximately 200,000 New York City residents.

37.     NYCHA owns and manages the residential building located at 791 Hicks Street, New York, New York 11231.

38.     NYCHA owns and manages the residential building located at 1460 Bronx River Avenue, Bronx, NY 10472.

39.    NYCHA owns and manages the residential building located at 569 East 108th Street, Apt 2A, Brooklyn, New York 11236.

40.    The NYCHA Board of Directors consists of seven members, of which the chairperson is appointed by and serves at the pleasure of the Mayor of New York City, while the Mayor appoints the others for three-year terms.

41.    Defendant City of New York is a municipal corporation organized under New York State law.

42.    Defendant Shola Olatoye ("Olatoye") is a New York resident and is the current chairperson of the NYCHA Board and chief executive at NYCHA. Defendant Olatoye is sued in both her individual and official capacities. She is individually liable insofar as she personally approved of, and thereby participated in the decisions that deliberately created, increased and prolonged the public health crisis in this case and participated in the concealment of the harm caused plaintiffs. Defendant Olatoye is also sued because she conspired with other defendants to deprive plaintiffs and the Class of their civil and constitutional rights and participated in and/or aided and abetted others to violate plaintiffs' and the Class' rights to full and equal enjoyment of public services as guaranteed under the Equal Protection Clause of the 14th Amendment. Additionally, as chairperson, she was a policymaker for defendant NYCHA and defendant City of New York within the meaning of *Monell*, and as such her actions constituted customs, policies and/or practices of defendant NYCHA and defendant City of New York.

43.    Defendant Olatoye has admitted in public statements that NYCHA has not complied with federal lead inspection requirements, and that non-compliance was a matter of custom and policy in an effort to falsely reduce NYCHA's backlog of lead paint inspections.

44.　　As a policymaker, defendant Olatoye was integrally involved in devising and implementing a nefarious scheme ("Scheme 1") wherein the New York City Department of Health and Mental Hygiene ("DOH") responds to reports of a lead poisoned child; DOH issues violations; defendant NYCHA challenges DOH's findings as to all aspects of the DOH inspection other than lead-based paint dust violations; DOH retracts its non-dust related violations; and defendant NYCHA is left with no remedial responsibilities other than to, at most, deal with and remediate lead dust hazards. As part of Scheme 1, defendant Olatoye permitted NYCHA to utilize unqualified inspectors and unlicensed workers as a foundational basis for challenges to DOH reported violations.

45.　　As a policymaker, defendant Olatoye was also integrally involved in devising and implementing a second nefarious scheme ("Scheme 2") wherein defendant NYCHA requests (and receives) inspection waivers from the U.S. Department of Housing and Urban Development ("HUD") and/or from defendant New York City's Department of Housing Preservation and Development ("HPD") for units that have been "cleared" of lead hazards by unqualified and unlicensed workers, thereby drastically reducing each entity's inspection and repair/remediation responsibilities on an enormous scale.

46.　　Defendant Bill de Blasio ("de Blasio") is a New York resident and is the Mayor of New York City. Defendant de Blasio is sued in both his individual and official capacities. He is individually liable insofar as he personally approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused plaintiffs. Defendant de Blasio is also sued because he conspired with other defendants to deprive plaintiffs and the Class of their civil and constitutional rights and participated in and/or aided and abetted others to

violate plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the Equal Protection Clause of the 14th Amendment of the United States Constitution. Additionally, as Mayor, he was a policymaker for defendant City of New York and defendant NYCHA, within the meaning of *Monell*, and as such his actions constituted customs, policies and/or practices of defendant City of New York and defendant NYCHA.

47.    De Blasio is personally involved in, *inter alia*, the management and oversight of defendant NYCHA's operations, including the development of a new operating plan that was implemented in 2015. Defendant de Blasio is also responsible for defendant New York City's DOH and HPD.

48.    As early as February 2014, defendant de Blasio publicly insisted that he, and therefore the City of New York, was responsible for NYCHA. Defendant de Blasio and defendant City of New York have thus undertaken a duty to monitor and participate in NYCHA's most fundamental functions, including inspections for lead-based paint and lead-based paint hazards and any necessary repairs/remediation associated therewith.

49.    As a policymaker, defendant de Blasio permitted and participated in Scheme 1, wherein the DOH responds to reports of a lead poisoned child; DOH issues violations; NYCHA challenges DOH's findings as to all aspects of the DOH inspection other than lead-based paint dust violations; DOH retracts its non-dust related violations; and NYCHA is left with no remedial responsibilities other than to, at most, deal with and remediate lead dust hazards. As part of the scheme defendant de Blasio permitted NYCHA to utilize unqualified inspectors and unlicensed workers as a foundational basis for challenges to DOH reported violations.

50.    As a policymaker, defendant de Blasio also permitted and participated in Scheme 2, wherein NYCHA requests (and receives) inspection waivers from HUD and/or from HPD for

11

units that have been "cleared" of lead hazards by unqualified and unlicensed workers, thereby drastically reducing each entity's inspection and repair/remediation responsibilities on an enormous scale.

51.    Defendant Mary Travis Bassett, MD ("Bassett") is a New York Resident and is the current Commissioner of New York City's DOH. Defendant Bassett is sued in both her individual and official capacities. She is individually liable insofar as she personally approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis in this case and participated in the concealment of the harm caused plaintiffs and the Class. Defendant Bassett is also sued because she conspired with other defendants to deprive plaintiffs and the Class of their civil and constitutional rights and participated in and/or aided and abetted others to violate plaintiffs' and the class' rights to full and equal enjoyment of public services as guaranteed under the Equal Protection Clause of the 14th Amendment. Additionally, as Commissioner, she was a policymaker for the DOH and defendant City of New York within the meaning of *Monell*, and as such her actions constituted customs, policies and/or practices of DOH and defendant City of New York.

52.    As a policymaker, defendant Bassett was integrally involved in devising and implementing Scheme 1.

53.    Defendant Maria Torres-Springer ("Torres-Springer") is a resident of New York and is the current Commissioner HPD. Defendant Torres-Springer is sued in both her individual and official capacities. She is individually liable insofar as she personally approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis in this case and participated in the concealment of the harm caused plaintiffs and the Class. Defendant Torres-Springer is also sued because she conspired with other

defendants to deprive plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate plaintiffs' and the class' rights to full and equal enjoyment of public services as guaranteed under the Equal Protection Clause of the 14th Amendment. Additionally, as Commissioner, she was a policymaker for HPD and defendant City of New York within the meaning of *Monell*, and as such her actions constituted customs, policies and/or practices of HPD and defendant City of New York.

54.    As policymaker, defendant Torres-Springer was integrally involved in devising and implementing Scheme 2, wherein NYCHA requests (and receives) inspection waivers from HPD for units that have been "cleared" of lead hazards by unqualified and unlicensed workers, thereby drastically reducing each entity's inspection and repair/remediation responsibilities on an enormous scale.

55.    Defendant Michael Kelly ("Kelly") is a resident of New York and is the current General Manager of NYCHA, having been appointed on or about March 25, 2015. Defendant Kelly is sued in his individual capacity because, during his term as General Manager, he deliberately increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused plaintiffs and the Class. Kelly is also sued because he conspired with other defendants to deprive plaintiffs and the Class of their civil and constitutional rights and participated in and/or aided and abetted others to violate plaintiffs' and the Class' rights to full and equal enjoyment of public services as guaranteed under Equal Protection Clause of the 14th Amendment of the United States Constitution.

56.    Defendant Kelly has admitted in public statements that defendant NYCHA has not complied with federal, state and municipal lead inspection requirements, and that non-

compliance was a matter of custom and policy in an effort to falsely reduce NYCHA's backlog of lead paint inspections.

57.     Defendant Kelly was integrally involved in implementing Schemes 1 and 2.

58.     Defendant Alicia Glenn ("Glenn") is a resident of New York and serves as the Deputy Mayor for Housing and Economic Development. Defendant Glenn is sued in her individual capacity because, during her term as Deputy Mayor, she deliberately increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm she caused plaintiffs and the Class. Defendant Glenn is also sued because she conspired with other defendants to deprive plaintiffs and the class of their civil and constitutional rights and participated in and/or aided and abetted others to violate plaintiffs' rights to full and equal enjoyment of public services as guaranteed under Equal Protection Clause of the 14th Amendment of the United States Constitution.

59.     On numerous occasions defendant Glenn met with and advised defendant Olatoye regarding the filing of inspection certifications. Many of these meetings occurred prior to defendant Olatoye filing false certifications. Defendant Glenn not once notified the public of NYCHA's failures, despite having knowledge of said failures for at least two years prior to when the failures were made public.

60.     Defendant Glenn was integrally involved in implementing Schemes 1 and 2.

61.     Defendant Brian Clarke ("Clarke") is a New York resident and resigned as Senior Vice President for NYCHA Operations on November 17, 2017. Defendant Clarke is sued in his individual capacity because, during his term as Senior Vice President, he deliberately increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused plaintiffs and the Class. Clarke is also sued because he conspired with other

defendants to deprive plaintiffs and the Class of their civil and constitutional rights and participated in and/or aided and abetted others to violate plaintiffs' and the Class' rights to full and equal enjoyment of public services as guaranteed under Equal Protection Clause of the 14th Amendment of the United States Constitution.

62.    Defendant Clarke was aware of and purposefully concealed defendant NYCHA's failures for over two years before they were made public.

63.    Defendant Clarke was integrally involved in implementing Schemes 1 and 2.

64.    Defendant Jay Krantz ("Krantz") is a resident of New York, and resigned as Director of NYCHA's Technical Services on November 17, 2017. Defendant Krantz is sued in his individual capacity because, during his term as Director, he deliberately increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused plaintiffs and the Class. Krantz is also sued because he conspired with other defendants to deprive plaintiffs and the Class of their civil and constitutional rights and participated in and/or aided and abetted others to violate plaintiffs' and the Class' rights to full and equal enjoyment of public services as guaranteed under Equal Protection Clause of the 14th Amendment of the United States Constitution.

65.    Defendant Krantz was aware of and purposefully concealed NYCHA's failures for over two years before they were made public.

66.    Defendant Krantz was integrally involved in implementing Schemes 1 and 2.

67.    Defendant Luis Ponce ("Ponce") is a resident of New York and was formerly NYCHA's Senior Vice President for Operations, but on November 17, 2017 was demoted and suspended for thirty days without pay. Defendant Ponce is sued in his individual capacity because, during his term as Senior Vice President, he deliberately increased and prolonged the

public health crisis at issue in this case and participated in the concealment of the harm he caused plaintiffs and the Class. Defendant Ponce is also sued because he conspired with other defendants to deprive plaintiffs and the Class of their civil and constitutional rights and participated in and/or aided and abetted others to violate plaintiffs' and the Class' rights to full and equal enjoyment of public services as guaranteed under Equal Protection Clause of the 14th Amendment of the United States Constitution.

68.    Defendant Ponce was aware of and purposefully concealed defendant NYCHA's failures for over two years before they were made public.

69.    Defendant Ponce was integrally involved in implementing Schemes 1 and 2.

70.    Defendant Hermania Palacio ("Palacio") is a New York resident and presently serves as Deputy Mayor for Health and Human Services. Defendant Palacio is sued in her individual capacity because, during her term as Deputy Mayor, she deliberately increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm she caused plaintiffs and the Class. Palacio is also sued because she conspired with other defendants to deprive plaintiffs and the Class of their civil and constitutional rights and participated in and/or aided and abetted others to violate plaintiffs' and the Class' rights to full and equal enjoyment of public services as guaranteed under Equal Protection Clause of the 14th Amendment of the United States Constitution.

71.    Defendant Palacio created and advised the administration and defendant NYCHA regarding lead-poisoning prevention policies with an eye toward minimizing defendants' responsibilities, and with no regard for the plaintiffs and Class members most affected by lead-based paint and lead-based paint hazard exposure – children. Defendant Palacio was aware of and purposefully concealed NYCHA's failures for over two years before they were made public.

72.    Defendant Palacio was integral in implementing Schemes 1 and 2.

**PRIVATE DEFENDANTS**

73.    Defendant ATC Associates, Inc. ("ATC Inc.") is a New York professional corporation with its principal place of business located at 104 East 25th Street, New York, New York 10010. During the relevant period, Defendant ATC Inc. provided environmental consulting services to the governmental defendants with regard to lead-based paint and lead-based paint hazards. Specifically, defendant ATC Inc. at all relevant times conducted defendant NYCHA's follow-up inspections as part of Scheme 1. Defendant ATC Inc. routinely and commonly followed DOH inspections with a finding that contradicted DOH findings of lead-based paint and lead-based paint hazards. Thus, defendant ATC was integrally involved in laying a foundation for and the facilitation of Schemes 1 and 2.

74.    Defendant ATC Group Services, LLC ("ATC LLC") is a Louisiana corporation with its principal place of business in Lafayette, Louisiana. Per its website, ATC LLC maintains a branch in New York City located at 104 East 25th Street, New York, New York 10010. The "local branch" is ATC Inc.

75.    The corporate structure of ATC Inc. and ATC LLC is such that ATC LLC exerts nearly full control over its subsidiary.

76.    Defendants ATC Inc. and ATC LLC (collectively hereinafter "ATC") are defendants in this action based on their collective failure to properly inspect units within New York City Public Housing in conjunction with their participation Schemes 1 and 2.

## STATEMENT OF FACTS

77.    Since as late as 2012, required inspections for units in public housing as well as in premises where tenants receive Section 8 assistance have either: not occurred at all; were conducted by unqualified inspectors; and (in rare instances where unqualified inspectors found hazards) were "remediated" or repaired by unlicensed workers.

78.    On four separate instances since 2015 the New York City Department of Investigation ("DOI") has determined that defendant NYCHA has neglected safety rules and regulations.

