**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| SHERRON PAIGE, individually and ON BEHALF OF HER MINOR CHILD, K.D.; EVELYN GRAY; TANEEQUA CARRINGTON; and A.P., on their own behalf and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NEW YORK CITY HOUSING AUTHORITY; CITY OF NEW YORK; SHOLA OLATOYE; BILL de BLASIO; MARY TRAVIS BASSETT, M.D.; MARIA TORRES-SPRINGER; MICHAEL KELLY; ALICIA GLENN; BRIAN CLARKE; JAY KRANTZ; LUIS PONCE; HERMINA POLACIO; ATC ASSOCIATES, INC.; and ATC GROUP SERVICES, LLC <br><br> Defendants. | No. 1:17-CV-07481-WHP <br><br> JURY TRIAL DEMANDED |

## PLAINTIFFS' SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, MONEY DAMAGES, AND JURY DEMAND

*"No safe blood lead level in children has been identified. Even low levels of lead in blood have been shown to affect IQ, ability to pay attention, and academic achievement. And effects of lead exposure cannot be corrected. The most important step parents, doctors, and others can take is to **prevent lead exposure before it occurs.**" – Centers for Disease Control*

*"The buck stops at City Hall from now on when it comes to NYCHA ... because I consider myself ultimately responsible for what we do at NYCHA." – Mayor Bill de Blasio, February 8, 2014*

*"Everything we do will be focused on improving the quality of life for our tenants, especially protecting their safety." – Shola Olatoye, February 8, 2014*

## INTRODUCTORY STATEMENT

1.     This class action is pursued on behalf of approximately **400,000** individuals who reside in New York City public housing owned and operated by Defendant New York City Housing Authority ("NYCHA"). The victims of Defendants' unlawful conduct include Plaintiffs and their young children, who from 2012 to the present (the "Class Period"), and possibly earlier, have experienced and will continue to experience serious civil rights violations, increased risk of personal injury, and property damage caused by Defendants' deliberate and conscious-shocking misconduct.

2.     Defendants knowingly worsened a decades-old public health crisis by evading and ignoring federal, state and local laws that require periodic inspection for, and repair/remediation of, lead-based paint hazards.

3.     Worse, Defendants also exacerbated the crisis by concealing and misrepresenting its scope; by failing to take effective remedial action to eliminate it; and by lying about it to cover up their misconduct.

4.     At least two groups of Defendants are responsible for the misconduct alleged in this Complaint: A group of government officials and bodies, including NYCHA, the City of New York, Chair and Chief Executive Officer of NYCHA – Shola Olatoye, Mayor Bill de Blasio, Mary Travis Bassett, MD, Maria Torres-Springer, Michael Kelly, Alicia Glenn, Brian Clarke, Jay Krantz, Luis Ponce and Hermina Palacio. The individuals are collectively referred to herein as the "NYCHA [and/or] City Officials." Also Defendants in this action are two private companies–ATC Associates, Inc. and ATC Group Services, LLC–who were hired by NYCHA to perform lead paint inspection and abatement work. The term "Government Defendants," as used

in this Complaint, refers to all Defendants except ATC Associates, Inc. and ATC Group Services, LLC.

5.    Specifically, Defendants have engaged in the following categories of misconduct:

a)  Implementing a policy of not performing annual lead paint inspections on apartments constructed prior to 1978 where young children reside in violation of federal and New York City lead paint poisoning prevention laws.

b)  The widespread use by NYCHA of unlicensed and unqualified employees and contractors to perform lead paint inspection, testing, and remediation work in violation of Federal and New York City lead paint laws.

c)  Implementing a policy of not performing lead paint inspection and testing, including lead dust testing, of common areas in NYCHA buildings where NYCHA and City Officials had presumed and/or actual knowledge of the presence of lead paint and lead paint dust.

d)  Routinely and improperly contesting the New York City Department of Health and Mental Hygiene's lead paint inspection and testing findings to purposefully avoid NYCHA's obligations to inspect and remediate lead paint hazards.

e)  Improperly designating NYCHA apartments as lead-free and exempt from lead paint inspections under federal and New York City law through the use of insufficient testing and remediation using unqualified employees and contractors.

f)  Purposefully ignoring and failing to act upon tenant complaints of lead paint hazards as required by federal and New York City lead paint laws.

g)  Falsely certifying to the United States Department of Housing and Urban Development ("HUD") that NYCHA was in compliance with lead paint inspection and remediation regulations despite knowledge by NYCHA and City Officials of material, systematic non-compliance.

h)  Knowingly making public, false statements about NYCHA's lead paint inspection, testing, and remediation actions and their compliance with federal and New York City Law with the intent to and effect of misleading the public and chilling speech, press coverage, and political action on the topic of lead paint hazards and NYCHA's legal violations.

6.      Defendants misconduct related NYCHA's lead-based paint activities gives rise to seven claims:

    i.   Unlawful discrimination related to familial status under the Fair Housing Act ("FHA"), 42 U.S.C. §3604(b);

    ii.   Violations of the Lead Paint Disclosure Rule, 42 U.S.C. §4852(d);

    iii.   Violation of 42 U.S.C. § 1983 and Procedural Due Process;

    iv.   Violations of 42 U.S.C. § 1983 and Substantive Due Process;

    v.   Violations of 42 U.S.C. § 1983 and the First Amendment;

    vi.   Negligence under New York law and New York City Local Law 1 of 2014; and

    vii.   Professional negligence under New York law.

## JURISDICTION AND VENUE

7.      This is a civil action brought pursuant to federal law, including 42 U.S.C. §3604(b), 42 U.S.C. §4852(d), and 42 U.S.C. § 1983, together with Plaintiffs' state law claims for negligence and violations of New York City Local Law 1 of 2004.

8.      The Court has jurisdiction pursuant to 28 U.S.C. § 1331, which authorizes federal courts to decide cases concerning federal questions; 28 U.S.C. § 1343(a)(3) and (4), which authorizes federal courts to hear civil rights cases; and 28 U.S.C. § 2201, the Declaratory Judgment Act.

9.      The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear Plaintiffs' state-law claims, which arise out of the same operative facts as Plaintiffs' federal claims.

10.     This Court has personal jurisdiction over Defendants because Defendants reside in this District and the acts that form the basis for this Complaint occurred, in substantial part, in this District.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b)–(c) because Defendants reside in this District and a substantial part of the acts or omissions that give rise to this action occurred in this District.

## PLAINTIFFS

12.     Plaintiff Sherron Paige ("Paige") is an individual residing in New York City. Paige is the mother of a minor child, K.D. From birth through the present, Paige and K.D. have resided at 791 Hicks Street, Apt. 5a, New York, New York 11231 ("791 Hicks Street").

13.     Plaintiff K.D. is an individual minor child residing in New York City. K.D. was born in July 2013 and, at all relevant times, has resided with his mother at 791 Hicks Street.

14.     K.D. was lead poisoned at 791 Hicks Street. Testing DOH confirmed there was lead paint and lead dust hazards present in the apartment where Paige and K.D. reside. NYCHA left a large hole in the wall of Paige's apartment for almost a year despite her complaints, which on information and belief, contributed to the lead dust that caused K.D.'s lead poisoning. Had Defendants properly inspected the apartment and the common areas associated therewith, pursuant to federal, state and municipal regulations, K.D. would not have been lead poisoned, or at a minimum his lead poisoning would have been significantly mitigated.

15.     Plaintiff Evelyn Gray ("Gray") is an individual residing in New York City.  Gray is the mother of a minor child, P.G. Gray and P.G. previously resided at 1460 Bronx River Avenue, Apt 1A, Bronx, NY 10472 ("1460 Bronx River Ave"), a property owned and managed by NYCHA.

16.     Non-party P.G. is an individual minor child residing in New York City. P.G. was born in October 2009 and resided with Gray at 1460 Bronx River Ave from birth until August 2017.

17.     P.G. was lead poisoned at 1460 Bronx River Ave from lead present in Gray's NYCHA-owned apartment and/or the common areas of 1460 Bronx River Ave. Had Defendants properly inspected the apartment and the common areas associated therewith, pursuant to federal, state and municipal regulations, P.G. would not have been lead poisoned, or at a minimum his or her lead poisoning would have been significantly mitigated.

18.     Taneequa Carrington ("Carrington") is an individual residing in New York City. Carrington is the mother of a minor child, N.C. Carrington resides at 569 East 108th Street, Apt 2A, Brooklyn, NY 11236 ("569 108th Street"), a property owned and managed by NYCHA, from 1997 through the present.

19.     Non-party N.C. is an individual minor child residing in New York City. N.C. was born in January 2015 and has resided with Carrington at 569 108th Street from birth through the present.

20.     N.C. was lead poisoned at 569 108th Street from lead present in Carrington's NYCHA-owned apartment and/or common areas of 569 108th Street. Had Defendants properly inspected the apartment and the common areas associated therewith, pursuant to federal, state and municipal regulations, N.C. would not have been lead poisoned, or at a minimum his or her lead poisoning would have been significantly mitigated.