79.    In December 2015 and March 2017, DOI issued reports regarding NYCHA's failures to exclude dangerous criminal offenders from public housing.

80.    In March 2016, DOI found that NYCHA was not performing critical elevator inspections.

81.    In October 2016, DOI found that NYCHA was failing to perform critical inspections inside NYCHA apartments including testing smoke alarms and carbon monoxide detectors.

82.    On November 14, 2017, DOI concluded, amongst other things, that in 2013, 2014 and 2015, NYCHA submitted documentation to HUD certifying that it was in compliance with lead-based paint regulations, despite not having conducted the required visual assessments.

## WHAT IS LEAD?

83.    Lead is a naturally occurring element found in the earth's crust.

84.    Lead is a neurotoxin, so when people, specifically children under the age of seven, absorb certain quantities lead causes brain damage.

85.    The term "lead poisoning" really means brain poisoning.

86.    In the last hundred years, lead was most commonly known for its use in gasoline.

87.    Lead began to be added to gasoline in the 1920s to reduce knocking or pinging within internal combustion engines.

88.    Due to the harmful effects of leaded gasoline on people's health, as well as its negative environmental impact, leaded gasoline was phased out through various legislative efforts.

89.    Unleaded gasoline was introduced to the mainstream in 1974.

90.    Today, the most widespread place where lead is found is in old paint.

91.    Buildings constructed before 1978 typically contained paint that was lead-based.

92.    Lead in paint served as filler and as a whitening agent.

93.    The use of lead-based paint was banned by New York City in 1960, and by the Federal Government in 1978.

94.    Lead-based paint becomes dangerous to young children when it chips, flakes or is contained on friction surfaces, like windowsills, where dust can be created.

95.    In 1995, Steve Matthews, who at that time was a spokesman for the New York City Health Department stated:

> *In some ways, the biggest problem is not from the obvious, the walls, but from friction surfaces, like doorjambs and window casings. Every time the door opens and closes or a window is raised and lowered, you're putting dust into the atmosphere. You can see the chips flaking form the wall, but you don't really see the dust from opening and closing the door.*

96.    Experts now consider lead dust to be "the primary exposure pathway of childhood lead poisoning." *N.Y.C. Coal. to End Lead Poisoning, Inc. v. Vallone, 100 N.Y.2d 337, 343 (2003).* Lead dust is invisible to the naked eye and highly toxic even in very small quantities. Indeed, in 1999 HUD lowered its safety standards to only 40 micrograms (millionths' of a gram)

per square foot of floor area (:g/ft²), 64 F.R. 50140, 50181 (1999), *an amount less than half the mass of a single particle of coffee sweetener.*

97.     The units of measurement are sometimes difficult to synthesize, micrograms (or millionths of a gram) per deciliter of blood, abbreviated ug/dL, but the trend is obvious: in 1970 the Centers for Disease Control ("CDC") declared that blood lead levels of 40 micrograms and up were considered elevated; in 1991 the same agency used 10 micrograms, or 75 percent less; in 2012, the CDC began using a reference level of 5 micrograms per deciliter to identify children with elevated blood lead levels.

98.     The CDC has stated that there is no "safe" blood lead level.

99.     Children, particularly very young children, are most susceptible to ingesting lead-based paint because of how their mobility evolves – from rolling around on the ground, to learning to crawl, to learning to prop oneself up, to being able to stand, to walking.

100.    Children are more prone to placing things in their mouth, so the dust that might accumulate on a friction surface can easily find its way to a child's hand and mouth sooner than it would an adult.

101.    To compound matters, lead-based paint chips have a sweet taste, so that if a child puts one in his mouth, he will likely enjoy the taste and is prone to do it repeatedly.

102.    Unlike polio, chickenpox, and the flu, there is no vaccine for lead poisoning. There is also no cure. Once a child ingests a certain amount of lead he will be lead poisoned. And even if the lead is flushed from his body, the poisoning that occurs is irreversible.

103.    Hundreds of thousands of individuals, including the most susceptible to lead-poisoning, children under the age of seven, have needlessly been exposed to lead-based paint and lead-based paint hazards for at least five years as a result of defendants' complete failure in

inspecting and remediating its residences, and in those instances where inspections and remediation (allegedly) took place, in their failure to use certified inspectors and licensed workers.

104.    New York City Public Housing consists of roughly 178,000 apartments, which are home to approximately 400,000 individuals.

105.    Despite New York City's ban of lead-based paint in 1960, it is unsafe to assume that any building built after 1960, but before 1978, is lead-safe, because New York City is known for informal retailing of banned chemicals.

106.    Defendants have made this assumption and have failed to inspect residences built between 1960 and 1978 on the false assumption that apartments in these buildings are lead-free.

LAWS, REGULATIONS & REQUIREMENTS

*Federal Laws*

A.    The Lead-Based Paint Poisoning Prevention Act of 1971

107.    In 1971, Congress enacted the Lead-Based Paint Poisoning Prevention Act ("LPPPA"), 42 U.S.C. Chapter 63, §§ 4821 *et seq.*, to require reduced levels of lead in paint in federally financed and subsidized housing and to fund screening and research programs.

108.    In 1973, the LPPPA was amended to require HUD to take steps to eliminate the hazards of lead-based paint in federally financed and subsidized housing.

109.    HUD adopted several implementing regulations, the current versions of which appear in 24 C.F.R. parts 35, 570, 882, 887, 905, 965 and 968.

110.    Implementing 1976 amendments to the LPPPA, the Consumer Product Safety Commission ("CPSC") banned the sale of lead-based paint effective February 27, 1978, with

certain exceptions for industrial, agricultural and other paints supplied in containers with specified warning labels.

111.    Lead-containing paint was defined as any coating material with a lead content in excess of 0.5% by weight of its nonvolatile content or the dried film, but by operation of 42 U.S.C. § 4841(3)(B) was changed to .06% when the CPSC did not determine that a higher level was safe.

112.    In April 1990, HUD published "Interim Guidelines" for hazard identification and abatement of lead-based paint in Public and Indian Housing Programs assisted under the Comprehensive Improvement Assistance Program ("CIAP").

113.    The Interim Guidelines contained extensive requirements and also valuable information about methods and technologies. Among the guidelines were testing methods and equipment, qualifications and training of abatement contractors and workers, abatement choices and methods, worker protection, cleanup and disposal.

114.    To the extent defendants have been and are required to follow the mandates contained in LPPPA, they have aggressively and needlessly failed. Their failures have caused a deprivation of rights amongst and harm to plaintiffs and the Class.

B.    Title X and the Residential Lead-Based Paint Reduction Act of 1992

115.    In 1992, Congress made significant revisions in the federal response to lead poisoning via Title X of the Housing and Community Development Act of 1992 ("Title X"), an omnibus housing bill.

116.    Title X has several key components: amendments to the Lead Poisoning Prevention Act of 1971, 42 U.S.C. Chapter 63, §§ 4821 - 4846; the addition of a new chapter, the "Residential Lead-Based Paint Hazard Reduction Act," ("RLBPHRA") 42 U.S.C. Chapter 63A,

§§ 4851 - 4856; and the addition of a new Title IV, entitled "Lead Exposure Reduction," to the Toxic Substances Control Act ("TSCA") at 15 U.S.C. §§ 2681 et seq.

117.    Title X imposes, among other things, specific requirements and deadlines on federally owned, insured and assisted housing relating to the prevention and abatement of lead-based paint hazards.

118.    Title X extends existing federal lead-based paint regulations to all housing units which receive more than $5,000 in assistance under any federal housing or community development program (§ 1012), and in some cases less than $5,000.

119.    All federal housing is subject to Title X's requirements, together with any state and local requirements that may be imposed (§ 1021).

120.    Only a few provisions of Title X, however, directly imposed requirements for most private housing (although there are indirect components, such as, e.g., training requirements for certified lead abatement contractors).

121.    Section 1018, codified at 42 U.S.C. § 4852d, imposed lead-based paint disclosure and warning requirements at the time of the sale **or rental** of the vast majority of pre-1978 housing units.

122.    TSCA § 406, codified at 15 USC § 2686, requires certain warning notices prior to renovations; TSCA § 402, codified at 15 USC § 2682(c), requires guidelines for the conduct of renovation and remodeling activities where there is a risk of lead exposure.

i.    Amendments to the Lead Paint Poisoning Prevention Act

123.    Title X inserted a number of amendments to the LPPPA.

124.    Formerly, 42 U.S.C. § 4822(a) had required, for housing constructed or substantially rehabilitated prior to 1978 covered by an application for mortgage insurance or

housing assistance payments under a HUD administered plan, that the Secretary of HUD to establish "appropriate measures to eliminate as far as practicable immediate hazards due to the presence of accessible intact, and not intact interior and exterior painted surfaces that may contain lead in any such housing where a child who is less than 7 years of age resides or is expected to reside."

125.    Sections 1012 and 1013 to Title X inserted a series of more specific minimal requirements for risk assessment, interim controls, inspection, reduction of lead-based paint hazards, and abatement, depending, among other things, on the level of expenditures, the type and age of the housing, and the federal program involved.

126.    A comprehensive set of revisions to the regulations concerning these provisions was issued on September 15, 1999, most of which took effect on September 15, 2000.

127.    Section 1012 to Title X also inserted amendments in a number of other laws concerning housing and related subjects, such as 42 U.S.C. § 5305(a) (Community Development Block Grants) and 42 U.S.C. § 1437f(c)(2)(B) (Section 8 Rental Assistance programs), linking them to the requirements and programs in the LPPPA and RLBPHRA.

ii.    Residential Lead-Based Paint Hazard Reduction

128.    In addition to the amendments to the LPPPA discussed above, Title X added an entirely new law, the Residential Lead-Based Paint Hazard Reduction Act ("RLBPHRA"), codified in Chapter 63A to 42 U.S.C., §§ 4851 - 4856.

129.    Section 1018, codified at 42 U.S.C. § 4852d, required EPA to issue regulations requiring that every seller and lessor of "target housing" (generally, pre-1978 housing dwellings, meet several requirements for the benefit of the buyer or tenant.

130.    Contracts for purchase or sale of any interest in target housing must contain a warning statement and a statement signed by the purchaser or tenant that evidences compliance with the requirements of the RLBPHRA, including disclosure of known lead hazards.

131.    Treble damages, attorneys' fees and civil penalties are provided for violations.

132.    Another provision, § 1017, codified at 42 U.S.C. § 4852c, required HUD to issue guidelines for lead-based paint hazard evaluation and reduction activities applicable to all federally supported work involving risk assessments, inspections, interim controls, and abatement of lead-based paint hazards. The HUD Guidelines for the Evaluation and Control of Lead-Based Paint Hazards in Housing were issued in 1995, and revised in 1997.

iii.    Amendments to the Toxic Substances Control Act

133.    Title X also amended the Toxic Substances Control Act ("TSCA" - 15 U.S.C. §§ 2601 et seq.) by adding a new Title IV, entitled "Lead Exposure Reduction," found at 15 U.S.C. §§ 2681 et seq.

134.    Section 401 (15 U.S.C. § 2681) contains extensive definitions, including a definition of "lead-based paint" as any surface coating containing in excess of 1.0 milligram per centimeter squared ("mg/cm2") or 0.5% by weight or such lower levels in target housing as may be established by HUD or for other coatings by the federal Environmental Protection Agency ("EPA").

135.    Section 402 (15 U.S.C. § 2682), "Lead-based paint activities training and certification," mandated the EPA, in consultation with the Department of Labor, HUD and the National Institute for Occupational Safety and Health ("NIOSH"), to issue regulations requiring training and accreditation of individuals engaged in "lead-based paint activities" and that all risk

assessment, inspection and abatement activities performed in "target housing" be performed by trained, certified contractors.

136.    TSCA § 402 also required the EPA to promulgate guidelines and eventually adopt regulations to govern renovation and remodeling activities in target housing that may create lead exposure risk.

137.    TSCA § 403 (15 U.S.C. § 2683) ("Identification of Dangerous Levels of Lead") directed the EPA to promulgate regulations "for the purposes of this title and the [RLBPHRA]" defining lead-based paint hazards, lead-contaminated dust, and lead contaminated soil.

138.    TSCA § 405 (15 U.S.C. § 2685) created a mandate to the EPA and other federal departments and agencies, among other things, to engage in public education and outreach activities "to increase public awareness" of lead poisoning, targeted to, among others, homeowners, landlords, the residential real estate industry, and the home renovation industry.

139.    TSCA § 406 (15 U.S.C. § 2686) required the creation of a lead hazard information pamphlet, which is to be distributed in a number of contexts, including during renovation of target housing (15 U.S.C. § 2686(b)), and as part of real estate transactions.

140.    To the extent defendants have been and are required to follow the mandates contained in Title X, they have aggressively and needlessly failed. Their failures have in part caused a deprivation of rights amongst and harm to plaintiffs and the Class.

C.    Federal Regulations

    i.    Worker Certification (TSCA § 402 Regulations)

141.    Lead-based paint activities are defined in § 402(b) (15 U.S.C. § 2682(b)) as "in the case of target housing [i.e., pre-1978], risk assessment, inspection, and abatement" and in the case of "pre-1978 public buildings, commercial buildings, bridge, or other structures,

26

identification of lead-based paint and materials containing lead-based paint, de-leading, removal of lead from bridges, and demolition."

142.     The EPA regulations were published August 29, 1996, 61 Fed. Reg. 45778, and are found in 40 C.F.R. Part 745, Subpart L (§§ 745.223-745.238). They began to go into effect on August 28, 1998, although certain provisions were phased in after that time. The regulations became fully effective in New York State on March 1, 2000. 64 Fed. Reg. 42849.

143.     Under TSCA § 404 (15 U.S.C. § 2683), states were given permission to administer and enforce § 402 if the EPA Administrator approved the state program, otherwise the EPA would handle the administration.