21.     A.P. is an adult individual residing in New York City. A.P. resides at 2931 Frederick Douglas Blvd, New York, NY 10039 ("2931 Frederick Douglas Blvd") with five of

her minor children. 2931 Frederick Douglas Blvd is a property owned and managed by NYCHA, where A.P. and her children have resided from 2016 through the present.

22.     In or around December 2017, one or more of A.P.'s young children were determined to have lead in their blood. These blood-lead levels were the result of exposure to lead paint and/or lead dust in A.P.'s apartment and/or and the common areas of 2931 Frederick Douglas Blvd.

## GOVERNMENTAL DEFENDANTS

23.     The individually named governmental Defendants are sued in their individual and/or official capacities as indicated below.

24.     Defendant NYCHA is a New York state public-benefit corporation organized under the Public Housing Law. NYCHA is the largest public housing authority in the United States with 326 housing developments throughout the five boroughs of New York City and more than 400,000 residents.

25.     NYCHA owns and manages 176,066 public housing apartments, in 2,462 buildings, throughout the five boroughs of New York City, including the buildings where Plaintiffs reside or resided with their young children during the Class Period.

26.     The NYCHA Board of Directors consists of seven members, of which the chairperson is appointed by and serves at the pleasure of the Mayor of New York City, while the Mayor appoints the others for three-year terms.

27.     Defendant City of New York is a municipal corporation organized under New York State law.

28.     Defendant Shola Olatoye ("Olatoye") is a New York resident and is the current chairperson of the NYCHA Board and chief executive at NYCHA. Olatoye personally approved

of, and thereby participated in the decisions that deliberately created, increased and prolonged NYCHA's non-compliance with federal and New York City lead paint laws and participated in the concealment of lead-paint law violations from Plaintiffs, the public, and the press. Additionally, as chairperson, she was a policymaker for Defendant NYCHA and, as such, her actions constituted customs, policies and/or practices of Defendant NYCHA and Defendant City of New York. Specifically, as the chief executive of NYCHA, Olatoye was integrally involved in devising and implementing the violations described in this Complaint.

29.     Defendant Olatoye has admitted in public statements that NYCHA has not complied with federal lead inspection requirements, and that non-compliance was a matter of custom and policy in an effort to falsely reduce NYCHA's backlog of lead paint inspections.

30.     Defendant Bill de Blasio ("de Blasio") is a New York resident and is the Mayor of New York City. De Blasio personally approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged NYCHA's non-compliance with federal and New York City lead paint laws and participated in the concealment of these violations from Plaintiffs, the public, and the press. As Mayor, de Blasio was a policymaker for Defendant City of New York and Defendant NYCHA and, as such, his actions constituted customs, policies and/or practices of Defendant City of New York and Defendant NYCHA.

31.      De Blasio is personally involved in, inter alia, the management and oversight of Defendant NYCHA's operations, including the development of a new operating plan that was implemented in 2015. Defendant de Blasio is also responsible for Defendant New York City's DOH and Department of Housing Preservation and Development ("HPD").

32.     As early as February 2014, Defendant de Blasio publicly insisted that he, and therefore the City of New York, was responsible for NYCHA. Defendant de Blasio and

Defendant City of New York have thus undertaken a duty to monitor and participate in NYCHA's most fundamental functions, including inspections for lead-based paint and lead-based paint hazards and any necessary repairs/remediation associated therewith.

33.    Defendant Mary Travis Bassett, MD ("Bassett") is a New York Resident and is the current Commissioner of New York City's DOH. She personally approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged NYCHA's non-compliance with federal and New York City lead paint laws and participated in the concealment of these violations from Plaintiffs, the public, and the press. Additionally, as Commissioner, she was a policymaker for the DOH and, as such, her actions constituted customs, policies and/or practices of DOH and Defendant City of New York.

34.    Defendant Maria Torres-Springer ("Torres-Springer") is a resident of New York and is the current Commissioner of HPD. Torres-Springer personally approved of and participated in the decisions that deliberately created, increased and prolonged NYCHA's non-compliance with federal and New York City lead paint laws and participated in the concealment of these violations from Plaintiffs, the public, and the press. Additionally, as Commissioner, she was a policymaker for HPD and Defendant City of New York and, as such, her actions constituted customs, policies and/or practices of HPD and Defendant City of New York.

35.    Defendant Michael Kelly ("Kelly") is a resident of New York and was, at all relevant times, employed as the General Manager of NYCHA, having been appointed on or about March 25, 2015. Defendant Kelly, during his term as General Manager, deliberately created, increased and prolonged NYCHA's non-compliance with federal and New York City lead paint laws and participated in the concealment of these violations from Plaintiffs, the public, and the press.

36.     Defendant Kelly has admitted in public statements that Defendant NYCHA has not complied with federal, state and municipal lead inspection requirements, and that non-compliance was a matter of custom and policy in an effort to falsely reduce NYCHA's backlog of lead paint inspections. Defendant Kelly has announced that he will resign his position, effective February 22, 2018.

37.     Defendant Alicia Glenn ("Glenn") is a resident of New York and serves as the Deputy Mayor for Housing and Economic Development. Defendant Glenn, during her term as Deputy Mayor, deliberately created, increased and prolonged NYCHA's non-compliance with federal and New York City lead paint laws and participated in the concealment of the non-compliance from Plaintiffs, the public, and the press.

38.     On numerous occasions Defendant Glenn met with and advised Defendant Olatoye regarding the filing of inspection certifications. Many of these meetings occurred prior to Defendant Olatoye filing false certifications. Defendant Glenn not once notified the public of NYCHA's failures, despite having knowledge of said failures for at least two years prior to said failures being made public.

39.     Defendant Brian Clarke ("Clarke") is a New York resident and resigned as Senior Vice President for NYCHA Operations on November 17, 2017. Defendant Clarke, during his term as Senior Vice President, deliberately created, increased and prolonged NYCHA's non-compliance with federal and New York City lead paint laws and participated in the concealment of these violations from Plaintiffs, the public, and the press.

40.     Defendant Clarke was aware of and purposefully concealed Defendant NYCHA's failures for over two years before they were made public.

41.    Defendant Jay Krantz ("Krantz") is a resident of New York, and resigned as Director of NYCHA's Technical Services on November 17, 2017. Defendant Krantz, during his term as Director, deliberately created, increased and prolonged NYCHA's non-compliance with federal and New York City lead paint laws and participated in the concealment of these violations from Plaintiffs, the public, and the press.

42.    Defendant Krantz was aware of and purposefully concealed NYCHA's failures for over two years before they were made public.

43.    Defendant Luis Ponce ("Ponce") is a resident of New York and was formerly NYCHA's Senior Vice President for Operations, but on November 17, 2017 was demoted and suspended for thirty days without pay. Defendant Ponce, during his term as Senior Vice President, deliberately created, increased and prolonged NYCHA's non-compliance with federal and New York City lead paint laws and participated in the concealment of these violations from Plaintiffs, the public, and the press.

44.    Defendant Ponce was aware of and purposefully concealed Defendant NYCHA's failures for over two years before they were made public.

45.    Defendant Hermania Palacio ("Palacio") is a New York resident and presently serves as Deputy Mayor for Health and Human Services. Defendant Palacio, during her term as Deputy Mayor, deliberately created, increased and prolonged NYCHA's non-compliance with federal and New York City lead paint laws and participated in the concealment of these violations from Plaintiffs, the public, and the press.

46.    Defendant Palacio created and advised the administration and Defendant NYCHA regarding lead-poisoning prevention policies with an eye toward minimizing Defendants' responsibilities, and with no regard for the Plaintiffs and Class members most affected by lead-

based paint and lead-based paint hazard exposure – children. Defendant Palacio was aware of and purposefully concealed NYCHA's failures for over two years before they were made public.

<strong><u>PRIVATE DEFENDANTS</u></strong>

47.    Defendant ATC Associates, Inc. ("ATC Inc.") is a New York professional corporation with its principal place of business located at 104 East 25th Street, New York, New York 10010.

48.    Defendant ATC Group Services, LLC ("ATC LLC") is a Louisiana corporation with its principal place of business in Lafayette, Louisiana. Per its website, ATC LLC maintains a branch in New York City located at 104 East 25th Street, New York, New York 10010. The "local branch" is ATC Inc.

49.    Defendants ATC Inc. and ATC LLC (collectively hereinafter "ATC") are Defendants in this action based on their performance of lead paint inspections and investigations on behalf of NYCHA.

50.    During the relevant period, ATC provided environmental consulting services to the governmental Defendants with regard to lead-based paint and lead-based paint hazards. ATC was hired by NYCHA to perform visual lead paint inspections in July 2017. NYCHA also hired ATC to conduct lead paint testing and investigations, prior and subsequent thereto, which routinely contradicted lead hazard investigation findings determined by DOH.

<strong><u>BACKGROUND</u></strong>

### A. The Dangers of Lead Paint and Lead Paint Dust

51.    Lead is a neurotoxin, so when people, specifically children under the age of seven, absorb certain quantities, they can be brain damaged.