144.     While a number of states have now set up such programs, New York is not among them.

145.     The regulations not only control the certification of persons engaged in lead-based paint activities, but set fairly exacting standards for the activities themselves. See, e.g., 40 C.F.R. § 745.227 ("Work-practice standards for conducting lead-based paint activities: target housing and child-occupied facilities").

ii.     Identification of Dangerous Levels of Lead (TSCA § 403 Regulations)

146.     Although TSCA § 403 required the EPA to issue regulations within 18 months, the EPA took considerable time to promulgate these regulations.

147.     In 1995, the EPA issued an interim "Guidance on Identification of Lead-based Paint Hazards," published in the federal register on September 11, 1995 at 60 Fed. Reg. 47248.

148.     It defined lead-based paint hazards as any deteriorated lead-based paint, or lead-based paint on friction, impact, or chewable surfaces (60 Fed. Reg. 47249-50). Lead dust hazards were defined as 100 micrograms per square foot (".tg/ft2") – about the size of a grain of coffee

sweetener – on bare floors (there was no standard for carpeted floors), 500 .tg/ft2 on window sills, 800 .tg/ft2 on window wells or troughs. 60 Fed. Reg. 47250.

149.    Proposed regulations were issued in 1998, 63 Fed. Reg. 30302, and final regulations were published in the federal register on January 5, 2001, at 66 Fed. Reg. 1205-1240, and became effective March 6, 2001, codified at 40 C.F.R. 745 Subpart D, § 745.65.

150.    The final regulations set more stringent dust clearance levels: 40 .tg/ft2 on floors (including carpeted floors), 250 .tg/ft2 on windowsills, 400 .tg/ft2 on window wells or troughs. 40 C.F.R. § 745.65(b).

151.    Lead-paint hazards are defined as "Any ... deteriorated lead-based paint in any residential building or child-occupied facility," 40 C.F.R. § 745.65(a)(4), all lead-paint on friction surfaces, where subject to abrasion and dust levels exceed standards, § 745.65(a)(1), damaged lead-based paint caused by impact from a related building component, § 745.65(a)(2), and chewable lead-based painted surfaces with evidence of teeth marks. § 745.65(a)(3).

152.    The TSCA § 403 regulations themselves state that "nothing in this subpart requires any persons to evaluate the propert(ies) for the presence of lead-based paint hazards or to take any action to control these conditions if one or more of them is identified." 40 C.F.R. § 745.61. However, in the commentary to the regulations, the EPA "strongly recommends that property owners or other decision makers take appropriate actions to reduce or eliminate hazards."

153.    The EPA also notes in the commentary that "the standards are intended to identify dangerous levels of lead, not housing that is free from risks associated with exposure to lead" (66 Fed. Reg. 1211) and that "lower levels are not risk-free and may in individual cases present significant risks." (66 Fed. Reg. 1232).

154.    Thus, the TSCA § 403 regulations certainly constitute guidance as to appropriate actions to be taken, but are not necessarily determinative of the absence or presence of the risks of lead hazards and the appropriateness of a property owner's actions. Indeed, of late there has been a push among researchers for most stringent dust clearance levels.

iii.    Pre-Renovation Warnings and Repair Renovation Regulations

155.    As required by TSCA § 406, the EPA issued regulations that became effective June 1, 1999, 40 C.F.R. 745 Subpart E (§ 745.80 et seq.), requiring the distribution of lead hazard information prior to commencing renovation work.

156.    The rules apply where work is done that disturbs over two square feet of painted surfaces, and require renovators, no more than 60 days prior to beginning work, to give the owner of the unit the EPA lead pamphlet on lead hazards (see page 20), **and the adult occupant** of the unit. **If work will be performed in common areas, the renovator must ensure that each unit is notified, and make the pamphlet available**.

157.    Although TSCA § 402 required the EPA to promulgate regulations by April 1994 concerning renovation and remodeling work that may create a risk of exposure to lead paint, these regulations were not issued until April 22, 2008. 73 FR21692.

158.    These regulations have been phased in by stages beginning June 23, 2008, and did not fully come into effect until April 22, 2010. However, as a result of an August 2009 settlement in litigation brought by the Sierra Club, the New York City Coalition to End Lead Poisoning, and others, the EPA amended the regulations effective July 6, 2010.

159.    The regulations apply to target housing and child-occupied facilities (i.e. other buildings regularly used by children age six and under).

160.    The EPA has established requirements for training renovators and dust sampling technicians; certifying renovators, dust sampling technicians, and renovation firms; accrediting providers of renovation and dust sampling technician training; and renovation work practices.

161.    The training programs began to go into effect on June 23, 2008 and firms could begin applying for certification on October 22, 2009.

162.    Effective April 22, 2010, in target housing and child-occupied facilities, no firm may perform, offer, or claim to perform renovations without EPA certification for repair and renovation activities and must comply with the work practice standards under this rule. In New York City public housing, this has occurred in less than 20% of the time all repairs and renovations have taken place involving the presence of lead-based paint hazards.

163.    These include provisions for occupant protection, warning signs, work area isolation, requirements for removing or sealing furnishings and other items in the work area, and other measures to restrict the dispersal of leaded dust.

164.    Certain work practices are prohibited (such as open flame burning of leaded paint, sanding, grinding, etc. of leaded paint (unless a HEPA exhaust control is used), waste controls, cleanup requirements, post-renovation cleaning verification, and record keeping.

iv.    Lead Disclosure

165.    On March 6, 1996, HUD and the EPA promulgated joint regulations entitled "Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazards in Housing" ("Lead Disclosure Rules").

166.    The effective dates of the Lead Disclosure Rules were September 6, 1996, for owners of buildings containing more than four residential dwelling units, and December 6, 1996, for owners of one to four units.

167. The regulations require the lessor to make the following disclosures before the lessee becomes legally bound under the lease. The lessor must:

- Provide the lessee a copy of the EPA pamphlet Protect Your Family From Lead in Your Home (EPA 747-K-94-001), or an equivalent pamphlet that the EPA has approved for use in the situs state;

- Disclose to the lessee the presence in the housing of any lead-based paint or lead-based paint hazards, defined as conditions that cause exposure to lead from lead-contaminated soil or dust, or from any lead-contaminated paint that has deteriorated or is present in accessible surfaces, friction surfaces or impact surfaces that would result is adverse human health effects;

- Disclose to the lessee any additional information available concerning the known lead-based paint or lead-based paint hazards, such as the basis for the conclusion that lead-based paint or lead-based paint hazards are present, the location of any such paint or hazards, and the condition of the paint; and

- Provide the lessee with any records or reports available to the lessor pertaining to lead-based paint or lead-based paint hazards, not only in the rental unit, but also in common areas. In multifamily housing, the lessor must also provide reports and records about paint and hazards in other units, if the information was part of an evaluation or reduction of paint and hazards in the project as a whole.

168. These disclosures have universally been ignored as to public housing tenants in the City of New York.

169. The regulations also oblige lessors' agents to inform lessors of their disclosure obligations and to ensure that they comply with them.

170. Every lease must also include a Lead Warning Statement with the following language:

171. Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.

172.    The lease must also contain a statement by the lessor disclosing the presence of any lead-based paint or lead-based paint hazards, or indicating that the lessor does not know of any such paint or hazards. It must also list any records or reports on lead-based paint or lead-based paint hazards that the lessor has provided to the lessee, or state that no such records or reports are available. The lease must also contain a statement by the lessee affirming receipt of this information and of the EPA-approved pamphlet.

173.    While defendant NYCHA has a pattern and practice of conducting repairs, renovations and remediation in its units after one tenant moves out and before another moves in, no such statements regarding the work appears in leases executed by new tenants, and NYCHA has universally failed to provide any records of such work to new tenants at the commencement of their tenancy.

174.    The regulations provide exemptions for leases of housing previously found to be lead-free by a certified inspector, short-term leases (100 days or less) where no renewal or extension can occur, and renewals of leases where the lessor has previously made the required disclosures and has not obtained any new information that must be disclosed.

175.    NYCHA routinely uses inspectors that are not certified.

176.    Section 1018 also provides for a number of enforcement mechanisms, including penalties and injunctions although violation does not void leases. **The statute expressly creates a private right of action**. Knowing violators are liable to lessees for treble damages, and that liability can extend to agents; the court can also award a prevailing lessee costs, reasonable attorneys' fees, and expert witness fees; the courts can also impose up to $10,000 in civil and/or criminal penalties and up to one year in jail.

v.    HUD Regulations (24 C.F.R. Part 35)

177.    On September 15, 1999, pursuant to §§ 1012 and 1013 of the RLBPHRA of 1992, HUD issued a comprehensive set of regulations, "Requirements for Notification, Evaluation and Reduction of Lead-Based Paint Hazards in Federally Owned Residential Property and Housing Receiving Federal Assistance," 64 Fed. Reg. 50140, codified in 24 C.F.R. Part 35, which put virtually all of HUD's lead-based paint regulations in one part of the Code of Federal Regulations. The new requirements took effect on September 15, 2000. HUD estimated that about 2.8 million housing units would be affected by the regulations during their first five years.

178.    The regulations set hazard reduction requirements that gave much greater emphasis than prior regulations to reducing lead in house dust. The new regulations require dust testing after paint is disturbed to make sure the home is lead-safe. However, the specific requirements depend on a host of factors, including whether the housing is being disposed of or assisted by the federal government, the type and amount of financial assistance, the age of the structure, and whether the dwelling is rental or owner-occupied. The housing categories covered include:

- Federally-owned housing being sold;

- Housing receiving a federal subsidy that is associated with the property, rather than with the occupants (project-based assistance);

- Housing where the tenant is receiving federal rental assistance, such as Section 8 assistance.

179.    Under 24 C.F.R. § 35.150(b), "local laws, ordinances, codes or regulations governing evaluation and hazard reduction" are not only applicable, but indeed, "the more protective definition (i.e., the lower level)" shall be followed[.]"

180.    Section 8 subsidized housing must meet certain Housing Quality Standards ("HQS"), which include inspections for lead-based paint hazards by the Housing Authority and safe removal of those hazards.

181.    The Housing Quality Standards applicable to lead paint were formerly found in 24 C.F.R. § 882.109(I), and there were requirements for initial inspection, § 822.209(h)(1) and periodic inspection, § 882.211(b). These provisions have been significantly re-codified over the past few years, see 60 Fed. Reg. 34695, and are now found in 24 C.F.R. § 982.401.

182.    A tenant enters into a Section 8 lease with the landlord, and the landlord in turn enters into a Housing Assistance Payment ("HAP") contract with NYCHA. The Section 8 lease will contain requirements that the landlord maintain the property in accordance with federal, state, and local laws and regulations.

183.    In addition, the HAP contract will mandate that the landlord maintain the premises in accordance with the Section 8 regulations. Thus, the Section 8 landlord has both regulatory and statutory obligations with respect to lead paint in the premises.

184.    To the extent defendants have been and are required to follow mandates contained in these Federal Regulations, they have aggressively and needlessly failed. Their failures have in part caused a deprivation of rights amongst and harm to plaintiffs and the Class.

_New York State Laws_

A.    _Overview_

185.    In 1970, in an effort to limit the lead poisoning epidemic, the State legislature enacted Title X of Article 13 of the Public Health Law (codified at PHL § 1370 et seq.), declaring:

> *The occurrence of the disease of lead poisoning in children has become a*
> *major public health concern. Severe lead poisoning cases result in death or*

> *mental retardation. It is estimated that children in our nation with abnormally high blood levels of lead number in the hundreds of thousands. Many thousands of children in the cities of our state are actual or potential victims of lead poisoning. The disease of lead poisoning is most prevalent in areas of old and deteriorating housing where leaded paint and plaster in a peeling condition is accessible for ingestion by young children.*
>
> *Lead poisoning is a disease which will require the concerted efforts of public health agencies and other agencies concerned with the availability of healthful housing for the people of our state before the disease can be brought under control and its incidence reduced.*

McKinney's PHL § 1370, Historical and Statutory Notes.

186.    Despite these noble sentiments, a quarter of a century later, New York City Department of Health ("NYSDoH") data indicated that in 1994 – while only 42% of children under age 3 were screened – some 17,741 children under 3 years of age had blood lead levels of 10 ug/dL or above. NYSDoH, Maternal, Child and Adolescent Health Profile, New York State 1995; New York State Lead Poisoning Prevention Advisory Council, 1998 Report for the Program Years 1995-1996. The actual number of children under six who had elevated blood levels was … much higher, as only "31 percent of the State's 1.5 million children under 6" were tested for lead in 1994. DHCR, Consolidated Plan: Federal Fiscal Years 1996-1997 at 73.

187.    Soon after Title X was enacted, in Graham v. Wisenburn, 70 Misc.2d 492, 334 N.Y.S.2d 79 (S. Ct. Albany Co. 1972) rev'd, 39 A.D.2d 334, 336, 334 N.Y.S.2d 81 (3d Dep't 1972) an Albany family with lead poisoned children used it as the basis for obtaining an injunction to force their landlord to correct lead hazards (hazards he admitted were present).

188.    The Third Department swiftly reversed, holding that Title X gave health officials enforcement powers "but add[ed] nothing to the rights of a private party to force landlords into action." 39 A.D.2d at 336.

189.    The following year, an Albany group brought an Article 78 to compel the county and state health commissioners to designate certain areas as "high risk," inspect housing for lead hazards, and administer blood lead tests pursuant to Title X.

190.    In Community Action Against Lead Poisoning v. Lyons, 72 Misc. 2d 662, 340 N.Y.S.2d 422 (S. Ct. Albany Co. 1973), rev'd, 43 A.D.2d 201, 350 N.Y.S.2d 812 (3d Dep't 1974), aff'd, 36 N.Y.2d 686, 366 N.Y.S.2d 409 (1975) the same justice as in Graham declared the provisions of Title X were mandatory, only to be reversed once again by the Third Department, which found the enforcement of Title X committed to the judgment and discretion of the health departments.