52.     The use of lead-based paint was banned by New York City in 1960, and by the Federal Government in 1978.

53.     Historically, lead in paint served as a filler and whitening agent.

54.     Buildings constructed before 1978 typically contained paint that was lead-based.

55.     Lead-based paint becomes dangerous to young children when it chips, flakes or is contained on friction surfaces, like windowsills, where dust can be created.

56.     In 1995, Steve Matthews, who at that time was a spokesman for the New York City Health Department stated:

> *In some ways, the biggest problem is not from the obvious, the walls, but from friction surfaces, like doorjambs and window casings. Every time the door opens and closes or a window is raised and lowered, you're putting dust into the atmosphere. You can see the chips flaking form the wall, but you don't really see the dust from opening and closing the door.*

57.     Experts now consider lead dust to be "the primary exposure pathway of childhood lead poisoning." *N.Y.C. Coal. to End Lead Poisoning, Inc. v. Vallone, 100 N.Y.2d 337, 343 (2003).* Lead dust is invisible to the naked eye and highly toxic even in very small quantities. Indeed, in 1999 HUD lowered its safety standards to only 40 micrograms (millionths' of a gram) per square foot of floor area (:g/ft²), 64 F.R. 50140, 50181 (1999), *an amount less than half the mass of a single particle of coffee sweetener.*

58.     The units of measurement are sometimes difficult to synthesize, micrograms (or millionths of a gram) per deciliter of blood, abbreviated ug/dL, but the trend is obvious: in 1970 the Centers for Disease Control ("CDC") declared that blood lead levels of 40 micrograms and up were considered elevated; in 1991 the same agency used 10 micrograms, or 75 percent less; in 2012, the CDC began using a reference level of 5 micrograms per deciliter to identify children with elevated blood lead levels.

59.     The CDC has gone even further, stating that there is no "safe" blood lead level.

60.     Children, particularly very young children, are most susceptible to ingesting lead-based paint because of how their mobility evolves – from rolling around on the ground, to learning to crawl, to learning to prop oneself up, to being able to stand, to walking.

61.     Children are more prone to placing things in their mouth, so the dust that might accumulate on a friction surface or floor is much more likely to find its way to a child's hand and mouth than it would an adult.

62.     To compound matters, lead-based paint chips have a sweet taste, so that if a child puts one in his mouth, he will likely enjoy the taste and is prone to do it repeatedly.

63.     There is also no cure or treatment for lead poisoning. Once a child ingests a certain amount of lead, he or she will be lead poisoned. And even if the lead is flushed from his body, the damage that occurs is irreversible.

### B. HUD Lead Paint Regulations

64.     A HUD regulation known as the Lead Safe Housing Rule, 24 C.F.R. 35, requires public housing authorities to conduct annual visual assessments of apartments where the possibility of lead-based paint has not been ruled out, regardless of the age of the occupants. Conversely, if testing demonstrates that no lead-based paint is present, public housing authorities may obtain exemptions.

65.     At NYCHA, as of 2016, there were at least 55,000 apartments that required annual visual inspections pursuant to 24 C.F.R. 35.

66.     Under 24 C.F.R. § 35.150(b), "local laws, ordinances, codes or regulations governing evaluation and hazard reduction" are not only applicable, but indeed, "the more protective definition (i.e., the lower level)" shall be followed[.]"

### C. Federal Lead Paint Disclosure Law

67.    Section 1018, codified at 42 U.S.C. § 4852d, imposes lead-based paint disclosure and warning requirements at the time of the sale **or rental** of the vast majority of pre-1978 housing units. These disclosures must be made at the time of every real property transaction, including annual lease renewals for NYCHA tenants.

68.    The regulations require the lessor to make the following disclosures before the lessee becomes legally bound under the lease. The lessor must:

- Provide the lessee a copy of the EPA pamphlet Protect Your Family From Lead in Your Home (EPA 747-K-94-001), or an equivalent pamphlet that the EPA has approved for use in the situs state;

- Disclose to the lessee the presence in the housing of any lead-based paint or lead-based paint hazards, defined as conditions that cause exposure to lead from lead-contaminated soil or dust, or from any lead-contaminated paint that has deteriorated or is present in accessible surfaces, friction surfaces or impact surfaces that would result is adverse human health effects;

- Disclose to the lessee any additional information available concerning the known lead-based paint or lead-based paint hazards, such as the basis for the conclusion that lead-based paint or lead-based paint hazards are present, the location of any such paint or hazards, and the condition of the paint; and

- Provide the lessee with any records or reports available to the lessor pertaining to lead-based paint or lead-based paint hazards, not only in the rental unit, but also in common areas. In multifamily housing, the lessor must also provide reports and records about paint and hazards in other units, if the information was part of an evaluation or reduction of paint and hazards in the project as a whole.

- The lease must also contain a statement by the lessor disclosing the presence of any lead-based paint or lead-based paint hazards, or indicating that the lessor does not know of any such paint or hazards. It must also list any records or reports on lead-based paint or lead-based paint hazards that the lessor has provided to the lessee, or state that no such records or reports are available. The lease must also contain a statement by the lessee affirming receipt of this information and of the EPA-approved pamphlet.

69.    While Defendant NYCHA has a pattern and practice of conducting repairs, renovations and remediation in its units after one tenant moves out and before another moves in,

no such statements regarding the work appears in leases executed by new tenants, and NYCHA has universally failed to provide any records of such work to new tenants at the commencement of their tenancy.

70.    The regulations provide exemptions for leases of housing previously found to be lead-free by a certified inspector, short-term leases (100 days or less) where no renewal or extension can occur, and renewals of leases where the lessor has previously made the required disclosures and has not obtained any new information that must be disclosed.

71.    Section 1018 also provides for a number of enforcement mechanisms, including penalties and injunctions. **The statute expressly creates a private right of action**. Knowing violators are liable to lessees for treble damages, and that liability can extend to agents; the court can also award a prevailing lessee costs, reasonable attorneys' fees, and expert witness fees; the courts can also impose up to $10,000 in civil and/or criminal penalties and up to one year in jail.

### D.  Worker Certification (TSCA § 402 Regulations)

72.    Lead-based paint activities are defined in § 402(b) (15 U.S.C. § 2682(b)) as: "in the case of target housing [i.e., pre-1978], risk assessment, inspection, and abatement" and in the case of "pre-1978 public buildings, commercial buildings, bridge, or other structures, identification of lead-based paint and materials containing lead-based paint, de-leading, removal of lead from bridges, and demolition."

73.    The regulations not only control the certification of persons engaged in lead-based paint activities, but set fairly exacting standards for the activities themselves. See, e.g., 40 C.F.R. § 745.227 ("Work-practice standards for conducting lead-based paint activities: target housing and child-occupied facilities").

74.     Although TSCA § 402 required the EPA to promulgate regulations by April 1994 concerning renovation and remodeling work that may create a risk of exposure to lead paint, these regulations were not issued until April 22, 2008. 73 FR21692.

75.     The EPA has established requirements for training renovators and dust sampling technicians; certifying renovators, dust sampling technicians, and renovation firms; accrediting providers of renovation and dust sampling technician training; and renovation work practices.

76.     The training programs began to go into effect on June 23, 2008 and firms could begin applying for certification on October 22, 2009. Effective April 22, 2010, in target housing and child-occupied facilities, no firm may perform, offer, or claim to perform renovations without EPA certification for repair and renovation activities and must comply with the work practice standards under this rule. In New York City public housing, this has occurred in less than 20% of the instances all repairs and renovations have taken place involving the presence of lead-based paint hazards.

### E.  New York City Law

77.     NYC Local Law 1 of 2004, the New York City Childhood Lead Poisoning Prevention Act, requires landlords—including NYCHA—to conduct annual visual inspections of apartments built before 1960, or between 1960 and 1978 "where the owner has actual knowledge of the presence of lead-based paint," but only for apartments where the tenant has reported the presence of a resident child under the age of six. At NYCHA, there are, once pending exemption applications have been processed, at least 48,000 units in which lead paint is either presumed or has been found.

78.     LL1/2004, as well as prior versions of the law, identifies dust from lead-based paint or paint of unknown lead content in any dwelling unit as a public nuisance and a condition dangerous to life and health.

  i.    <u>Key Definitions</u>

79.     LL1/2004 and its implementing regulations introduced many newly defined terms that were not utilized in prior New York City lead laws. Most importantly, it included "lead-contaminated dust," (Admin. Code § 27-2056.2(8), 28 R.C.N.Y. § 11-01(u)) which is the major pathway of lead poisoning in children. Prior laws merely included lead-contaminated dust within the definition of a "lead-based paint hazard." (§§ 27-2056.2(6), 11-01(s))

80.     Lead-based paint hazards are also broadly defined by LL1/2004 to any condition that causes environmental exposure to lead from paint, rather than just peeling paint.

81.     Under LL1/2004, landlords are responsible for lead-based paint hazards in the common areas of a child-occupied multiple dwelling. A "Common Area" is defined as "a portion of a multiple dwelling that is not within a dwelling unit and is regularly used by occupants for access to and egress from any dwelling unit within such multiple dwelling" (§272056.2(2), <u>see also</u> 28 R.C.N.Y. § 11-01(f)).