191.    Clearly, state law had not been as effective as had been hoped. In 1992, the legislature enacted the Lead Poisoning Prevention Act, amending PHL Title X and declaring that:

> *Lead is the number one environmental poison for children and lead poisoning is still one of the most prevalent and preventable childhood health problems in New York State today. Despite advances in reducing or eliminating lead from paint and gasoline, little progress has been made in limiting childhood exposure to leaded paint from the interior and exterior of older housing.*

McKinney's PHL § 1370-a, Historical and Statutory Notes.

192.    Yet while the amendments improved the mechanisms for blood lead screening, PHL Title X still largely remains a "secondary prevention" health policy — i.e., one that waits until a child is identified as lead poisoned before requiring environmental intervention – rather than a "primary prevention" policy (mandating intervention before a child is lead poisoned).

B.    Public Health Law Title X ("Control of Lead Poisoning") of 1970

193.    Effective September 1, 1970, PHL § 1372 banned the application of leaded paint on the interior surfaces, windowsills and frames, and porches of dwellings. Dwellings included childcare facilities, kindergartens and nursery schools. PHL § 1370(1).

194.    The manufacture or sale of lead painted children's toys and furniture were also banned by PHL §1371. The definition of "leaded paint" was first set at 1% by weight in 1970, reduced to .5% in 1977, and further reduced to .06 % in 1992.

195.    PHL § 1370(2) provided the State Commissioner of Health or local county health department and housing code enforcement agencies (pursuant to § 1375) the power (although not the mandate) to designate areas of one or more dwellings with paint "conditions conducive to lead poisoning" (defined as lead paint that was accessible for ingestion or peeling or chipping, § 1371(3)) as "high risk" and, under § 1373(1), the power (but apparently not the obligation) to order the removal of the hazardous conditions.

196.    Lead paint in this context is defined in § 1373(2) as .5% by weight, although the implementing regulations create a presumption that the paint is .5% lead by weight if X-ray fluorescence ("XRF") testing indicates 1.6 mg/cm2 (or 2.0 mg/cm2 without substrate correction). 10 NYCRR § 67-2.4(a).

197.    PHL § 1373(3) and (4) provide enforcement mechanisms for the health department, as well as § 1373, which grants the health department the power to seek appointment of a receiver should the owner not comply. Assuming a health department order has issued, § 1373(5) provides that even if the landlord removes the tenant, the obligation to remove the cited lead hazards continues.

198.    To the extent defendants have been and are required to follow the mandates contained in Public Health Law Title X, they have aggressively and needlessly failed. Their failures have in part caused a deprivation of rights amongst and harm to plaintiffs and the Class.

C.    Lead Poisoning Prevention Act of 1992 Amendments to Title X, and Implementing Regulations

199.    The amendments to PHL Title X in 1992 included various requirements for lead screening of children and reporting of the results (§§ 1370-a(2), 1370-c, 1370-d, and 1370-e) and the establishment of a Lead Poisoning Prevention Program ("LPPP") within the Department of Health (§ 1370-a(a)), which would promulgate and enforce regulations for Title X. An advisory council on lead poisoning prevention was established. § 1370-b.

200.    Under § 1370-c, all physicians or other authorized practitioners who provide medical care to children or pregnant women must screen children (or refer them for screening) at the intervals and using the methods established by the LPPP's regulations.

201.    The regulations require mandatory screening at 12 and 24 months of age, and at each well-child visit or at least annually if at risk. 10 NYCRR § 671.2.

202.    Prenatal health care providers are also required to provide pregnant women guidance on lead poisoning prevention and assess them for risk of exposure; if at risk, they too must be screened. 10 NYCRR § 67-1.5.

203.    Hospitals, health care facilities, HMOs, clinics and similar facilities that serve children must ensure that their patients are screened, and the practitioner must give a certificate of screening to the child's parent or guardian. § 1370-c.

204.    PHL § 1370-d requires that child care providers, public and private nursery schools and preschools must – prior to or within three months after initial enrollment of a child under age six – obtain from the child's parent or guardian evidence that the child was screened

for lead. If there is no such evidence, the institution must provide the parent with information of lead poisoning and refer the parent or guardian to a primary care provider or local health department for screening. Implementing regulations are at 10 NYCRR § 67-1.4.

205.    PHL § 1370-e mandates that doctors, hospitals, and clinics report elevated blood lead levels (defined in PHL § 1370(6) as 10 ug/dL or above) to the local health department. Laboratories that analyze blood samples for lead are required to report all results to the local and state health departments. Using this data, under § 1370-a(2)(c) the LPPP is required to establish a statewide registry of children with elevated blood lead levels, to be maintained as confidential except for disclosures for medical treatment purposes or of non-identifying epidemiological data.

206.    Pursuant to 10 NYCRR § 67-1.2(a)(9), when children have blood lead levels at 20 ug/dL or over, a referral must be made to the local health department for environmental management.

207.    Under 10 NYCRR§ 67-2.3, upon receipt of such referral, the local health department must perform an environmental investigation of the child's dwelling, child care facility, and other areas where the child spends significant amounts of time.

208.    The methods for paint sampling are specified in 10 NYCRR § 672.4.

209.    If the health department finds a "condition conducive to lead poisoning" exists in the dwelling, it may order its abatement under 10 NYCRR § 67-2.6, to the extent and using such methods as the health department orders.

210.    The owner must comply with any federal, state or local laws concerning worker health and safety, disposal of lead-containing wastes, and housing, and provide documentation upon request as to compliance. Id.

211.    10 NYCRR § 67-2.7 specifies certain work practices for control of lead dust during abatement and post-abatement cleanup, as well as additional provisions the health department can specify, as well as methods of abatement.

212.    To the extent defendants have been and are required to follow the mandates contained in the Amendments, they have aggressively and needlessly failed. Their failures have in part caused a deprivation of rights amongst and harm to plaintiffs and the Class.

*New York City Laws*

A.    Overview

213.    Compared to New York State, New York City has had a far more extensive body of local laws, health codes, and regulations concerning lead paint and lead poisoning prevention, and an even more extensive body of case law.

214.    These laws underwent a major revision in 1999, via Local Law 38, ("LL38") and further revisions in 2003 and 2004 as a result of litigation and the enactment of the New York City Childhood Lead Poisoning Prevention Act of 2003, known as Local Law 1 of 2004 ("LL1/2004").

B.    Local Law 1 of 2004

215.    LL1/2004 is the operative law that presently dictates requirements regarding lead-based paint and lead-based paint hazards within the city.

216.    LL1/2004, as well as prior versions of Local Law 1, defines dry scrapping or sanding of lead-based paint or paint of unknown lead content in any dwelling unit as a public nuisance and a condition dangerous to life and health.

217.   LL1/2004, went into effect on August 2, 2004, repealing Local Law 1 of 1982 ("LL1/1982") and Local Law 50 of 1972 ("LL 50 of 1972") (the latter essentially re-codified as § 27-2056.14), and formally repealing as well the already invalidated LL38 of 1999.

218.   The major portion of LL1/2004 is contained in a new Article 14 ("Lead Poisoning Prevention and Control") added to the Housing Maintenance Code ("HMC") (Subchapter 2 of chapter 2 of title 27 of the Administrative Code).

219.   In addition, HPD promulgated implementing regulations (City Record, July 2, 2004, at 2611-2616), codified in 28 R.C.N.Y. Chapter 11, and the Board of Health revised various provisions of the Health Code (City Record, July 30, 2004, at 30893095) that concern lead paint to harmonize with LL1/2004.

220.   While it would be perhaps easiest to characterize LL1/2004 as a middle ground – in some ways narrower than LL1/1982 but broader than LL38 – it is important to note the preliminary statement of findings and purposes, which, in explaining that the approach of this act, signaled a major philosophical shift from the prior laws.

221.   While LL1/2004 does not require LL1/1982's full abatement, it does continue LL1/1982's mandate that owners maintain a safe dwelling at all times, using their knowledge of the particular characteristics of the buildings they manage.

222.   The overall approach of LL1/2004 recognizes that if landlords are to be permitted to leave some lead paint in place, they must proactively assure that the lead paint is kept in a condition that is not hazardous to the occupants. And more specifically, it requires that any work involving repairs or disturbance of lead paint – including activities that in and of themselves are not intended to remediate lead paint but nonetheless will disturb it (such as major plumbing or

electrical repairs that involve opening up large sections of a lead-painted wall) – may only be done by properly trained personnel using safe work practices.

223.    In sum, under LL1/2004 it is the landlord's continuing duty to assure that a dwelling where a young child resides is safe from lead hazards, and to use professional judgment in assuring so, depending on the conditions of the dwelling and building.

224.    Unlike either LL1/1982 or LL38 of 1999, this standard of care is de-coupled from the standards that guide the City's code enforcement actions when there is a problem landlord; as to the latter, clear uniform standards are set, with defined violations and defined timeframes for enforcement.

    i.    Definitions

225.    LL1/2004 and its implementing regulations introduced many new defined terms that were not utilized in prior New York City lead laws. Most importantly, it included "lead-contaminated dust," (Admin. Code § 27-2056.2(8), 28 R.C.N.Y. § 11-01(u)) which is the major pathway of lead poisoning in children, and unlike LL38, subsumes lead-contaminated dust within the definition of a "lead-based paint hazard." (§§ 27-2056.2(6), 11-01(s))

226.    The definition of a lead-based paint hazard is itself broader than that in LL38: it comprises basically any condition that causes environmental exposure to lead from paint, rather than just peeling paint. Id.

227.    Moreover, it indicates various areas where lead-based paint hazards are likely to exist, such on a "Chewable Surface," "Friction Surface," and an "Impact Surface."

228.    It also provides a definition for an "underlying defect" and redefines a "deteriorated subsurface."

229.    Since under LL1/2004 landlords are responsible for lead-based paint hazards in the common areas of a child-occupied multiple dwelling, the "Common Area" is defined as "a portion of a multiple dwelling that is not within a dwelling unit and is regularly used by occupants for access to and egress from any dwelling unit within such multiple dwelling" (§27-2056.2(2), see also 28 R.C.N.Y. § 11-01(f)).

230.    Other new terms include "Remediation" or "Remediate" and "encapsulation."

231.    Remediation was defined as: "the reduction or elimination of lead-based paint hazard through the wet scraping and repainting, removal, encapsulation, enclosure or replacement of lead-based paint approved by the commissioner of health and mental hygiene."

232.    Encapsulation was defined as: "the application of a covering or coating that acts as a barrier between the lead-based paint and the environment and that relies for its durability on adhesion between the encapsulant and the painted surface, and on the integrity of the existing bonds between paint layers and between the paint and the substrate." 28 R.C.N.Y. § 11-02(l).

233.    Since 2012, defendants have an institutional scheme and practice of not engaging in wet scraping as part of their minimal remediation efforts in public housing, most of which were undertaken by unqualified and unlicensed workers.

ii.    Applicability, Child of Applicable Age

234.    In general, LL1/2004 applies to Multiple Dwellings (buildings with 3 or more units) built before 1960 (or 1978 if the landlord is aware of the presence of lead paint) in units where a "child of applicable age" resides, and common areas of those buildings.

235.    There are several limited circumstances where some provisions of LL1/2004 apply to non-multiple dwellings; in particular, the provisions concerning the City's responses to

a lead poisoned child, and the requirements at turnover of a rental property that will not be occupied by the owners' family.

236.    Co-ops and condos are treated essentially as non-multiple dwellings when occupied by the condo unit owner or the proprietary leaseholder, or their immediate families. § 27-2056.15(c); 28 R.C.N.Y. § 11-12.

237.    There is also an emergency provision in LL1/2004 for actions "immediately necessary to safeguard against imminent danger to human life, health or safety or to protect property from further major damage," – that is, structural collapse or fires – but even in those circumstances occupant protections are required to the extent possible, and the exception is only during the immediate emergency.

238.    The age of children protected by LL1/2004 is referred to throughout as "a child of applicable age." Section 27.2056.18 defines this as a child "'under seven years of age' (as in LL1/1982) for at least one calendar year from the effective date" (i.e., August 2, 2004) of LL1/2004; see also 28 R.C.N.Y. §11-01(b), after which the Board of Health could redefine the "applicable age" to mean less than six years of age, but no lower.

239.    By a resolution adopted on March 16, 2006, the Board of Health lowered the applicable age to less than six years, effective October 1, 2006. See Health Code §173.14(b) (Definitions: "Child of applicable age").

iii.    Owners' Responsibility to Remediate

240.    LL1/2004 § 27-2056.3 (and 28 R.C.N.Y. §11-02) make the landlord responsible not only to promptly remediate lead hazards, but also to prevent the reasonably foreseeable occurrences of lead-based paint hazards.

241.    This responsibility only applies to multiple dwelling units where a child of the applicable age resides (and common areas of such buildings). § 27-2056.3

242.    The landlord also has a duty to remediate any underlying defect causing a lead-based paint hazard. Id., see also 28 R.C.N.Y. § 11-02.

243.    The owner must always use the specific safe work practices required in § 27.2056.11 and 28 R.C.N.Y. § 11-06 whenever removing lead hazards, or indeed, whenever disturbing lead paint or paint of unknown lead content.

244.    An owner can be exempted from the responsibility to remediate lead dust if DHMH determines, pursuant to §27-2056.10(c)(6), that the lead dust on an area (such as on a window) is not caused by a source within the landlord's control, although DHMH may nonetheless order an abatement of the dust. Health Code § 173.13(d)(1).

iv.    Owners' Responsibility to Notify and Investigate

245.    Sections 27-2056.4 and 11-04(a) provide that in a child-occupied units in multiple dwellings erected before 1960 (or before 1978 where the landlord knows of the presence of lead-based paint), the landlord must investigate for lead hazards such as peeling paint, chewable surfaces, deteriorated subsurfaces, friction surfaces, and impact surfaces at least once a year.