82.     LL1/2004 § 27-2056.3 (and 28 R.C.N.Y. §11-02) make the landlord responsible not only to promptly remediate lead hazards, but also to prevent the reasonably foreseeable occurrences of lead-based paint hazards.

83.     This responsibility only applies to multiple dwelling units where a child of the applicable age resides (and common areas of such buildings). § 27-2056.3.

84.     The landlord also has a duty to remediate any underlying defect causing a lead-based paint hazard in the unit and in the common areas of multiple dwellings. Id., see also 28 R.C.N.Y. § 11-02.

85.     The owner must always use the specific safe work practices required in § 27.2056.11 and 28 R.C.N.Y. § 11-06 whenever removing lead hazards, or indeed, whenever disturbing lead paint or paint of unknown lead content.

86.     Sections 27-2056.4 and 11-04(a) provide that in  child-occupied units in multiple dwellings erected before 1960 (or before 1978 where the landlord knows of the presence of lead-based paint), the landlord must investigate for lead hazards such as peeling paint, chewable surfaces, deteriorated subsurfaces, friction surfaces, and impact surfaces at least once a year.

87.     Under LL1/2004 the owner may be obligated to conduct an investigation more frequently, such as when he or she knows (or should know) of a condition that is reasonably foreseeable to cause a lead-based paint hazard, when an occupant makes a complaint or requests an inspection, or when the owner receives a notice of violation or is ordered to correct a lead-based paint hazard. The complaint need not be related specifically to lead in order to trigger the obligation to remediate a hazard.

88.     If a landlord chooses not to permanently abate lead-based paint, the landlord is continually obligated to assure that it is not in a hazardous condition.

89.     LL1/2004 makes it the owner's responsibility to ascertain if a child of applicable age resides in a dwelling unit. §§ 272056.4(a), 11-03(b)(5).

      ii.     Presumption of Lead Paint

90.     §27-2056.5 and 28 R.C.N.Y. § 11-07, LL1/2004 continue the rebuttable presumption of the prior laws: in any multiple dwelling erected before 1960, where a child of

applicable age lives, it is presumed that the paint within the dwelling unit or the common area is lead-based. This presumption may be rebutted by the owner through the submission to HPD of a sworn statement along with lead-based paint testing or sampling results, and a sworn written statement by the person performing the testing (who must be EPA certified) indicating that no lead-based paint exists in the dwelling unit or common area. §§ 27-2056.5(a) and 11-07(b).

91.    The owner can also apply for an exemption to the presumption if she or he has performed substantial alterations to the apartment, or common areas, such as removal or permanent covering of all lead-based paint. §§ 27-2056.5(b) and 11-08.

92.    Whether the proof submitted by the landlord is adequate to rebut the presumption is decided by HPD.§§ 27-2056.5(a).

iii.    HPD Inspections

93.    For the purposes of HMC violations, §27-2056.6 defines a lead-based paint violation as "lead-based paint that is peeling or on a deteriorated subsurface in a unit in a multiple dwelling where a child of applicable age resides."

94.    Under §27-2056.9, HPD must inspect within 10 days after receiving a complaint regarding peeling paint, a deteriorated subsurface or an underlying defect in an apartment built before 1960 where a child of applicable age lives.

95.    If HPD is unable to gain access within the 10 days, it must make a reasonable second attempt to gain access within 5 days of the first attempt. Unlike the prior laws (which chiefly relied on the statutory presumption of lead paint), under LL1/2004 HPD inspections use an XRF analyzer to determine whether lead-based paint is present in the apartment, except for when the XRF analysis is unable to be performed during an inspection, in which case HPD can continue to rely on the §27-2056.5 presumption to issue violations.

96.     If a violation is found, HPD must serve a notice of violation on the owner within 10 additional days, along with a guide on the safe work practice regulations. In addition, notification of the violation must be sent simultaneously to the tenant, §27-2155(l)(1), § 27-2056.13, along with the phone number of DHMH for help with lead screening.

97.     LL1/2004 also added several pro-active measures in § 27-2056.9 regarding HPD enforcement. For example, when HPD receives a complaint about peeling paint and underlying defect, or a deteriorated subsurface, HPD must make diligent efforts to ascertain whether a child of applicable age resides in the apartment, and if so, treat it as a lead paint complaint. §27-2056.9(b).

98.     In addition, § 272056.9(a) requires that when HPD enters a dwelling unit in a pre-1960 building to investigate any violation or complaint – whether lead-related or not – the inspector must attempt to ascertain whether a child of applicable age lives in the apartment by asking the occupant. If the answer is yes, the inspector must immediately perform a room-by-room inspection of the apartment and record whether the paint in each room is peeling or intact. If peeling paint is found, within 10 days HPD must perform another inspection using an XRF analyzer to determine whether lead-based paint is within the dwelling.

99.     Pursuant to §27-2056.10, HPD inspectors and supervisory personnel are required to be appropriately trained to EPA and HUD standards for performance of visual inspections.

100.    A violation cannot be removed from HPD's records nor will it be deemed corrected until HPD's records contain written verification that it conducted a final inspection and verified correction of the violation, and copies of lead dust clearance test results, where applicable by law, are filed.

101.     A copy of the final inspection report and the status of the violation must be mailed or delivered to the occupant and owner. § 27-2115(l)(4).

      iv.   <u>Work Practices</u>

102.     HPD's regulations, promulgated with the approval of DOH, establish safe work practices owners must follow, tailored to different circumstances. §27-2056.11. <u>See</u> 28 R.C.N.Y. § 11-06.

103.     In general, these regulations are required to be as protective as the safety standards that already apply when a child is determined to be lead poisoned (Health Code § 173.14).

104.     Even when a violation has not been issued, if an owner is performing any work in a pre-1960 building (or pre-1978 if there is known lead paint) that will disturb lead-based paint or paint of unknown lead content in an apartment where a child of applicable age lives, or in the common area of such multiple dwelling, § 27-2056.11(a)(2) requires that the work practices in § 11-06 be followed, including the occupant protection provisions in § 11-06(g)(2).

105.     Dust clearance tests must be performed at the completion of work. §§ 27-2056.11(a)(2)(i), 11-06(g)(2)(vii).

106.     Those performing the work must also, at a minimum, have completed a course on lead-safe work practices given by or on behalf of HPD, the United States Environmental Protection Agency, or HUD or an entity authorized to give such a course. §§ 27-2056.11(a)(2)(i), 11-06(b)(3). For work that disturbs more than 100 square feet of lead-based paint or work that involves the removal of two or more windows with lead-based paint, the owner must, in addition, use only EPA certified firms. §§ 27-2056.11(a)(2)(ii), 11-06(b)(2).

107.     Owners performing work in order to comply with a notice of violation or order to correct issued by the City must use the HPD work practices and, in addition, all work must be performed only by EPA certified firms. §§ 27-2056.11(a)(1); 11-06(b)(2). Where a landlord is performing work on turnover pursuant to § 27-2056.8, lead-contaminated dust clearance tests must be performed after work is completed. §§ 27-2056.11(a)(3), 11-06(g)(3).

108.     The landlord must provide appropriate temporary relocation to the occupants when the work cannot be performed safely §§ 27-2056.11(a)(2)(i), 11-06(g)(2)(viii), (g)(1)(ix)(E).

109.     The owner of the premises or the firm performing the work must also file with DHMH, no less than 10 days prior to the commencement of work, so that the DHMH can perform audits of the work. §§ 27-2056.11(a)(2)(ii), 11-06(a).

         v.     Dust clearance tests

110.     Persons performing dust clearance tests must be third parties who are independent of the owner and any individual or firm that performs the work. §§ 27-2056.11(b), 11-06(b)(2)(iii), (3)(ii), and (4).

111.     They must have successfully completed a course approved or administered by DHMH or by the EPA or HUD and must obtain a certificate or document issued by or acceptable to DHMH. Id.

112.     All dust clearance tests sent to a laboratory for analysis must include a sworn certification that the test was performed in compliance with all applicable rules and regulations. § 27-2056.11(c).

113.     When an owner is performing work in response to a cited violation all clearance test results must be filed with HPD. § 27-2056.11(d).

114.    A copy of all dust clearance test results must be given to the occupant by the owner, and must provide a sufficiently clear explanation of the meaning of such results. §§ 27-2056.11(d), 11-06(g)(1)(ix)(D), (g)(2)(vii), and (g)(3)(iii).

115.    Work areas cannot be cleared for permanent re-occupancy until dust clearance is achieved, however, temporary access is permitted to occupants pending lab results as long as the test samples have been collected and all the required cleanup measures have been performed. § 11-06(g)(1)(ix)(D).

### F.  Fair Housing Act Requirements

116.    The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, **familial status**, or national origin." 42 U.S.C. § 3604(b) (2018).

117.    "Familial status" "means one or more individuals (who have not attained the age of 18 years) being domiciled with" a "parent or another person having legal custody of such individual or individuals" or " the designee of such parent or other person having such custody, with the written permission of such parent or other person." Id. § 3602(k). This definition and protection extends to "any person who is pregnant." Id.