246.    Unlike LL38, under LL1/2004 the owner may be obligated to conduct an investigation more frequently, such as when he or she knows (or should know) of a condition that is reasonably foreseeable to cause a lead-based paint hazard, when an occupant makes a complaint or requests an inspection, or when the owner receives a notice of violation or is ordered to correct a lead-based paint hazard.

247.    Unlike LL1/1982, the presence of lead paint in a child-occupied dwelling is not per se illegal, but if a landlord chooses not to permanently abate it, the landlord is continually obligated to assure that it is not in a hazardous condition.

248.    LL1/2004 makes it the owner's responsibility to ascertain if a child of applicable age resides in a dwelling unit. §§ 272056.4(a), 11-03(b)(5).

249.    Leases must attach a rider providing information about the respective obligations of the tenants and landlords under LL1/2004, in a format approved by HPD. §§ 27-2056.4(c); 11-03(a)(1).

250.    The landlord is also required to provide tenants with a pamphlet (created by DHMH pursuant to §17-179) about the hazards of lead paint and the process by which violations of LL1/2004 are to be corrected, along with phone numbers for obtaining lead screening and for reporting unsafe work practices. §§ 27-2056.4(c); 11-03(a)(1).

251.    LL1/2004 requires that the landlord, upon signing a lease, including a renewal lease for a unit in a multiple dwelling built before 1960 (or before 1978 if it is known to contain lead paint), inquire using a standardized form whether a child of the applicable age resides or will reside in the apartment. §§ 27-2056.4(d)(1); 11-03(a).

252.    In addition, each year between January 1st and 16th, the landlord must send a notice to each occupant inquiring whether a child of applicable age resides in the apartment. §§ 27-2056.4(e)(1)(3); 11-03(b)(1), (4).

253.    The notice must be either delivered by first class mail (addressed to the occupant), by hand, enclosed with the January rent bill, (if the bill is sent between December 15 and January 16), or in conjunction with the annual window guard notice. §§ 27-2056.4(e)(2); 11-03(b)(2).

254.    If the landlord receives no response by February 15, the landlord must make reasonable attempts between February 16 and March 1 to gain access to an apartment to determine if a child of applicable age resides there; if still unsuccessful, the owner must inform DHMH. §§ 27-2056.4(e)(3)(i); 11-03(b)(5).

255.    For any investigation, the owner must provide the results to the occupant and keep a copy for ten years from the date of the report, which must be made available to HPD upon request and transferred to any successor in title.

256.    Owners who violate the notice and investigation provisions can be charged with a misdemeanor and fined up to $500 or imprisoned for up to 6 months, or both. Additionally, the owner can be subject to a civil penalty of up to $1500 per violation. § 27-2056.4(g).

v.    Turnover Requirements

257.    Sections 27-2056.8 and 11-05 provide that upon turnover of a dwelling unit in a multiple dwelling or private dwelling (if the unit is to be occupied by persons other than the owner or the owner's family) erected before 1960, the owner must: (1) remediate all lead-based paint hazards and any underlying defects; (2) make all bare floors, windowsills, and window wells smooth and cleanable; (3) remove and permanently cover all lead-based paint on all friction surfaces on all doors and door frames; and (4) remove and permanently cover all lead-based paint on all friction surfaces on all windows, or install replacement window channels or slides on all lead-based painted friction surfaces on all windows.

258.    All work performed must follow the safe work practices under § 27-2056.11(a)(3), 28 R.C.N.Y. § 11-06(g)(3), and Health Code § 173.14(e)(3).

259.    The owner must certify compliance to the new tenant. § 11-05(d).

260.    Defendants do not follow these rules, in any way whatsoever.

vi.    Presumption of Lead Paint

261.    In §27-2056.5 and 28 R.C.N.Y. § 11-07, LL1/2004 continues the rebuttable presumption of the prior laws: in any multiple dwelling erected before 1960, where a child of applicable age lives, it is presumed that the paint within the dwelling unit or the common area is lead-based paint. This presumption may be rebutted by the owner by submitting to HPD a sworn statement along with lead-based paint testing or sampling results, and a sworn written statement by the person performing the testing (who must be EPA certified) indicating that no lead-based paint exists in the dwelling unit or common area. §§ 27-2056.5(a) and 11-07(b).

262.    The owner can also apply for an exemption to the presumption if she or he has performed substantial alterations to the apartment such as removal or permanent covering of all lead-based paint in that dwelling unit. §§ 27-2056.5(b) and 11-08.

263.    Whether the proof submitted by the landlord is adequate to rebut the presumption will be decided by HPD.§§ 27-2056.5(a).

vii.    HPD Inspections

264.    For the purposes of HMC violations, §27-2056.6 defines a lead-based paint violation lead-based paint that is peeling or on a deteriorated subsurface in a unit in a multiple dwelling where a child of applicable age resides.

265.    Under §27-2056.9, HPD must inspect within 10 days after receiving a complaint regarding peeling paint, a deteriorated subsurface or an underlying defect in an apartment built before 1960 where a child of applicable age lives.

266.    If HPD is unable to gain access within the 10 days, it must make a reasonable second attempt to gain access within 5 days of the first attempt. Unlike the prior laws (which chiefly relied on the statutory presumption of lead paint), under LL1/2004 HPD inspections use

an XRF analyzer to determine whether lead-based paint is present in the apartment, except for when the XRF analysis unable to be performed during an inspection, in which case HPD can continue to rely on the §27-2056.5 presumption to issue violations.

267.    If a violation is found, HPD must serve a notice of violation on the owner within 10 additional days, along with a guide on the safe work practice regulations. In addition, notification of the violation must be sent simultaneously to the tenant, §27-2155(l)(1), § 27-2056.13, along with the phone number of DHMH for help with lead screening.

268.    Furthermore, HPD must notify DHMH when it places a violation so that DHMH can follow up with the family regarding lead screening. § 27-2056.13. (DHMH is required to assist the family with obtaining lead screening if the child is uninsured. §§ 17179 27-2056.13).

269.    LL1/2004 also added several pro-active measures in § 27-2056.9 regarding HPD enforcement. For example, when HPD receives a complaint about peeling paint, and underlying defect, or a deteriorated subsurface, HPD must make diligent efforts to ascertain whether a child of applicable age resides in the apartment, and if so, treat it as a lead paint complaint. §27-2056.9(b).

270.    In addition, § 272056.9(a) requires that when HPD enters a dwelling unit in a pre-1960 building to investigate <u>any</u> violation or complaint – whether lead-related or not – the inspector must attempt to ascertain whether a child of applicable age lives in the apartment by asking the occupant. If the answer is yes, the inspector must immediately perform a room-by-room inspection of the apartment and record whether the paint in each room is peeling or intact. If peeling paint is found, within 10 days HPD must perform another inspection using an XRF analyzer to determine whether lead-based paint is within the dwelling.

271.    Pursuant to §27-2056.10, HPD inspectors and supervisory personnel are required to be appropriately trained to EPA and HUD standards for performance of visual inspections.

272.    HPD's pattern and practice is to ignore these laws, rules, regulations and instructions.

viii.    Work Practices

273.    HPD's regulations, promulgated with the approval of DHMH, establish safe work practices owners must follow, tailored to different circumstances. §27-2056.11. See 28 R.C.N.Y. § 11-06.

274.    In general, these regulations are required to be as protective as the safety standards that already apply when a child is determined to be lead poisoned (Health Code § 173.14).

a.    Where a Violation has not been issued

275.    Even when a violation has not been issued, if an owner is performing any work in a pre-1960 building (or pre-1978 if there is known lead paint) that will disturb lead-based paint or paint of unknown lead content in an apartment where a child of applicable age lives, or in the common area of such multiple dwelling, § 27-2056.11(a)(2) requires that the work practices in § 11-06 be followed, including the occupant protection provisions in § 11-06(g)(2).

276.    Dust clearance tests must be performed at the completion of work. §§ 27-2056.11(a)(2)(i), 11-06(g)(2)(vii).

277.    Those performing the work must also, at a minimum, have completed a course on lead-safe work practices given by or on behalf of HPD, EPA, or HUD or an entity authorized to give such a course. §§ 27-2056.11(a)(2)(i), 11-06(b)(3).

278.    The landlord must provide appropriate temporary relocation to the occupants when the work cannot be performed safely §§ 27-2056.11(a)(2)(i), 11-06(g)(2)(viii), (g)(1)(ix)(E).

279.    For work that disturbs more than 100 square feet of lead-based paint or work that involves the removal of two or more windows with lead-based paint, the owner must, in addition, use only EPA certified firms. §§ 27-2056.11(a)(2)(ii), 11-06(b)(2).

280.    The owner of the premises or the firm performing the work must also file with DHMH, no less than 10 days prior to the commencement of work, so that the DHMH can perform audits of the work. §§ 27-2056.11(a)(2)(ii), 11-06(a).

281.    These work practices do not apply when the work performed disturbs surfaces less than 2 square feet of peeling lead-based paint per room or 10% of the total surface area of peeling paint on a type of component with a small surface area, such as a window sill or door frame. § 27-2056.11(a)(2)(iii).

b.    When notice of violation is issued

282.    Owners performing work in order to comply with a notice of violation or order to correct issued by the City must use the HPD work practices discussed in the prior section, and in addition, all work must be performed only by EPA certified firms. §§ 27-2056.11(a)(1); 11-06(b)(2).

c.    Work performed upon turnover

283.    Where a landlord is performing work on turnover pursuant to § 27-2056.8, lead-contaminated dust clearance tests must be performed after work is completed. §§ 27-2056.11(a)(3), 11-06(g)(3).

d.    Dust clearance tests

284.    Persons performing dust clearance tests must be third parties who are independent of the owner and any individual or firm that performs the work. §§ 27-2056.11(b), 11-06(b)(2)(iii), (3)(ii), and (4).

285.    They must have successfully completed a course approved or administered by DHMH or by the EPA or HUD and must obtain a certificate or document issued by or acceptable to DHMH. Id.

286.    All dust clearance tests sent to a laboratory for analysis must include a sworn certification that the test was performed in compliance with all applicable rules and regulations. § 27-2056.11(c).

287.    When an owner is performing work in response to a cited violation all clearance test results must be filed with HPD. § 27-2056.11(d).

288.    A copy of all dust clearance test results must be given to the occupant by the owner, and must provide a sufficiently clear explanation of the meaning of such results. §§ 27-2056.11(d), 11-06(g)(1)(ix)(D), (g)(2)(vii), and (g)(3)(iii).

289.    Work areas cannot be cleared for permanent re-occupancy until dust clearance is achieved, however, temporary access is permitted to occupants pending lab results as long as the test samples have been collected and all the required cleanup measures have been performed. § 11-06(g)(1)(ix)(D).

ix.    HPD Orders to Remediate

290.    The administrative aspects of LL1/2004 violations are chiefly set out in subdivision "l" of § 27-2115, as well as in § 27-2056.9 and 28 R.C.N.Y. §§ 11-09.

a.    Notifications of violations

291.    As noted above, HPD must serve the notice of violation on the landlord by HPD within 10 days. § 27-2056.9 (c), and simultaneously notify the tenant as well. §27-2155(*l*)(1), §27-2056.13.

b.    Time to correct

292.    Section 27-2115(l)(1) provides 21 days to correct the violation. The owner, "for good cause shown," may request a postponement by submitting a detailed, sworn statement showing it took prompt action to correct the violation but because of serious technical difficulties, was unable to obtain necessary materials, funds or labor, or was unable to gain access to the dwelling unit to make the repair. §§ 27-2115(l)(1), 11-10(b).

293.    The postponement cannot be longer than 14 days from the date set for correction in the notice of violation, and must be requested no later than 5 days before the original due date for correction. § 11-10(a).

294.    One additional postponement may be granted for no more than 14 days, but the owner must provide, in addition to a sworn statement as for the first postponement, an affidavit from an EPA certified firm that the paint or condition has been stabilized. §§ 27-2115(l)(1), 11-10(c)(1).

295.    HPD may also grant a longer postponement when one or more substantial capital improvements will be made that will significantly reduce the presence of lead-based paint within the dwelling, however the paint which is the subject of the violation be stabilized. §§ 27-2115(l)(1), 1110(c)(2).

296.    HPD must provide the owner and the occupant with a statement setting forth the reasons of each postponement or denial of postponement. §§ 27-2115(l)(1), 11-10(c)(1).

      c.      Certification of correction

297.    Each violation must be certified to HPD, in writing and under oath by the owner, registered officer or director of a corporate owner or by the registered managing agent. §§ 27-2115(l)(2), 1109(a).

298.    The certification must include a sworn statement by the person who performed the work that it was corrected in compliance with § 11-06's safe work practices. §§ 27-2115(l)(2), 11-09(a)(4).

299.    A copy of the lead dust clearance test results and the training certificate for the person taking the tests must also be included, and must be delivered to HPD by certified or registered mail, no later than 5 days after the date set for correction. §§ 27-2115(l)(2), 11-09(a)(3), (4).

300.    The date of correction for each violation must be included in the certification. HPD must then mail a copy of the certification to the complainant no more than 12 calendar days from the date HPD receives it. § 27-2115(l)(2).

301.    Failure to file the certification establishes a prima facie case that the violation has not been corrected. §§ 27-2115(l)(2), 11-09(c).

      d.      Final inspection and correction by HPD

302.    HPD must inspect conduct a final inspection to verify that the violation has been corrected within 14 days after the date set for correction. If HPD determines that the violation has not been corrected, it must correct the violations itself within 45 days of the final inspection or in a shorter time if practicable. § 27-2115(l)(3).

      e.      Removal of violation from HPD's database

303.    A violation cannot be removed from HPD's records nor will it be deemed corrected until HPD's records contain written verification that it conducted a final inspection and verified correction of the violation, and copies of lead dust clearance test results, where applicable by law, are filed.