118.    The U.S. Department of Housing and Urban Development (HUD) promulgated a regulation in 2013 recognizing disparate-impact claims. *See* 24 C.F.R. § 100.500. It provides that a "discriminatory effect" can form the basis of FHA liability "even if the practice was not motivated by a discriminatory intent." *Id.* "A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex,

handicap, familial status, or national origin." *Id.* § 100.500(a). In 2015, the United States Supreme Court held that "disparate-impact claims are cognizable under the [FHA]." *Texas Dep't of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2525 (2015).

119.    Discrimination based on familial status includes such misconduct as refusing to rent to families with children based on the presence of lead paint in a dwelling or restricting children from accessing common areas. Refusing to rent to a family with children in order to avoid the expense of performing lead paint remediation is direct discrimination on familial status; refusing to perform legally-required lead paint inspections and remediation imposes a predictable and disparate impact on families with children.

### G.  HUD Public Housing Requirements

120.    Each year, public housing authorities ("PHAs") that receive federal subsidies must certify that they are in compliance with HUD regulations, including a certification that the "PHA will comply with the Lead-Based Paint Poisoning Prevention Act, the Residential Lead-Based Paint Hazard Reduction Act of 1992, and 24 CFR Part 35" and a certification that "PHA certifies that it is in compliance with applicable Federal statutory and regulatory requirements." HUD, Certification of Compliance with PHA Plans and Related Regulations, *available at* https://www.hud.gov/sites/documents/DOC_11805.PDF.

121.    42 USCS § 1437d(l) states that "[e]ach public housing agency shall utilize leases which . . . (3) obligate the public housing agency to maintain the project in a decent, safe, and sanitary condition. This is an "affirmative command mandating that housing authorities contract with tenants in a particular way." *Davis v. City of N.Y.*, 902 F. Supp. 2d 405, 442 (S.D.N.Y. 2012) (construing section 1437d(l) as creating federal rights actionable under section 1983).

## FACTUAL ALLEGATIONS

### A.  NYCHA's Failure to Inspect

122.    Lead paint was banned in New York City in 1960. This means NYCHA has had *58 years* to test and remediate lead paint hazards in its buildings.

123.    Yet, despite the nearly six-decades that have passed since the hazards of lead-based paint to young children were recognized and codified, NYCHA has not only failed to remediate lead-based paint hazards, but has engaged in a scheme to knowingly mislead the public, its tenants, and federal regulators regarding its disregard for lead paint inspection and remediation requirements.

124.    In or around October 2015, the United States Attorney's Office for the Southern District of New York ("USAO-SDNY") served a Civil Investigative Demand, a document request similar to a subpoena, on NYCHA related to NYCHA's lead based paint inspection and remediation activities. It is the practice of the United States Department of Justice to only issue a Civil Investigation Demand under the False Claims Act after determining that there is credible evidence of fraud against a federally-funded program.

125.    In March 2016, following the entry of an order compelling NYCHA to produce documents to the USAO-SDNY, it was reported that NYCHA had been cooperating with a federal investigation into its lead paint practices, that Mayor Bill de Blasio was aware of the investigation, and that NYCHA chairperson Shola Olatoye described the investigation as "very expansive."

126.    In July 2017, it was reported that NYCHA had failed to comply with federal and New York City laws requiring annual lead paint inspections for all dwellings constructed prior to 1960 where young children reside.

127.    On November 14, 2017, one week after Mayor Bill de Blasio's re-election, the Department of Investigation for the City of New York released an investigation report titled, "Investigation into False Certifications of NYCHA Lead Paint Inspections" (the "DOI Report"). The DOI report determined that

> NYCHA has violated city and federal laws by failing to conduct mandatory safety inspections for lead paint. Further, since 2013, NYCHA has falsely certified to the United States Department of Housing and Urban Development (HUD) that it was in compliance with the federal law. By 2015, certain senior NYCHA officials were aware that NYCHA was violating city lead laws. By summer 2016, NYCHA's Chair, Shola Olatoye, knew that NYCHA was out of compliance both with city and federal lead laws when she submitted a false certification to HUD.

> This investigation uncovered what, at a minimum, constituted a series of flawed decisions and a lack of due diligence by NYCHA, including by NYCHA executive leadership, that resulted in NYCHA submitting false lead certifications, from 2013 through 2016, with HUD. These certifications passed through NYCHA executive leadership without anyone performing basic due diligence checks to ensure that the information submitted to HUD – under penalty of perjury – was accurate. Indeed, by 2016, senior staff at NYCHA affirmatively knew that the forms were not accurate.

**B. Inspections, Remediation, and Abatement Using Qualified Workers**

128.    Following the DOI report, NYCHA publicly admitted that it used workers to perform lead paint inspections and cleanup without proper training, licenses and certifications for years and that, according to NYCHA, the inspections "may not be accurate or reliable and therefore the knowledge of the extent of the problem is questionable." Until 2016, none of the workers used by NCHA to perform lead paint visual inspections had a certificate required by HUD and until August 2017, no NYCHA workers performing lead paint cleanup had an EPA-required lead paint renovation certification.

129.    Improperly performed lead paint remediation can actually make the problem worse by spreading lead paint dust to clean surfaces, common areas, and other units. DOI is

currently investigating the likelihood that 20,000 NYCHA apartments were improperly exempted from lead paint inspection and falsely designated as "lead-free" through abatement and testing performed by unqualified workers.

### C.  Failure to Inspect and Remediate Common Areas

130.    In December 2017, NYCHA officials admitted that they had engaged in yet another violation of federal and New York City law by failing to inspect common areas for lead paint violations. In fact, NYCHA admitted that had not consistently conducted common-area inspections "since Local Law 1 was passed in 2003."

131.    HUD and New York City guidelines also require dust wipe testing of common areas as part of a lead paint investigation when a child tests positive for lead, which NYCHA also failed to perform despite hundreds of lead paint investigations in its buildings from 2010 through the present.

132.    NYCHA announced that it would start inspecting common areas after this outrageous lapse on or around December 21, 2017, just days after counsel for NYCHA informed the judge in this matter that nearly all lead paint inspections had been completed. NYCHA now estimates that it will not be done completing common-area inspections for approximately 250 of its buildings until March 2018.

### D.  Failure to Make Lead Paint Disclosures

133.    The results of the common-area inspections in 2018, and prior inspection and testing of commons areas have not been disclosed to tenants. Nor have these lead paint testing and inspection activities and related documents been disclosed to new tenants and current tenants at the time of their annual lease renewals.

### E. Disparate Impact on Families with Young Children

134.   NYCHA implemented policies of failing to inspect paint in apartments constructed prior to 1960 (or 1978 where it knew lead could be present). This policy exposes families with young children to disproportionately-higher risk of lead-paint poisoning and permanent neurological harm because young children are much more likely to touch and ingest lead paint dust and peeling, chipping paint. Families with children are also more likely to suffer permanent and devastating harm as a result of NYCHA's lead paint policies because young children are most susceptible to devastating injury from lead paint poisoning.

135.   In NYCHA housing, for lead paint investigations triggered by positive blood lead levels, incidences of lead paint poisoning, complaints of lead paint exposure, and harm therefrom, virtually 100 percent of the victims are young children (and their families).

136.   Due to the mechanisms of lead paint exposure, the medically-accepted susceptibility of young children to harm from lead poisoning, the comprehensive federal, state, and city regulatory schemes that have been enacted to prevent childhood lead paint poisoning, and numerous reports and statements issued by Defendants, it is entirely predictable that NYCHA's policies related to lead paint activities have and will disproportionately harm families with young children in comparison to other tenants.

137.   The entrances, hallways, stairwells, and other common areas of NYCHA buildings, which NYCHA has failed to inspect and remediate, from at least 2003 through the present, are disproportionately dangerous to young children because there is low likelihood that adult tenants will ingest the lead dust or chipping and peeling paint, but there is a significantly higher chance that young children will be lead poisoned from the same hazard. This disparity is obvious and predictable.

138.    Plaintiffs are all tenants with young  children who have been disproportionately harmed by NYCHA's lead paint policies because their children have been exposed to lead paint hazards in NYCHA buildings and have tested positive for the presence of lead their blood. Plaintiffs would not have suffered these impacts if they did not have children residing with them in NYCHA residences.

139.    Further, NYCHA knowingly and intentionally implemented policies that it knew would disproportionately impact families with young children by exposing them to illegal lead paint hazards. Such was readily apparent based on the nature of the policies that the harm would fall disproportionately on families with young children.

### F.  The DOI Report and Role of the Individual Defendants

140.    As a public housing agency receiving federal funding from HUD, every fall NYCHA is required to file with HUD a PHA Annual Agency Plan (the "Annual Plan") for the upcoming Fiscal Year, a document that contains information about NYCHA programs and initiatives ranging from physical needs assessments to technological innovations.