304.    A copy of the final inspection report and the status of the violation must be mailed or delivered to the occupant and owner. § 27-2115(l)(4).

f.    Penalties for false certification

305.    A person making a false certification of correction of a violation can be subject to a civil penalty of not less than $1000 and no more than $3000 for each false certification made, recoverable in a civil action brought by HPD. § 27-2115(l)(5).

306.    The owner shall be equally responsible for a civil penalty if the person making a false certification is an employee of the owner. Id.

307.    Any person making a false certification of correction can also be guilty of a misdemeanor punishable by a fine up to $1000 or imprisonment for up to 1 year or both. Id.

g.    Penalties for owners' failure to correct a violation

308.    A landlord who fails to timely correct a lead-based paint violation, using the required safe work practices can be subject to a civil penalty of $250 per day for each violation to a maximum of $10,000 from the initial date set for correction in the notice of violation until the date the violation is corrected and certified. § 27-2115(l)(6).

309.    Additionally, an owner may be punished under Admin. Code §27-2118.

310.    There is a presumption that the condition constituting a violation continues after the service of the notice of violation. § 27-2115(l)(6).

h.    Defenses

311.    In an action for civil penalties by HPD, the owner may in defense or mitigation of liability for civil penalties show that: (1) the condition constituting the violation did not exist at the time the violation was placed; (2) that the owner began to correct the condition promptly but that full correction could not be completed expeditiously because of serious technical difficulties, inability to obtain necessary materials, funds or labor, or inability to gain access to the dwelling, or such other portion of the building that might be necessary to make the repair, provided that a postponement was granted by HPD; (3) that the owner was unable to obtain a permit or license necessary to correct the violation, provided that diligent and prompt application was made; or (4) that the violation giving rise to the action was caused by negligence, neglect or abuse of another not in the employ or subject to the direction of the owner, however, the owner shall not show in defense or mitigation evidence of any acts occurring, undertaken, or performed by any predecessor in title. § 27-2115(l)(6).

312.    For mitigation of penalties, the owner must show by competent proof, pertinent financial data and efforts made to obtain necessary materials, funds or labor or to gain access, or to obtain a permit or license and such other evidence as the court may require. Id.

313.    The court may remit all or part of any penalties arising from the violations if it finds that sufficient mitigating circumstances exist. However, it may condition such remission upon a correction of the violation within a time period fixed by the court.

i.    HPD data reporting

314.    Section 27-2056.12 requires HPD and DHMH to provide annual reports on a variety of specified parameters concerning enforcement of LL1/2004 and statistics on childhood lead poisoning.

315. In addition, §27-2056.12(c) requires that HPD maintain a central register of orders to correct LL1/2004 violations, including information on the complaint date and inspections and re-inspections, and addresses (this may be useful in matters concerning compliance with federal lead disclosure requirements).

j. DHMH inspections when a child is lead poisoned

316. Section 27-2056.14 essentially re-codified what was LL50 of 1972. Whenever DHMH receives a report that a person under 18 years old has been identified with a blood lead level of 15 ug/dL or higher, it must conduct an investigation to identify the sources of the elevated blood lead level, regardless of whether the person lives in a multiple dwelling.

317. This includes an inspection of the dwelling unit where the person lives, but does not limit it to the person's residence (for example DHMH may inspect a day care facility or relative's home where the child regularly spends time).

318. If DHMH issues an order to correct any violation to the landlord, it must notify HPD of the order.

319. Where the owner fails to comply with the order issued by DHMH to correct a violation, DHMH must certify the hazardous conditions to HPD within 16 days of the report of the elevated blood lead level, and HPD must then correct the condition within 18 days.

320. In addition, LL1/2004 sets up a system for focusing on problem buildings.

321. Under §§ 272056.7 and 11-11(a), within 15 days of HPD being notified by DHMH of a lead poisoning (pursuant to § 27-2056.14), HPD must notify the landlord that it is required to provide within 45 days all the records required under LL1/2004.

322. Once HPD has these records, it is to inspect all child-occupied units where it determines there may be uncorrected violations.

323.    If the owner does not provide the records to HPD the department will inspect the dwelling units where a child of applicable age resides within 45 days to determine whether there are any lead paint violations. (HPD is not required to inspect or request records if it has done so already within the prior twelve month period.)

324.    An owner who fails to comply with the section can be liable for a class C violation and a maximum civil penalty of $1000.

k.    Other amendments related to Health sections of the Administrative Code

325.    LL1/2004 has several innovative prevention measures codified in the Health title of the Administrative Code. For example, Administrative Code §17-186 requires the creation and distribution of a pamphlet discussing the risks and effects of lead poisoning and the intervals at which a child should be screened for blood lead level with telephone numbers of resources for parents along with the landlords requirements to inspect and repair lead paint hazards. This pamphlet must accompany birth certificates furnished to parents by DHMH.

326.    Certain other provisions that were contained in LL38 were re-enacted in LL1/2004, such as prohibitions on dry scraping or dry sanding of lead-based paint or paint of unknown lead content in any dwelling, daycare or school, §17-181, and DHMH's requirement to respond to complaints regarding unsafe lead-based paint work practices. Admin. Code §§17-185, Health Code § 173.14(f).

327.    To the extent defendants have been and are required to follow the mandates contained in LL1/2014, they have aggressively and needlessly failed. Their failures have in part caused a deprivation of rights amongst and harm to plaintiffs and the Class.

<u>INSPECTION FAILURES</u>

A.    <u>Residences Constructed After 1960 and Residences with "Waivers"</u>

328.    As evidence of the current crisis has evolved, many city and NYCHA officials have turned to "the numbers" as a way put a low ceiling on their failures. For instance, of the 178,000 public housing apartments, 55,000 were built after 1960 (when New York City banned the use of lead-based paint).

329.    City and NYCHA officials therefore claim that *only* 123,000 apartments could possibly contain lead-based paint and lead-based paint hazards, and are subject to inspection laws and regulations. But because lead-based paint was not banned nationally until 1978, some residences constructed after 1960, *but before* 1978, could contain lead-based paint but have never been inspected. Thus there is some percentage of apartments that has never been tested for lead-based paint and lead-based paint hazards, but very well may contain both.

330.    Officials also claim that through internal surveys and sampling, they have reduced the number of units constructed before 1960, which require inspections, by 75,000 (from 123,000 to 48,000).

331.    This reduction is premised upon the alleged granting of waiver requests to the New York City Department of Housing Preservation and Development ("HPD"), and to the U.S. Department of Housing and Urban Development ("HUD").

332.    In order to receive waivers from both state and federal agencies, certain representations and certifications must be made to those entities indicating that units are lead-safe. But as recently as 2016, less than 20% of all government staff associated with inspections and remediation had the requisite training for either.

333. Thus, some percentage of the 75,000 units officials claim to be exempt from inspection and for which they have requested state and federal waivers, cannot be said to be lead-safe because inspectors were unqualified to inspect and those remediating were unqualified to remediate.

334. There are a percentage of 55,000 units built after 1960, but before 1978, that have never been assessed for lead-based paint and lead-based paint hazards.

335. And there are a percentage of 75,000 units that have allegedly received waivers based on untrained assessments and remediation conducted by unlicensed and unqualified workers. These inspections need to take place and licensed professionals should perform remediation, if remediation is required.

B.    Public Housing Constructed Before 1960

336. As a Public Housing Agency (PHA) receiving federal funding from HUD, every fall NYCHA is required to file with HUD a PHA Annual Agency Plan (the "Annual Plan") for the upcoming Fiscal Year, a document that contains information about NYCHA programs and initiatives ranging from physical needs assessments to technological innovations.

337. The Annual Plan also requires the attachment of numerous documents, including the "PHA Certifications of Compliance with PHA Plans and Related Regulations" (the "HUD certification"), also known as HUD form 50077, and all documentation must be made available for public review. Concerning lead-based paint, NYCHA attests via the HUD certification that: (1) the PHA will comply with the Lead-Based Paint Poisoning Prevention Act, the Residential Lead-Based Paint Hazard Reduction Act of 1992, and 24 CFR Part 35; and (2) the PHA certifies that it is in compliance with all applicable Federal statutory and regulatory requirements.

338.    NYCHA fell out of compliance with Local Law 1 and 24 C.F.R. 35 by the end of 2012. As a result, the HUD certifications submitted by NYCHA from 2013 through 2016 were false.

339.    NYCHA, during the same period, also failed to comply with New York City lead safety rules, specifically LL1/2004 requiring annual lead-based paint inspections, remediation and repair of lead-paint hazards, turnover remediation, and the use of certified personnel for inspection and remediation work.

340.    Historically, NYCHA performed the required visual assessments for lead-based paint hazards as part of HUD-mandated annual inspections to evaluate general apartment conditions. In 2012, HUD relaxed its rule so that apartment inspections were no longer required to be performed every year, in order to free up resources for apartment maintenance.

341.    NYCHA claims the relaxation of the rule was actually an elimination of the rule for those premises that had previously been "inspected" and "remediated."

342.    This interpretation was wrong, as evidenced by NYCHA's rush to inspect thousands of premises in October 2017 in an effort to comply with Federal rules and regulations it had failed to adhere to in the four preceding years.

343.    However, even if NYCHA's interpretation was correct, unqualified and unlicensed individuals that could not have made substantive findings conducted the inspections and remediation undertaken by NYCHA, its agents, employees, subsidiaries and proxies, and thus their findings and remediation work could not have served as a basis for relaxing or eliminating the rule.

344.    Additionally, even if NYCHA's interpretation was correct, NYCHA was still required to conduct inspections based on laws, rules and regulations, including [INSERT].

345.    Even if NYCHA's interpretation was correct, and even if there were no other laws, rules and regulations that required NYCHA to perform inspections (which there were), the NYCHA interpreted rule change did not eliminate the requirement to inspect for lead where relevant.

346.    But, in approximately August 2012, NYCHA ceased conducting annual apartment inspections and did not create a separate protocol to continue lead inspections. As a result, NYCHA was no longer performing annual visual assessments for potential lead-based paint hazards as legally required.

347.    In October 2013, NYCHA submitted to HUD its fiscal year 2014 Annual Plan with accompanying certifications, including HUD Form 50077, which NYCHA's then-Chair signed on October 11, 2013.

348.    Because NYCHA had not conducted visual assessments for lead-based paint hazards every year beginning in 2012, NYCHA's certification that it was compliant with federal lead-based paint laws was false.

349.    In October 2014, NYCHA submitted to HUD its fiscal year 2015 Annual Plan with accompanying certifications, including HUD Form 50077, which was signed by defendant Shola Olatoye on October 16, 2014.

350.    Because at that time NYCHA was still not conducting annual lead inspections, it continued to be noncompliant with Local Law 1 and 24 C.F.R. 35, thereby making the certification to HUD false.

351.    A senior official at NYCHA reported that he believed in 2015 that there was "general knowledge at the executive level" that NYCHA had suspended apartment inspections, because the General Manager's office was involved in the process of resuming inspections. By

April 2015, certain senior officials had learned that NYCHA was not in compliance with Local Law 1.

352.    On May 7, 2015, in an email, a senior operations executive asked another NYCHA official to provide a list of apartments with children under 7 years old in reference to lead law compliance. Meeting minutes show that on June 5, 2015, a group of NYCHA managers discussed apartment inspections including requirements for annual inspections. On July 16, 2015, a group of NYCHA managers recommended that development maintenance workers be assigned approximately eight apartment inspections per day in order to meet various goals, including inspection of "all apartments that may contain lead and have children under the age of six (6) residing in them, every year."

353.    Further, during a New York City Department of Investigation ("DOI") interview, another senior operations executive stated that he first learned of the Local Law 1 violation in 2015 when he was working with a group on a plan to switch back to annual inspections, focusing first on apartments with children under six.

354.    During another DOI interview, the General Manager, defendant Kelly said that he did not know of the Local Law 1 violation until approximately a year later in April or May 2016. Chair Olatoye also said that she was not made aware that NYCHA was out of compliance with Local Law 1 until April or May 2016.

355.    In October 2015, NYCHA submitted to HUD its fiscal year 2016 Annual Plan with accompanying certifications, including HUD Form 50077, which defendant Olatoye signed on October 12, 2015. Again, this certification that NYCHA was compliant with federal lead-based paint laws was false.

356.    Although NYCHA's Chair, defendant Olatoye, and General Manager, defendant Kelly, stated they were not aware that HUD form 50077 was false at the time it was submitted in October 2015, the DOI determined that in the spring 2015, certain senior NYCHA officials, including operations executives, did know that NYCHA was out of compliance with Local Law 1 (and thus should have known of a potential violation of the corresponding federal rule), because they were working to remediate the legal violation.

357.    In fact, one operations executive during a DOI investigation stated that if asked, he would have answered that NYCHA was not in compliance with applicable lead laws – but he was never asked.

358.    NYCHA failed to put in place a system to confirm the accuracy of federal forms before they were submitted.

359.    NYCHA's failure to confirm the accuracy of filings before they were made is an unacceptable gap in procedures.

360.    After NYCHA's Chair, defendant Olatoye, and General Manager, defendant Kelly, became aware of Local Law 1 noncompliance in April or May 2016, NYCHA began a program to inspect and remediate any lead hazards in units where NYCHA had not ruled out lead paint and a child under six resided.

361.    Unfortunately, the plan did not include utilization of qualified or licensed workers, further exacerbating the harm associated with the institutional failure to inspect over the course of four years.