141.    The Annual Plan also requires the attachment of numerous documents, including the "PHA Certifications of Compliance with PHA Plans and Related Regulations" (the "HUD certification"), also known as HUD form 50077, and all documentation must be made available for public review. Concerning lead-based paint, NYCHA attests via the HUD certification that: (1) the PHA will comply with the Lead-Based Paint Poisoning Prevention Act, the Residential Lead-Based Paint Hazard Reduction Act of 1992, and 24 CFR Part 35; and (2) the PHA certifies that it is in compliance with all applicable Federal statutory and regulatory requirements.

142.    NYCHA fell out of compliance with Local Law 1 and 24 C.F.R. 35 by the end of 2012. As a result, the HUD certifications submitted by NYCHA from 2013 through 2016 were false.

143.    NYCHA, during the same period, also failed to comply with New York City lead safety rules, specifically LL1/2004 requiring annual lead-based paint inspections, remediation and repair of lead-paint hazards, turnover remediation, and the use of certified personnel for inspection and remediation work.

144.    Historically, NYCHA performed the required visual assessments for lead-based paint hazards as part of HUD-mandated annual inspections to evaluate general apartment conditions. In 2012, HUD relaxed its rule so that apartment inspections were no longer required to be performed every year, in order to free-up resources for apartment maintenance.

145.    NYCHA falsely claims this *relaxation* of the rule was actually an *elimination* of the rule for those premises that had previously been "inspected" and "remediated."

146.    This interpretation was wrong, as evidenced by NYCHA's rush to inspect thousands of premises in October 2017 in an effort to comply with Federal rules and regulations it had failed to adhere to in the four preceding years.

147.    However, even if NYCHA's interpretation was correct, unqualified and unlicensed individuals that could not have made substantive findings conducted the inspections and remediation undertaken by NYCHA, its agents, employees, subsidiaries and proxies, and thus their findings and remediation work could not have served as a basis for relaxing **or** eliminating the rule.

148.    In approximately August 2012, NYCHA ceased conducting annual apartment inspections and did not create a separate protocol to continue lead inspections. As a result,

NYCHA was no longer performing annual visual assessments for potential lead-based paint hazards as legally required.

149.    In October 2013, NYCHA submitted to HUD its fiscal year 2014 Annual Plan with accompanying certifications, including HUD Form 50077, which NYCHA's then-Chair signed on October 11, 2013.

150.    Because NYCHA had not conducted visual assessments for lead-based paint hazards every year beginning in 2012, NYCHA's certification that it was compliant with federal lead-based paint laws was false.

151.    In October 2014, NYCHA submitted to HUD its fiscal year 2015 Annual Plan with accompanying certifications, including HUD Form 50077, which was signed by Defendant Defendant Olatoye on October 16, 2014.

152.    Because at that time NYCHA was still not conducting annual lead inspections, it continued to be noncompliant with Local Law 1 and 24 C.F.R. 35, thereby making the certification to HUD false.

153.    A senior official at NYCHA reported that he believed in 2015 that there was "general knowledge at the executive level" that NYCHA had suspended apartment inspections, because the General Manager's office was involved in the process of resuming inspections. By April 2015, certain senior officials had learned that NYCHA was not in compliance with Local Law 1.

154.    On May 7, 2015, in an email, a senior operations executive asked another NYCHA official to provide a list of apartments with children under 7 years old in reference to lead law compliance. Meeting minutes show that on June 5, 2015, a group of NYCHA managers discussed apartment inspections including requirements for annual inspections. On July 16,

2015, a group of NYCHA managers recommended that development maintenance workers be assigned approximately eight apartment inspections per day in order to meet various goals, including inspection of "all apartments that may contain lead and have children under the age of six (6) residing in them, every year."

155.    Further, during a New York City Department of Investigation ("DOI") interview, another senior operations executive stated that he first learned of the Local Law 1 violation in 2015 when he was working with a group on a plan to switch back to annual inspections, focusing first on apartments with children under six.

156.    During another DOI interview, the General Manager, Defendant Kelly said that he did not know of the Local Law 1 violation until approximately a year later in April or May 2016. Chair Olatoye also said that she was not made aware that NYCHA was out of compliance with Local Law 1 until April or May 2016.

157.    In October 2015, NYCHA submitted to HUD its fiscal year 2016 Annual Plan with accompanying certifications, including HUD Form 50077, which Defendant Olatoye signed on October 12, 2015. Again, this certification that NYCHA was compliant with federal lead-based paint laws was false.

158.    Although NYCHA's Chair, Defendant Olatoye, and General Manager, Defendant Kelly, stated they were not aware that HUD form 50077 was false at the time it was submitted in October 2015, the DOI determined that in the spring 2015, certain senior NYCHA officials, including operations executives, did know that NYCHA was out of compliance with Local Law 1 (and thus should have known of a potential violation of the corresponding federal rule), because they were working to remediate the legal violation.

159.    In fact, one operations executive during a DOI investigation stated that if asked, he would have answered that NYCHA was not in compliance with applicable lead laws – but he was never asked.

160.    NYCHA failed to put in place a system to confirm the accuracy of federal forms before they were submitted.

161.    NYCHA's failure to confirm the accuracy of filings before they were made is an unacceptable gap in procedures.

162.    After NYCHA's Chair, Defendant Olatoye, and General Manager, Defendant Kelly, became aware of Local Law 1 noncompliance in April or May 2016, NYCHA began a program to inspect and remediate any lead hazards in units where NYCHA had not ruled out lead paint and a child under six years old resided.

163.    Unfortunately, the plan did not include utilization of qualified or licensed workers, further exacerbating the harm associated with the institutional failure to inspect over the course of four years.

164.    At least six months after receiving a notice of a federal inquiry into a range of issues including lead-based paint and lead-based paint hazard inspections, for the first time in the summer of 2016, a senior advisor at NYCHA researched federal law concerning lead, and concluded that NYCHA was also in violation of the HUD regulations, 24 C.F.R. 35.

165.    The NYCHA official, whose name has not be revealed, convened a group of the relevant executives to conduct an urgent assessment of NYCHA's lead-based paint situation, and at the end of July 2016, Chair Olatoye was presented with a "lead workflow"/"game plan" to address NYCHA's lead obligations.

166.    In July 2016, a senior advisor circulated a draft chart detailing NYCHA's obligations under Local Law 1 and 24 C.F.R. 35, including a notation that the HUD regulation required visual assessments "at unit turnover and every 12 months."

167.    This appears to be the first time in four years (and only as a result of an investigation by the USAO-SDNY) that any Defendant attempted to understand fully NYCHA's obligations regarding lead-based paint and lead-based paint hazards under federal, state and local laws.

168.    On September 13, 2016, during a routine quarterly oversight meeting attended by Defendant Olatoye, Defendant Kelly, and other top NYCHA executives at HUD's central office in Washington, D.C., NYCHA executives delivered a PowerPoint presentation about various operations issues to numerous HUD officials.

169.    In one of the September 13 PowerPoint slides concerning "Accountability: Lead-Based Paint," NYCHA's talking points read:

> NYCHA has approximately 55,000 units where we have not yet ruled out lead-based paint. Approximately 4,200 of these 55,000 units have a child under 6 years old living there. We just completed inspections of these 4,200 units ... I want to talk a little more about inspections. Earlier, when we spoke about service levels, it was mentioned that a mistake of the previous administration was putting too much focus on work order numbers and there were some consequences. In a recent review of how this approach affected other areas of operations, it came to our attention that, starting in 2012, the previous administration made the decision to cease apartment inspections for a two-year period. It was through these annual apartment inspections that lead-based paint apartments also received their annual visual assessments, so this also ceased for these two years. Completing the recent inspections of the 4,231 units where a child under 6 years old focused our resources on where the risk of exposure to lead hazards is the greatest but it was just the first step in correcting for this. We are also creating a new operations plan that will also address the annual required inspections for the remaining 50,000 lead-based paint units which don't have a child under 6 years old, bringing us back on track.

170.    This statement makes no reference to the fact that for the approximately 75,000 units for which NYCHA has "ruled out" lead-based paint, some have never been inspected despite being built before 1978, and some have been inspected and "cleared" by unqualified and unlicensed professionals.

171.    One month after the aforementioned meeting with HUD, on October 18, 2016, NYCHA submitted to HUD its Fiscal Year 2017 Annual Plan, with HUD Form 50077 signed by Defendant Olatoye, wherein NYCHA falsely certified that it was in compliance with federal lead-based paint regulations.

172.    Defendant Olatoye has gone on record that in October 2016, when this certification was submitted, she was aware that NYCHA was not in compliance with the HUD regulations, which she considered "obviously a management failure," and thus that the certification was not accurate. However, she stated that in August and September 2016, NYCHA had already disclosed that information to HUD both in a private briefing document and orally for senior HUD officials.

173.    The forms by contrast are certifications to the overall agency that are publicly available including to NYCHA tenants and other interested parties, to whom information regarding non-compliance had not been disclosed.

174.    The General Manager, Defendant Kelly, who reviewed the HUD certification in August/September 2016, before it went to a Board vote, has stated on the record that although he was aware at the time that NYCHA was not in compliance with federal regulations, "we felt that this was something that ... HUD knew about, and we were submitting the report to HUD so … the disclosure was the important part."