362.    At least six months after receiving a notice of a federal inquiry into a range of issues including lead-based paint and lead-based paint hazard inspections, for the first time in the

summer of 2016, a senior advisor at NYCHA researched federal law concerning lead, and concluded that NYCHA was also in violation of the HUD regulations, 24 C.F.R. 35.

363.    She convened a group of the relevant executives to conduct an urgent assessment of NYCHA's lead-based paint situation, and at the end of July 2016, Chair Olatoye was presented with a "lead workflow"/"game plan" to address NYCHA's lead obligations.

364.    In July 2016, a senior advisor circulated a draft chart detailing NYCHA's obligations under Local Law 1 and 24 C.F.R. 35, including a notation that the HUD regulation required visual assessments "at unit turnover and every 12 months."

365.    This appears to be the first time in four years (and only as a result of an investigation by the United States Attorney's Office for the Southern District of New York) did a single defendant attempt to understand fully their obligations regarding lead-based paint and lead-based paint hazards under federal, state and local laws, beyond a calculated scheme to avoid compliance in any form or fashion.

366.    On September 13, 2016, during a routine quarterly oversight meeting attended by defendant Olatoye, defendant Kelly, and other top NYCHA executives at HUD's central office in Washington, D.C., NYCHA executives delivered a PowerPoint presentation about various operations issues to numerous HUD officials, including the Assistant Secretary of Public and Indian Housing.

367.    NYCHA senior officials contend that shortly before the September 13 meeting, they informed HUD's local and regional New York offices of NYCHA's non-compliance in a teleconference.

368.    In one of the September 13 PowerPoint slides concerning "Accountability: Lead-Based Paint," NYCHA's talking points read:

*NYCHA has approximately 55,000 units where we have not yet ruled out lead-based paint. Approximately 4,200 of these 55,000 units have a child under 6 years old living there. We just completed inspections of these 4,200 units ... I want to talk a little more about inspections. Earlier, when we spoke about service levels, it was mentioned that a mistake of the previous administration was putting too much focus on work order numbers and there were some consequences. In a recent review of how this approach affected other areas of operations, it came to our attention that, starting in 2012, the previous administration made the decision to cease apartment inspections for a two-year period. It was through these annual apartment inspections that lead-based paint apartments also received their annual visual assessments, so this also ceased for these two years. Completing the recent inspections of the 4,231 units where a child under 6 years old focused our resources on where the risk of exposure to lead hazards is the greatest but it was just the first step in correcting for this. We are also creating a new operations plan that will also address the annual required inspections for the remaining 50,000 lead-based paint units which don't have a child under 6 years old, bringing us back on track.*

369.   This statement makes no reference to the fact that for the approximately 75,000 units for which NYCHA has "ruled out" lead-based paint, some have never been inspected despite being built before 1978, and some have been inspected and "cleared" by unqualified and unlicensed professionals.

370.   One month after the aforementioned meeting with HUD, on October 18, 2016, NYCHA submitted to HUD its Fiscal Year 2017 Annual Plan, with HUD Form 50077 signed by defendant Olatoye, wherein NYCHA falsely certified that it was in compliance with federal lead-based paint regulations.

371.   Olatoye has gone on record that in October 2016 when this certification was submitted, she was aware that NYCHA was not in compliance with the HUD regulations, which she considered "obviously a management failure," and thus that the certification was not accurate. However, she stated that in August and September 2016, NYCHA had already disclosed that information to HUD both in a private briefing document and orally for senior HUD officials.

372.    The forms by contrast are certifications to the overall agency that are publicly available including to NYCHA tenants and other interested parties.

373.    The General Manager, defendant Kelly, who reviewed the HUD certification in August/September 2016, before it went to a Board vote, has stated on the record that although he was aware at the time that NYCHA was not in compliance with federal regulations, "we felt that this was something that ... HUD knew about, and we were submitting the report to HUD so … the disclosure was the important part."

374.    Although defendants Olatoye, Kelly and other senior executives were aware that NYCHA was out of compliance with federal lead-based paint regulations, NYCHA nonetheless submitted a false certification in October 2016, and had no reasonable explanation why this was acceptable.

375.    On July 26, 2017, several months after DOI commenced its investigation, NYCHA's Board considered and approved a significant amendment to the fiscal year 2017 annual PHA plan, which concerned various non-lead related real estate operations matters. With the significant amendment, NYCHA submitted HUD Form 50077 with the following additional asterisked language, qualifying its certifications of compliance with lead-based paint laws:

> *As previously discussed with the U.S. Attorney's Office for the Southern District of New York ("SDNY") and HUD, NYCHA has not complied with certain requirements related to lead-based paint but is working to ensure full compliance. NYCHA is cooperating with an investigation by the SDNY regarding conditions in NYCHA housing. We will continue to engage with both the SDNY and HUD regarding our remedial efforts.

376.    Defendant Olatoye has admitted that during preparations to file the significant amendment to the fiscal year 2017 annual PHA plan, NYCHA raised with HUD the certification, and a HUD attorney suggested that asterisked language be added to clarify that NYCHA was not in compliance but was working towards full compliance.

377.    NYCHA also released a fact sheet and letter to residents on lead-based paint programs in July 2017.

378.    These documents for the first acknowledged, directly to its residents, NYCHA's noncompliance with lead regulations.

379.    To compound matters, in late November and/or early December 2017, defendant NYCHA began sending "breach of lease" notices to dozens of Red Hook tenants with young children, chiding them for a "failure to comply with lead-based paint regulations" and warning them that eviction may be imminent.

## CLASS ALLEGATIONS

380.    Plaintiffs request certification pursuant to Fed. R. Civ. P 23(b)(2) on behalf of a proposed injunctive relief class defined as follows: all individuals who from January 1, 2012 to present resided on premises either owned, managed, or operated by defendant NYCHA or in residences where they administer assistance payments under a federal housing program.

381.    The number of class members is sufficiently numerous to make class action status the most practical method for Plaintiffs to secure redress for injuries sustained and to obtain class wide equitable injunctive relief.

382.    There are questions of law and fact raised by the named Plaintiffs' claims common to those raised by the Class(es) they seek to represent. Such common questions predominate over question affecting only individual members of the Class(es).

383.    The violations of law and resulting harms alleged by the named Plaintiffs are typical of the legal violations and harms suffered by all Class members.

384.    Plaintiff Class representatives will fairly and adequately protect the interests of the Plaintiff Class members. Plaintiffs' counsel are unaware of any conflicts of interest between

the Class representatives and absent Class members with respect to the matters at issue in this litigation; the Class representatives will vigorously prosecute the suit on behalf of the Class; and the Class representatives are represented by experienced counsel. Attorneys with substantial experience and expertise in complex and class action litigation involving personal injuries and property damage represent plaintiffs.

385.    Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action, and have committed sufficient resources to represent the Class.

386.    The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice. Moreover, the prosecution of separate actions by individual members of the Class could result in inconsistent or varying adjudications with respect to individual members of the Class and/or one or more of the Defendants.

387.    Defendants have acted or failed to act on grounds generally applicable to all Plaintiffs, necessitating declaratory and injunctive relief for the Class.

**COUNT I – CAUSE OF ACTION**
**42 U.S.C § 1983 – 14th AMENDMENT**
**SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER**
**AGAINST ALL GOVERNMENTAL DEFENDANTS**

388.    Individual plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

389.    Plaintiffs have a clearly established right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to be protected from risks, dangers, dangerous situations, or being made more vulnerable to increased risk of harms, affirmatively created and/or caused by persons acting under color of state law.

390.    The Government defendants, while acting under color of state law, affirmatively created or exacerbated the dangers and dangerous situations to which plaintiffs were exposed, making them more vulnerable to said dangers, and the Government defendants did so with an extreme degree of culpability.

391.    The Government defendants, while acting under color of state law, affirmatively continued, increased and perpetuated the dangers, risks of harm, and dangerous situations creating the public health crisis, when they deliberately and affirmatively denied, lied about, covered up, deceived, discredited, and ignored said known dangers and risks of harm to which they exposed Plaintiffs making them more vulnerable to said dangers.

392.    The Government defendants were aware that their conduct could result in the deprivation of Plaintiffs' due process rights to be protected from the dangers, dangerous situations, or being made more vulnerable to the dangers affirmatively created and perpetuated by them.

393.    This conduct was reckless, deliberately indifferent, and/or so outrageous as to shock the conscience, such that it was culpable in the extreme, insofar as the Government defendants knew of and disregarded the substantial risk of serious harm to Plaintiffs.

394.    The dangers and risks of harm were discreet and special to plaintiffs, as residents of New York City public housing or Section 8 recipients, and not risks affecting the public at large.

395.    The dangers and risks of harm to plaintiffs from the ongoing exposure to the lead-based paint and lead based paint hazards, which were created and perpetuated by the Government defendants, were so extreme as to be equivalent to private acts of violence visited upon them.

396.    These actions of the Government defendants, all under color of law, constituted affirmative acts that caused and/or substantially increased the risks of physical, emotional and economic harm to the plaintiffs.

397.    As a direct and proximate result of the aforementioned unconstitutional acts of the Government defendants, which through the making of state created danger, violated Plaintiffs' fundamental property and/or liberty rights, as alleged in this Amended Complaint, Plaintiffs suffered extensive damages, including, but not limited to:

    a.   serious and in some cases irreversible and permanent bodily injury;

    b.   Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

    c.   Pain and suffering;

    d.   Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

398.    The conduct of the Government Defendants was reckless and outrageous, entitling Plaintiffs and Plaintiff Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

**COUNT II – CAUSE OF ACTION**
**42 U.S.C § 1983 – 14th AMENDMENT**
**SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY**
**AGAINST ALL GOVERNMENTAL DEFENDANTS**

399.    Individual plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

400.    Individual plaintiffs have a clearly established fundamental right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to bodily integrity.

401.    The conduct of the Government defendants, all while acting under color of law, endangered and/or threatened plaintiffs' fundamental liberty interest to bodily integrity as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

402.    The Government defendants were aware that their conduct could result in the deprivation of individual plaintiffs' fundamental due process rights to bodily integrity.

403.    The Government defendants deliberately and knowingly breached the constitutionally protected bodily integrity of individual plaintiffs by creating and perpetuating the ongoing exposure to contaminated water, with deliberate indifference to the known risks of harm which said exposure would, and did, cause to individual Plaintiffs.

404.    The Government Defendants had the opportunity to reflect and deliberate before they acted and/or failed to act.

405.    As a direct and proximate result of the aforementioned unconstitutional acts of the Government Defendants, which violated individual Plaintiffs' fundamental property and/or liberty rights to bodily integrity, as alleged in this Consolidated Amended Complaint, Plaintiffs suffered extensive damages, including, but not limited to:

      a.  serious and in some cases irreversible and permanent bodily injury;

      b.  Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

  c. Pain and suffering;

  d. Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

406. The conduct of the Government Defendants was reckless and outrageous, entitling Plaintiffs and Plaintiff Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

**COUNT III – CAUSE OF ACTION**
**42 U.S.C § 1983 – 5th AND 14th AMENDMENT**
**EQUAL PROTECTION OF THE LAW: RACE BASED**
**AGAINST OLATOYE, de BLASIO, BASSETT, TORRES-SPRINGER**

407. Individual plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

408. Defendants Olatoye, de Blasio, Bassett, and Torres-Springer, acting under color of law, and in their respective individual and/or official capacities, engaged in conduct and/or adopted laws and policies that violated plaintiffs' and the Class' rights under the Fifth and Fourteenth Amendments to the United States Constitution

409. Amendment Fourteen, § 1 states in pertinent part, "No state shall make or enforce any law which shall … deny to any person within its jurisdiction the equal protection of the laws."

410. The Equal Protection Clause prohibits laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

411. Defendants' conduct deliberately exposed plaintiffs and the Class to lead-based paint and lead-based paint hazards, knowing that it could and would result in widespread serious damage.

412.    Defendants knew that following federal, state and municipal requirements to inspect for and remediate lead-based paint and lead-based paint hazards required millions of dollars and significant time and resources.

413.    Recognizing these facts, defendants devised Schemes 1 and 2, which had a predominant negative impact on African Americans. These schemes would never have been hatched if the majority of those affected were white.

414.    Because plaintiffs and the Class comprise a predominately African American community, their complaints as to all public housing issues were dismissed and disrespected as exaggerated, without merit, or inconsequential. If plaintiffs' community had been predominately white, citizen complaints would have been taken seriously, treated as valid defendants would have taken timely action to address the concerns.

415.    As a direct and proximate result of the aforementioned unconstitutional acts of the Government Defendants, which violated Plaintiffs' fundamental property and/ or liberty rights to equal protection of the laws based on race, as alleged in this Amended Complaint, plaintiffs and the Class suffered extensive damages, including, but not limited to:

    a.   serious and in some cases irreversible and permanent bodily injury;

    b.   Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

    c.   Pain and suffering;

    d.   Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

416.    The conduct of the Government Defendants was reckless and outrageous, entitling Plaintiffs and Plaintiff Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## COUNT IV – CAUSE OF ACTION
## 42 U.S.C § 1983 – 5th AND 14th AMENDMENT
## EQUAL PROTECTION OF THE LAW: RACE BASED
## AGAINST OLATOYE, de BLASIO, BASSETT, TORRES-SPRINGER

417.    Individual plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

418.    Defendants Olatoye, de Blasio, Bassett, and Torres-Springer, acting under color of law, and in their respective individual and/or official capacities, engaged in conduct and/or adopted laws and policies that violated plaintiffs' and the Class' rights under the Fifth and Fourteenth Amendments to the United States Constitution

419.    Amendment Fourteen, § 1 states in pertinent part, "No state shall make or enforce any law which shall … deny to any person within its jurisdiction the equal protection of the laws."

420.    The Equal Protection Clause prohibits laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

421.    Defendants' conduct deliberately exposed plaintiffs and the Class to lead-based paint and lead-based paint hazards, knowing that it could and would result in widespread serious damage.