175.     Although Defendants Olatoye, Kelly and other senior executives were aware that NYCHA was out of compliance with federal lead-based paint regulations, NYCHA nonetheless submitted a false certification in October 2016, and had no reasonable explanation for this lie.

## CLASS ALLEGATIONS

176.     Plaintiffs request certification pursuant to Fed. R. Civ. P 23(b)(2) on behalf of a proposed injunctive relief class defined as follows: NYCHA residents who have, had, or are of the age to have, young children, and who from January 1, 2010 through present, resided on premises owned or operated by Defendant NYCHA.

177.     The number of class members is sufficiently numerous to make class action status the most practical method for Plaintiffs to secure redress for injuries sustained and to obtain class-wide equitable injunctive relief.

178.     There are questions of law and fact raised by the named Plaintiffs' claims common to those raised by the Class(es) they seek to represent. Such common questions predominate over questions affecting only individual members of the Class(es).

179.     The violations of law and resulting harms alleged by the named Plaintiffs are typical of the legal violations and harms suffered by all Class members.

180.     Plaintiff Class representatives will fairly and adequately protect the interests of the Plaintiff Class members. Plaintiffs' counsel are unaware of any conflicts of interest between the Class representatives and absent Class members with respect to the matters at issue in this litigation; the Class representatives will vigorously prosecute the suit on behalf of the Class; and the Class representatives are represented by experienced counsel. Plaintiffs' counsel has substantial experience and expertise in complex and class action litigation involving personal injuries and property damage.

181.    Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action, to the extent possible before formal discovery, and have committed sufficient resources to represent the Class.

182.    The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice. Moreover, the prosecution of separate actions by individual members of the Class could result in inconsistent or varying adjudications with respect to individual members of the Class and/or one or more of the Defendants.

183.    Defendants have acted or failed to act on grounds generally applicable to all Plaintiffs, necessitating declaratory and injunctive relief for the Class.

### COUNT I: 42 U.S.C. § 3604(b) - FAIR HOUSING ACT DISCRIMINATION AGAINST ALL GOVERNMENT DEFENDANTS

184.    Individual Plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

185.    Section § 3604(b) of the Fair Housing Act prohibits discrimination against "any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, **familial status**, or national origin." 42 U.S.C. § 3604(b) (emphasis added).

186.    The FHA specifically provides for enforcement by private persons. 42 U.S.C. § 3613(a) (2018). "[I]f the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the Plaintiff actual and punitive damages, and  . . . may grant as relief, as the court deems appropriate, any permanent or temporary injunction . . . or other order (including an order enjoying the Defendant from engaging in such practice or ordering such affirmative action as may be appropriate). *Id.* § 3613(c)(1).

187.    The Government Defendants' policy of failing to inspect apartments for lead paint hazards disproportionately harms families with young children.

188.    The Government Defendants informed residents who complained about the poor condition of the paint in their units that inspections were backlogged for multiple years. Knowing the high incidence of lead paint in NYCHA buildings and the heightened risk of serious, permanent injury children face from peeling and flaking paint that contains lead, and lead dust, families with children were subjected to disproportionately dangerous living conditions, increased risk of serious injury, medical expenses, and emotional distress.

189.    Further, by failing to inspect and remediate lead paint hazards, the Government Defendants discouraged families with young children from renting and remaining in NYCHA housing due to the increased risk young children face from lead poisoning.

190.    As a result of the Government Defendants' discriminatory acts and policies, Plaintiffs are entitled to monetary and injunctive relief, including punitive damages, attorneys' fees and costs, and prospective equitable relief enjoining NYCHA from violating the FHA.

191.    The NYCHA and City Officials are sued in their official and individual capacities for violating Plaintiffs' rights to be free from discrimination under the FHA.

192.    The conduct of the Government Defendants was reckless and outrageous, entitling Plaintiffs and Plaintiff Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## COUNT II: LEAD PAINT DISCLOSURE RULE VIOLATIONS
## AGAINST NYCHA AND NYCHA OFFICIALS (42 U.S. Code § 4852d )

193.    Individual Plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

194.    Plaintiffs, as NYCHA tenants, were entitled to disclosures regarding NYCHA's lead-based paint activities at the time of entering into a lease and every lease renewal, *which occurred at least annually*. The required disclosures include reports of lead testing and any other documents in NYCHA's possession or control related to lead-based paint hazard inspection, testing, remediation, repair, and abatement activities. The required documents extend to a tenants' unit, as well as documents related to the common areas of their buildings.

195.    NYCHA and the NYCHA Officials failed to fully and accurately disclose documentation of lead-based paint activities to Plaintiffs and a similarly situated class of NYCHA tenants.

196.    NYCHA and the NYCHA Officials also purposefully ensured that the disclosures and documents that Plaintiffs did receive were false and misleading.

197.    The NYCHA Officials are sued in their official and individual capacities for violating Plaintiffs' rights to lead paint activity disclosures at the execution of their leases and lease renewals.

198.    Under 42 U.S. Code § 4852d, Plaintiffs are entitled to treble damages, attorneys' fees, and costs.

## COUNT III: 42 U.S.C. § 1983 – HUD-MANDATED LEASE PROTECTIONS AND
## PROCEDURAL DUE PROCESS AGAINST ALL GOVERNMENT DEFENDANTS

199.    Individual Plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

200.    Under the Fourteenth Amendment to the United States' Constitution, Plaintiffs are entitled to Procedural Due Process before being deprived of their life, liberty or property.

201.    Plaintiffs Paige, Gray, Carrington, and A.P. are or were tenants of NYCHA, and held a property interest as a result. This property interest included the rights to a habitable residence that is free from dangerous and unsafe conditions, as well as the right to safe ingress and egress for Plaintiffs and their family to access their apartments. These rights are codified in 42 USCS § 1437d(l), which sets forth minimum lease rights enjoyed by all tenants of federally-subsidized homes owned by public housing authorities, such as NYCHA.

202.    The Governmental Defendants violated Plaintiffs' Due Process rights by depriving them of their safe and habitable residences, and safe ingress and egress therefrom, without proper notice or hearing. As this deprivation was conducted pursuant to a policy established by the Government Defendants, it was not arbitrary or random, and a post-deprivation remedy is insufficient.

203.    The Governmental Defendants concealed their actions, which prevented Plaintiffs from discovering and using truthful information that would have allowed them to remedy for Defendants' failure to comply with federal, state, and local lead-based paint laws through the enforcement of their lease terms with NYCHA, as dictated by 42 USCS § 1437d(k).

204.    As a result of the Government Defendants' false and misleading conduct, Plaintiffs were unable to access administrative and procedural remedies that exist to protect their right to be free lead-based paint hazards—a condition dangerous to life and safety of Plaintiffs and their young children—as promised by 42 USCS § 1437d(k)-(l).

205.    The Government Defendants' conduct deprived Plaintiffs of their property interest in their annual leases, and rights thereunder set forth in 42 USCS § 1437d, without

adequate Due Process, including notice and hearing. The deprivation of these rights is irreparable because lead poisoning is irreparable.

206.     The NYCHA and City Officials are sued in their official and individual capacities for violating Plaintiffs' clearly established rights to Due Process.

207.     Plaintiffs are entitled to damages and injunctive relief as a result of Defendants' violations of 42 U.S.C. § 1983.

208.     The conduct of the Government Defendants was reckless and outrageous, entitling Plaintiffs and Plaintiff Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

**COUNT IV – CAUSE OF ACTION**
**42 U.S.C § 1983 – 14th AMENDMENT**
**SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER**
**AGAINST ALL GOVERNMENTAL DEFENDANTS**

209.     Individual Plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

210.     Plaintiffs have a clearly established right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to be protected from risks, dangers, dangerous situations, or being made more vulnerable to increased risk of harms, affirmatively created and/or caused by persons acting under color of state law.

211.     The Government Defendants, while acting under color of state law, affirmatively created or exacerbated the dangers and dangerous situations to which Plaintiffs were exposed, making them more vulnerable to said dangers, and the Government Defendants did so with an extreme degree of culpability.

212.     The Government Defendants, while acting under color of state law, affirmatively continued, increased and perpetuated the dangers, risks of harm, and dangerous situations

creating the public health crisis, when they deliberately and affirmatively denied, lied about, covered up, deceived, discredited, and ignored said known dangers and risks of harm to which they exposed Plaintiffs making them more vulnerable to said dangers.

213.   The Government Defendants were aware that their conduct could result in the deprivation of Plaintiffs' due process rights to be protected from the dangers, dangerous situations, or being made more vulnerable to the dangers affirmatively created and perpetuated by them.

214.   This conduct was reckless, deliberately indifferent, and/or so outrageous as to shock the conscience, such that it was culpable in the extreme, insofar as the Government Defendants knew of and disregarded the substantial risk of serious harm to Plaintiffs.

215.   The Government Defendants were not faced with an emergent or decision involving difficult competing interests when they made the decision to implement a years-long policy that subjected NYCHA residents with young children to a known and predictable danger without the tenants knowledge. Thus, the Government Defendants' conduct was entered into after the opportunity for cool reflection and shocks the conscience.