422.    Defendants knew that following federal, state and municipal requirements to inspect for and remediate lead-based paint and lead-based paint hazards required millions of dollars and significant time and resources.

423.    Recognizing these facts, defendants devised Schemes 1 and 2, which had a predominant negative impact on predominately impoverished individuals that reside in public housing or receive Section 8 assistance. These schemes would never have been hatched if the majority of those affected were wealthy.

424.    Because plaintiffs and the Class comprise a predominately-impoverished community, their complaints as to all public housing issues were dismissed and disrespected as exaggerated, without merit, or inconsequential. If plaintiffs' community had been predominately wealthy, citizen complaints would have been taken seriously, treated as valid and defendants would have taken timely action to address the concerns.

425.    As a direct and proximate result of the aforementioned unconstitutional acts of the Government Defendants, which violated Plaintiffs' fundamental property and/ or liberty rights to equal protection of the laws based on race, as alleged in this Amended Complaint, plaintiffs and the Class suffered extensive damages, including, but not limited to:

    a.    serious and in some cases irreversible and permanent bodily injury;

    b.    Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

    c.    Pain and suffering;

    d.    Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

426.    The conduct of the Government Defendants was reckless and outrageous, entitling Plaintiffs and Plaintiff Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

<u>**COUNT V: 42 U.S.C. § 1985(3) – CONSPIRACY TO VIOLATE**</u>
<u>**PLAINTIFFS' CONSTITUTIONAL RIGHTS AGAINST**</u>
<u>**OLATOYE, de BLASIO, BASSETT, TORRES-SPRINGER,**</u>
<u>**ATC ASSOCIATES, INC., ATC GROUP SERVICES, LLC**</u>

427.    Individual plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

428.    42 U.S.C § 1985(3) secures the rights of the Plaintiffs and the Class to be free from conspiracies, founded on invidious racial animus, to violate the constitutional rights of Plaintiffs to equal protection and due process.

429.    The Equal Protection Clause prohibits laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

430.    Defendants' conduct deliberately exposed plaintiffs and the Class to lead-based paint and lead-based paint hazards, knowing that it could and would result in significant harm.

431.    Beginning as late as 2012, and for every year thereafter, Defendants were required to follow the laws, rules and regulations promulgated by federal, state and municipal agencies as discussed herein. Defendants intentionally failed to perform inspections; intentionally failed to utilize qualified/licensed workers in the rare instances where inspections occurred; intentionally failed to properly remediate issues that unskilled inspectors observed; and lied to, misled and in critical instances stayed silent as to the public, and more importantly as to the individual plaintiffs and the Class.

432.    Recognizing these facts, these defendants conspired to devise two schemes that caused the predominately black and impoverished residents to live in unsafe conditions.

433.    There was no rational justification for treating the predominately black and impoverished residents of New York City Public Housing as if their health and safety was of no concern.

434.    If plaintiffs' and the class' community had been predominately white or affluent, citizen complaints would have been treated as valid and defendants would not only would have followed the law, but would have taken timely action to address residents' concerns. The disrespect and dismissive response arose directly from the conspiracy between these defendants founded on racial animus and discrimination against the impoverished.

435.    As a direct and proximate result of the aforementioned unconstitutional acts of the Government Defendants, which violated Plaintiffs' fundamental property and/ or liberty rights to equal protection of the laws based on race, as alleged in this Amended Complaint, plaintiffs and the Class suffered extensive damages, including, but not limited to:

      a.  serious and in some cases irreversible and permanent bodily injury;

      b.  Substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

      b.  Pain and suffering;

      c.  Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

436.    The conduct of Defendants was reckless and outrageous, entitling Plaintiffs and Plaintiff Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## COUNT VI: 42 U.S.C. § 1983 – DUE PROCESS ACCESS TO JUDICIAL PROCESS AGAINST ALL GOVERNMENT DEFENDANTS

437.    Individual plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

438.    Plaintiffs have a right under the Due Process Clause of the Fourteenth Amendment to the United States' Constitution access to judicial remedies.

439.    The Governmental Defendants violated this right by implementing a policy and pattern of creating false records and government documents related to lead-based paint hazard inspection, remediation, and the status of Plaintiffs' apartment as exempt from inspections or free from lead-based paint hazards.

440.    The Governmental Defendants' actions prevented Plaintiffs from discovering and using truthful information that would have allowed them to seek a judicial remedy for Defendants' failure to comply with federal, state, and local lead-based paint laws.

441.    As a result of Defendants' false and misleading conduct, Plaintiffs were unable to access administrative and procedural remedies that exist to protect their right to be free lead-based paint hazards—a condition dangerous to life and safety of Plaintiffs and their young children.

442.    Plaintiffs are entitled to damages and injunctive relief as a result of Defendants' violations of 42 U.S.C. § 1983 and Plaintiffs' Due Process right to access judicial remedies.

443.    The conduct of the Government Defendants was reckless and outrageous, entitling Plaintiffs and Plaintiff Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## COUNT VII: 42 U.S.C. § 1983 – PROCEDURAL DUE PROCESS
## AGAINST ALL GOVERNMENT DEFENDANTS

444.    Individual plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

445.    Under the Fourteenth Amendment to the United States' Constitution, Plaintiffs are entitled to Procedural Due Process before being deprived of their life, liberty or property.

446.    Plaintiffs Paige, Carrington, and Gray are or were tenants of NYCHA, and held a property interest as a result. This property interest included the rights to a habitable residence that is free from dangerous and unsafe conditions, as well as the right to safe ingress and egress for Plaintiffs and their family to access their apartments.

447.    The Governmental Defendants violated Plaintiffs' Due Process rights by implementing a policy and pattern of creating false records and government documents related to lead-based paint hazard inspection, remediation, and the status of Plaintiffs' apartment as exempt from inspections or free from lead-based paint hazards.

448.    The Governmental Defendants' actions prevented Plaintiffs from discovering and using truthful information that would have allowed them to seek a judicial remedy for Defendants' failure to comply with federal, state, and local lead-based paint laws.

449.    As a result of Defendants' false and misleading conduct, Plaintiffs were unable to access administrative and procedural remedies that exist to protect their right to be free lead-based paint hazards—a condition dangerous to life and safety of Plaintiffs and their young children.

450.    Defendants' conduct deprived Plaintiffs of their property interest in their apartments without adequate Due Process.

451.    Plaintiffs are entitled to damages and injunctive relief as a result of Defendants' violations of 42 U.S.C. § 1983 and Plaintiffs' procedural Due Process rights.

452.    The conduct of the Government Defendants was reckless and outrageous, entitling Plaintiffs and Plaintiff Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

### COUNT VIII: 42 U.S.C. § 1983 – FIRST AMENDMENT VIOLATIONS AGAINST ALL GOVERNMENT DEFENDANTS

453.    Individual plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

454.    This claim is alleged against the Government Defendants in their official capacity only.

455.    Under the First and Fourteenth Amendments to the United States' Constitution, Plaintiffs have a right of free speech, especially when it comes to public matters and the functioning of government institutions.

456.    The Governmental Defendants violated Plaintiffs' First Amendment rights by implementing a policy and pattern of creating false records and government documents related to lead-based paint hazard inspection, remediation, and the status of Plaintiffs' apartment as exempt from inspections or free from lead-based paint hazards.

457.    The Governmental Defendants' actions prevented Plaintiffs from discovering and using truthful information that would have allowed them to critique Defendants' actions, engage in political activism, and petition their government representatives regarding an important public health crisis.

458.    As a result of Defendants' false and misleading conduct, Plaintiffs free speech rights were unduly restricted and chilled. As government actors, Defendants false and misleading

statements, the creation of false documents, and concealment of violations of federal, state, and local laws prevented Plaintiffs and other members of the public from engaging in the type of speech and political activity that is fundamental to democracy.

459.    Plaintiffs are entitled to damages and injunctive relief as a result of Defendants' violations of 42 U.S.C. § 1983 and Plaintiffs' First Amendment rights.

460.    The conduct of the Government Defendants was reckless and outrageous, entitling Plaintiffs and Plaintiff Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## COUNT IX: LEAD PAINT DISCLOSURE RULE VIOLATIONS AGAINST ALL GOVERNMENT DEFENDANTS (42 U.S. Code § 4852d )

461.    Individual plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

462.    Plaintiffs, as NYCHA tenants, were entitled to disclosures regarding NYCHA's lead-based paint activities at the time of entering into a lease and every lease renewal. The required disclosures include reports of lead testing and any other documents in NYCHA's possession or control related to lead-based paint hazard inspection, testing, remediation, repair, and abatement activities. The required documents extend to a tenants' unit, as well as documents related to the common areas of their buildings.

463.    The Government Defendants failed to fully and accurately disclose documentation of lead-based paint activities to Plaintiffs and a similarly situated class of NYCHA tenants.

464.    By engaging in Schemes 1 and 2, Defendants also purposefully ensured that the disclosures and documents that Plaintiffs did receive were false and misleading.

465.    Under 42 U.S. Code § 4852d, Plaintiffs are entitled to treble damages, attorneys' fees, and costs.

466.    The conduct of the Government Defendants was reckless and outrageous, entitling Plaintiffs and Plaintiff Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## COUNT X: 42 U.S.C. § 3604(b) - FAIR HOUSING ACT DISCRIMINATION AGAINST ALL GOVERNMENT DEFENDANTS

467.    Individual plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

468.    Section § 3604(b) of the Fair Housing Act prohibits discrimination against "any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).

469.    NYCHA's policy of failing to inspect apartments for lead paint hazards disproportionately harms families with young children.

470.    NYCHA informed residents that complained about the poor condition of the paint in their units that inspections were backlogged for multiple years. Knowing the high incidence of lead paint in NYCHA buildings and the heightened risk of serious, permanent injury children face from peeling and flaking paint that contains lead, families with children were subjected to disproportionately dangerous living conditions, increased risk of serious injury, medical expenses, and emotional distress.

471.    Further, by failing to inspect and remediate lead paint hazards, NYCHA discouraged families with young children from renting and remaining in NYCHA housing due to the increased risk young children face from lead poisoning.

472.     As a result of NYCHA's discriminatory acts and policies, Plaintiffs are entitled to monetary and injunctive relief, including punitive damages, attorneys' fees and costs, and prospective equitable enjoining NYCHA from violating the FHA.

473.     The conduct of the Government Defendants was reckless and outrageous, entitling Plaintiffs and Plaintiff Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

<u>**COUNT XI – PROFESSIONAL NEGLIGENCE**</u>
<u>**AGAINST ATC DEFENDANTS**</u>

474.     Individual plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

475.     The ATC defendants undertook, for consideration, to render services for the Governmental Defendants, which it should have recognized as necessary for the protection of Plaintiffs.

476.     The ATC defendants undertook to perform a duty owed to plaintiffs and the Class by the governmental defendants.

477.     The ATC defendants, based on their undertaking, had a duty to plaintiffs and the Class to exercise reasonable care.

478.     Plaintiffs and the Class relied on the ATC defendants to perform the duty to inspect for lead-based paint and lead-based paint hazards to make sure their homes were safe.

479.     The ATC defendants failed to exercise reasonable care in inspecting for lead-based paint and lead-based paint hazards, and in-fact made it a pattern and practice to dispute DOH findings of lead-based paint hazards within New York City Public Housing.

480.    The ATC defendants failed to exercise reasonable care in each instance when they declared a residence within New York City Public Housing to be safe, including when they issued a report regarding the Paige residence, in contradiction to the DOH findings.

481.    Plaintiffs and the Class suffered harm as a result of the ATC defendants' failures to exercise reasonable care to protect its various undertakings.

482.    The ATC Defendants' failures to exercise reasonable care to protect their undertaking directly and proximately caused plaintiffs and the Class harm that was entirely foreseeable.

483.    The ATC defendants' conduct was malicious, willful and wanton as to disregard plaintiffs' and the class' rights for the following reasons:

   a.   The ATC defendants knew, or should have known, that plaintiffs and the Class were relying on them to ensure that their residences were free from lead-based paint hazards;

   b.   The ATC defendants knew, or should have known, that their participation in Schemes 1 and 2 posed threats to public health, safety, and property that would result in harm to plaintiffs and the Class.

   c.   The ATC defendants knew, or should have known, that the failure to notify and/or report to the proper authorities of unethical or illegal practices of others whose actions or decisions posed threats to public health, safety, and property would result in harm to plaintiffs and the Class.

484.    As a result of the foregoing, plaintiffs and the Class seek an award of punitive damages from the ATC defendants so as to deter such morally reprehensible conduct by the ATC defendants and similarly situated corporations in the future.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that judgment be entered against Defendants, ordering:

a.  Defendants be enjoined from further violations of Plaintiffs' rights;

b.  Defendants be required to follow all federal, state and municipal laws, rules and regulations, both <u>retroactively</u> and <u>prospectively</u>, including the requirement to inspect every single public housing dwelling constructed in or before 1978, as well as every single resident wherein a tenant receives Section 8 assistance;

c.  The appointment of an independent monitor to oversee NYCHA's compliance with its lead-based paint inspection obligations;

d.  Plaintiffs are awarded compensatory, punitive, and exemplary damages;

e.  Plaintiffs are awarded pre-judgment and post-judgment interest;

f.  Defendants pay Plaintiffs' reasonable costs and attorneys' fees; and

g.  All other relief the court deems necessary and equitable.

**JURY DEMAND**

A trial by jury is hereby demanded.

Dated: December 15, 2017.

**LEVY KONIGSBERG LLP**

/S/ COREY M. STERN
Corey M. Stern
*cstern@levylaw.com*
Brendan E. Little
*blittle@levylaw.com*

800 Third Ave., 11th Floor
New York, NY 10022
Phone:  (212) 605-6200
Fax:  (212) 605-6290

*Attorneys for the Plaintiffs*

86