216.   The dangers and risks of harm were discreet and special to Plaintiffs, as residents of New York City public housing with young children, and not risks affecting the public at large.

217.   The dangers and risks of harm to Plaintiffs from the ongoing exposure to the lead-based paint and lead based paint hazards, which were created and perpetuated by the Government Defendants, were so extreme as to be equivalent to private acts of violence visited upon them.

218.    The actions of the Government Defendants, all under color of law, constituted affirmative acts that caused and/or substantially increased the risks of physical, emotional and economic harm to the Plaintiffs.

219.    As a direct and proximate result of the aforementioned unconstitutional acts of the Government Defendants, which through the making of state created danger, violated Plaintiffs' fundamental property and/or liberty rights, as alleged in this Second Amended Complaint, Plaintiffs suffered extensive damages, including, but not limited to: serious and in some cases irreversible and permanent bodily injury; substantial economic losses from medical expenses, lost wages, lost income, lost or impaired earning capacity, and reduced property values, among others; pain and suffering; embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

220.    The NYCHA and City Officials are sued in their official and individual capacities for violating Plaintiffs' clearly established rights to Substantive Due Process and to be free from state-created dangers.

221.    The conduct of the Government Defendants was reckless and outrageous, entitling Plaintiffs and Plaintiff Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## <u>COUNT V: 42 U.S.C. § 1983 – FIRST AMENDMENT VIOLATIONS</u><br><u>AGAINST ALL GOVERNMENT DEFENDANTS</u>

222.    Individual Plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein. .

223.    Under the First and Fourteenth Amendments to the United States' Constitution, Plaintiffs have a right of free speech, especially when it comes to public matters and the functioning of government institutions.

224.    The purpose of the First Amendment is to protect citizen's rights to speak critically of their government, government officials, and their actions.

225.    The Government Defendants undertook affirmative acts by making deliberately false statements that were intended to, and did, suppress Plaintiffs' ability to speak out about the actions of the Government Defendants.

226.    The Government Defendants further delayed correcting their false statements until one week after the City elections, thereby permanently depriving Plaintiffs, the public, and the press from speaking out against the Government Defendants' actions during a crucial time.

227.    The Government Defendants affirmative efforts to conceal their legal violations were so coercive and effective as to be equivalent to a content-based restriction of speech on the topic of NYCHA's compliance with lead paint laws. The class of people primarily affected by this restriction include Plaintiffs, whom as NYCHA tenants, would have spoken out against the Government Defendants lead paint law violations.

228.    The Government Defendants violated Plaintiffs' First Amendment rights by implementing a policy and pattern of creating false records and government documents related to lead-based paint hazard inspection, remediation, and the status of Plaintiffs' apartment as exempt from inspections or free from lead-based paint hazards.

229.    The Government Defendants' actions prevented Plaintiffs from discovering and using truthful information that would have allowed them to critique Defendants' actions, engage in political activism, and petition their government representatives regarding an important public health crisis.

230.    As a result of the Government Defendants' false and misleading conduct, Plaintiffs free speech rights were unduly restricted and chilled. As government actors, the

Government Defendants false and misleading statements, the creation of false documents, and concealment of violations of federal, state, and local laws prevented Plaintiffs and other members of the public from engaging in the type of speech and political activity that is fundamental to our democracy.

231. The NYCHA and City Officials are sued in their official capacities only for violating Plaintiffs' rights to free speech under the First Amendment.

232. Plaintiffs are entitled to damages, nominal damages, and injunctive relief as a result of the Government Defendants' violations of 42 U.S.C. § 1983 and Plaintiffs' First Amendment rights.

233. The conduct of the Government Defendants was reckless and outrageous, entitling Plaintiffs and Plaintiff Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## COUNT VI – NEGLIGENCE UNDER NEW YORK LAW AND NEW YORK CITY LOCAL LAW 1 OF 2004 AGAINST NYCHA

234. Plaintiff K.D. asserts this claim against NYCHA.

235. K.D. has resided with his mother, Plaintiff Sharon Paige, at 791 Hicks Street, Apt. 5a, New York, New York 11231 since July 2013.

236. K.D. was lead poisoned at 791 Hicks Street from lead paint and/or lead dust that was present in his apartment at 791 Hicks Street.

237. As the owner of 791 Hicks Street, NYCHA owed K.D. a non-delegable duty to take reasonable precautions to protect K.D. from hazards of which it has notice, including lead paint hazards.

238. Testing by DOH confirmed there was lead paint and lead dust hazards present in the apartment where Paige and K.D. reside.

239.    NYCHA improperly sought and received an exception for K.D.'s apartment, removing or relaxing the mandatory legal requirements that NYCHA inspect K.D.'s apartment annually for lead paint hazards. This exception was improper because the lead paint testing and abatement work was done using unlicensed and unqualified workers.

240.    NYCHA left a large hole in the wall of Paige's apartment for almost a year despite her complaints, which on information and belief, contributed to the lead paint and lead dust that caused K.D.'s lead poisoning.

241.    NYCHA also failed to respond to multiple complaints by Paige related to the paint conditions in her apartment.

242.    NYCHA's failures to exercise reasonable care to remediate and/or warn K.D. or his mother regarding the lead paint hazards in Paige's apartment at 791 Hicks Street proximately caused K.D. to suffer permanent and severe injury due to lead poisoning. This harm was a foreseeable consequence of NYCHA actions and/or inactions.

243.    Had Defendants properly inspected the apartment and the common areas associated therewith, pursuant to federal, state and municipal regulations, K.D. would not have been lead poisoned, or at a minimum his lead poisoning would have been significantly mitigated.

### COUNT VII – PROFESSIONAL NEGLIGENCE
### AGAINST ATC DEFENDANTS

244.    Individual Plaintiffs and the Class incorporate by reference the allegations set forth in all foregoing paragraphs, as if fully set forth herein.

245.    The ATC Defendants undertook, for consideration, to render services for the Governmental Defendants, which it should have recognized as necessary for the protection of Plaintiffs.

246.    The ATC Defendants undertook to perform a duty owed to Plaintiffs and the Class by the governmental Defendants.

247.    The ATC Defendants, based on their undertaking, had a duty to Plaintiffs and the Class to exercise reasonable care.

248.    Plaintiffs and the Class relied on the ATC Defendants to perform the duty to inspect for lead-based paint and lead-based paint hazards to make sure their homes were safe.

249.    The ATC Defendants failed to exercise reasonable care in inspecting for lead-based paint and lead-based paint hazards, and in-fact made it a pattern and practice to dispute DOH findings of lead-based paint hazards within New York City Public Housing.

250.    The ATC Defendants failed to exercise reasonable care in each instance when they declared a residence within New York City Public Housing to be safe, including when they issued a report regarding the Paige residence, in contradiction to the DOH findings.

251.    Plaintiffs and the Class suffered harm as a result of the ATC Defendants' failures to exercise reasonable care to protect its various undertakings.

252.    The ATC Defendants' failures to exercise reasonable care to protect their undertaking directly and proximately caused Plaintiffs' and the Class's harm that was entirely foreseeable.

253.    The ATC Defendants' conduct was malicious, willful and wanton as to disregard Plaintiffs' and the class' rights for the following reasons:

- The ATC Defendants knew, or should have known, that Plaintiffs and the Class were relying on them to ensure that their residences were free from lead-based paint hazards;

- The ATC Defendants knew, or should have known, that their participation in the Government's non-compliant inspection and remediation activities posed threats to public health, safety, and property that would result in harm to Plaintiffs and the Class.

- The ATC Defendants knew, or should have known, that the failure to notify and/or report to the proper authorities of unethical or illegal practices of others whose actions or decisions posed threats to public health, safety, and property would result in harm to Plaintiffs and the Class.

254.    As a result of the foregoing, Plaintiffs and the Class seek an award of punitive damages from the ATC Defendants so as to deter such morally reprehensible conduct by the ATC Defendants and similarly situated corporations in the future.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that judgment be entered against Defendants, ordering:

a. Defendants be enjoined from further violations of Plaintiffs' rights;

b. Defendants be required to follow all federal, state and municipal laws, rules and regulations, both retroactively and prospectively, including the requirement to inspect every single public housing dwelling constructed in or before 1978 and test to determine whether the apartment (and common areas of multiple dwellings) contain lead;

c. The appointment of an independent monitor to oversee NYCHA's compliance with its lead-based paint inspection obligations;

d. Plaintiffs are awarded compensatory, punitive, and exemplary damages;

e. Plaintiffs are awarded pre-judgment and post-judgment interest;

f. Defendants pay Plaintiffs' reasonable costs and attorneys' fees; and

g. All other relief the court deems necessary and equitable.

## JURY DEMAND

A trial by jury is hereby demanded.

Dated: February 6, 2018.

**LEVY KONIGSBERG LLP**

/S/ COREY M. STERN
Corey M. Stern
*cstern@levylaw.com*
Brendan E. Little
*blittle@levylaw.com*

800 Third Ave., 11th Floor
New York, NY 10022
Phone: (212) 605-6200
Fax: (212) 605-6290

*Attorneys for the Plaintiffs*