UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------ :
:
SHERRON PAIGE, *et al.*, *individually and* :
*on behalf of all others similarly situated*, : 17cv7481
:
Plaintiffs, : <u>OPINION & ORDER</u>
:
-against- :
:
NEW YORK CITY HOUSING :
AUTHORITY, *et al.*, :
:
Defendants. :
------------------------------------------ :

WILLIAM H. PAULEY III, Senior United States District Judge:

Defendants New York City Housing Authority ("NYCHA"), former NYCHA

Chairwoman Shola Olatoye, former NYCHA General Manager Michael Kelly, former NYCHA

Senior Vice Presidents Brian Clarke and Luis Ponce, and former NYCHA Director Jay Krantz

(together, the "NYCHA Defendants"), the City of New York (the "City"), Mayor Bill de Blasio,

Deputy Mayors Alicia Glenn and Herminia Palacio, and NYC Commissioners Mary Travis

Bassett and Maria Torres-Springer, (together, the "City Defendants") move to dismiss this

putative class action arising out of the failure to inspect and remediate lead paint in NYCHA

housing.

Plaintiffs bring federal claims under: (1) the Fair Housing Act ("FHA"); (2) the

Residential Lead-Based Paint Hazard Reduction Act ("RLPHRA"); and (3) 42 U.S.C. § 1983.

Plaintiffs also bring a negligence claim against NYCHA and a professional negligence claim

against ATC Associates, Inc. and ATC Group Services, LLC (together, "ATC"), the independent

contractors responsible for lead paint inspections and abatement. (See Plaintiffs' Second

Amended Complaint, ECF No. 163 ("Compl.") ¶¶ 47–50, 234–254.) Plaintiffs' negligence

claims are not implicated by this motion.  Defendants contend that Plaintiffs' claims sound in tort and breach of contract, meaning that Plaintiffs fail to state a viable federal claim.  The City Defendants also contend that they are not proper parties.  For the following reasons, Defendants' motion to dismiss is granted in part and denied in part.[1]

BACKGROUND

I.  <u>Plaintiffs' Allegations</u>

The allegations in the Second Amended Complaint are accepted as true on this motion.  (<u>See</u> Plaintiffs' Second Amended Complaint for Injunctive and Declaratory Relief, Money Damages, and Jury Demand, ECF No. 163 ("Compl.").)  NYCHA is a New York state public-benefit corporation and "the largest public housing authority in the United States," managing 326 housing developments and 176,066 apartments.  (Compl. ¶¶ 24–25.)

Plaintiffs are four NYCHA tenants with young children: Sherron Paige, Evelyn Gray, Taneequa Carrington, and A.P., as well as Paige's child, K.D.  (Compl. ¶¶ 12–22.) Plaintiffs seek to represent a putative class of tenants with young children who resided in NYCHA housing from January 1, 2010 through the present.  (Compl. ¶ 176.)  Plaintiffs all have at least one child who tested positive for lead exposure.  (Compl. ¶¶ 14, 17, 20, 22.)

Plaintiffs allege that since 2012, NYCHA "failed to comply with federal and New York City laws requiring annual lead paint inspections for all dwellings constructed prior to 1960 where young children reside."  (Compl. ¶ 126.)  In August 2012, NYCHA stopped conducting lead paint inspections.  (Compl. ¶ 148.)  NYCHA then "falsely certified to the United States Department of Housing and Urban Development (HUD) that it was in compliance with . . .

---

[1] Defendants submit two motions to dismiss: one on behalf of NYCHA Defendants and one on behalf of the City Defendants.  (<u>See</u> ECF Nos. 199 & 202.)  Except for the City Defendants' argument that they are not proper parties, both briefs raise identical arguments.  Accordingly, this Court treats the motions together.

federal law." (Compl. ¶ 127.)  In October 2015, the United States Attorney's Office for the Southern District of New York served a Civil Investigative Demand on NYCHA.  (Compl. ¶ 124.)  In November 2017, the New York City Department of Investigations released a report detailing NYCHA's false certifications to HUD.  (Compl. ¶ 127.)  NYCHA subsequently admitted employing unqualified lead paint inspectors and failing to inspect common areas of NYCHA buildings.  (Compl. ¶¶ 5(e), 128, 130.)

By 2015 or 2016 at the latest, senior NYCHA officials knew that NYCHA was out of compliance with federal and city lead paint laws.  (See Compl. ¶¶ 153, 156, 159.) Plaintiffs assert that NYCHA's false certifications "exacerbated the crisis" by concealing it and delaying remedial measures.  (Compl. ¶¶ 3, 123.)

Plaintiffs also allege that NYCHA failed to disclose lead paint to tenants as required by federal law.  (Compl. ¶¶ 5(f), 69, 133.)  Further, Plaintiffs allege that NYCHA's actions "expose[d] families with young children to disproportionately-higher risk of lead-paint poisoning and permanent neurological harm because young children are much more likely to touch and ingest lead paint dust and peeling, chipping paint."  (Compl. ¶ 134.)  Plaintiffs aver this harm "discouraged families with young children from renting [or] remaining in NYCHA housing."  (Compl. ¶ 189.)  Finally, Plaintiffs claim that Defendants' false statements to HUD and the public deprived them of the ability to speak out against NYCHA's actions.  (Compl. ¶¶ 225–226, 229–230.)

II.     Procedural History

Plaintiffs filed this action in September 2017.  (See Original Complaint, ECF No. 1.)  In the ensuing months, NYCHA's systemic failures erupted in near-daily revelations.  In February 2018, Plaintiffs moved for a preliminary injunction, contending that they had

established irreparable harm and a likelihood of success on two of their claims: the FHA claim

and the procedural due process claim.  (See Notice of Motion for Preliminary Injunction, ECF

No. 164.)  In March 2018, this Court denied Plaintiffs' motion for a preliminary injunction,

holding that Plaintiffs did not demonstrate a clear likelihood of success on those claims.  See

Paige v. N.Y.C. Hous. Auth., 2018 WL 1226024, at *2–5 (S.D.N.Y. Mar. 9, 2018).

LEGAL STANDARD

Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule

12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."

Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  Defendants contend that this

Court lacks subject-matter jurisdiction over this action because Plaintiffs' federal claims are

deficient.  "[I]n cases where the asserted basis for subject matter jurisdiction is also an element

of the plaintiff's allegedly federal cause of action, [a court] ask[s] only whether—on its face—

the complaint is drawn so as to seek recovery under federal law or the Constitution.  If so, then

[the court] assume[s] . . . a sufficient basis for jurisdiction, and reserve[s] further scrutiny for an

inquiry on the merits."  Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1189 (2d

Cir. 1996).  Plaintiffs bring causes of action under the Constitution and federal law.  Therefore,

Defendants' motions are properly construed not as asserting a lack of subject-matter jurisdiction,

but rather that the federal claims fail on the merits.

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged. . . . [I]t asks for more than a sheer possibility that a defendant has acted unlawfully." Nguyen v. New Link Genetics Corp., 297 F. Supp. 3d 472, 482 (S.D.N.Y. 2018) (citing Iqbal, 556 U.S. at 678.) "[D]etermining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its experience and common sense." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (citation and alterations omitted).

On a motion to dismiss, a court "accept[s] as true all of the factual allegations contained in the complaint, . . . draw[s] all reasonable inferences in the plaintiff's favor, . . . and constru[es] any ambiguities in the light most favorable to upholding the plaintiff's claim." Duplan v. City of New York, 888 F.3d 612, 617 (2d Cir. 2018) (citations omitted). A court may only consider the facts stated on the face of the complaint, documents attached by reference, matters of which judicial notice may be taken, and documents "the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000); Leonard F. v. Isr. Disc. Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999).

## DISCUSSION

I.    Fair Housing Act

Plaintiffs allege that NYCHA's failure to inspect and remediate lead paint caused or will cause a disparate impact on families with young children and "discouraged families with young children from renting [or] remaining in NYCHA housing." (Compl. ¶ 189.) The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). Familial status is defined as "one or more individuals (who have not attained the age of 18 years)

being domiciled with—(1) a parent or another person having legal custody of such individual or individuals; or (2) the designee of such parent or other person having such custody." 42 U.S.C. § 3602(k). In other words, familial status protects families with children under the age of eighteen, and also applies to pregnant persons. 42 U.S.C. § 3602(k).

The Supreme Court recently held that the FHA encompasses disparate impact discrimination. See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507, 2518 (2015). Accordingly, housing practices with a discriminatory effect may violate the FHA regardless of discriminatory motive. "A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns . . . ." 24 C.F.R. § 100.500(a). At the pleading stage, a plaintiff must "allege facts . . . or produce statistical evidence demonstrating a causal connection" between the challenged policy and the discriminatory effect. Inclusive Communities Project, 135 S. Ct. at 2523. A plaintiff must aver that the challenged policy "imposes a significantly adverse or disproportionate impact on a protected group of individuals." Tsombanidis v. W. Haven Fire Dep't., 352 F.3d 565, 575 (2d Cir. 2003) (quotation marks omitted), superseded on other grounds as recognized by Mhany Mgmt., Inc. v. Cty. of Nassau, 819 F.3d 581 (2d Cir. 2016).

At the preliminary injunction stage, this Court held that Plaintiffs failed to establish a clear likelihood of success on their FHA claim. While they showed that families with young children were disproportionately harmed, it was unclear whether that harm actually or predictably led to a disproportionate effect on housing—i.e., that it deterred or would deter families from living in NYCHA housing.

Disparate impact liability requires a showing that the challenged policy "resulted in or predictably will result in under-representation" of the protected class in the relevant population. Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 91 (2d Cir. 2000), abrogated on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002); see also Tsombanidis, 352 F.3d at 575–76; Meyer v. Bear Road Assocs., 124 F. App'x 686, 688 (2d Cir. 2005) (summary order) (affirming that a plaintiff "must demonstrate that a facially neutral policy actually or predictably leads to under-representation of families with children in the housing relative to the general population"). Plaintiffs did not offer evidence that tenants with young children moved out of or were dissuaded from renting because of the presence of lead paint. See also Candlehouse, Inc. v. Town of Vestal, N.Y., 2013 WL 1867114, at *13 (N.D.N.Y. May 3, 2013) (holding that the plaintiff "must do more than merely show that the Town's . . . provisions adversely affected its students. It must also establish . . . that [its] neutral policy actually or predictably created a shortage of housing . . . .").

In opposing the motion to dismiss, Plaintiffs argue that a 2013 HUD regulation altered the FHA, and that FHA disparate impact liability now protects against any disparate harms, regardless of whether they affect housing. Plaintiffs rely on 24 C.F.R. § 100.500, which states in part that an FHA violation occurs through a housing practice's "disparate impact on a group of persons." See 24 C.F.R. § 100.500(a). Plaintiffs argue this broad language expanded the FHA's reach.

But Plaintiffs cite no decision that has construed this regulation to extend that far. Cf. Siino v. City of New York, 2016 WL 8711442, at *12 (E.D.N.Y. Feb. 19, 2016) (requiring the plaintiff to show a "'discriminatory impact on the availability of housing' for members of her religion" after § 100.500 was implemented) (citing Hack, 237 F.3d at 88)). Plaintiffs'

interpretation also does not accord with the purpose of the FHA: to eradicate discrimination in housing.  See Inclusive Communities Project, 135 S. Ct. at 2521 ("The FHA . . . was enacted to eradicate discriminatory practices within a sector of our Nation's economy.").  Further, in promulgating § 100.500, HUD stated that the regulation was not meant to "change decades-old substantive law articulated by HUD and the courts," but to only "clearly allocat[e] the burdens of proof and how such burdens are to be met."  See Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11,460, 11,460–11,461, 2013 WL 550406 (Feb. 15, 2013) (codified at 24 C.F.R. § 100.500).

Ultimately, this Court need not plumb that regulatory quagmire because Plaintiffs' second amended complaint sufficiently alleges an effect on housing.  As noted previously, a plaintiff must "allege facts . . . or produce statistical evidence demonstrating a causal connection" between the policy and the disparate impact.  Inclusive Communities Project, Inc., 135 S. Ct. at 2523 (emphasis added).  Although Plaintiffs do not offer statistics, they do allege facts stating an FHA claim at the pleading stage.

Plaintiffs plead that children are the primary, if not exclusive, victims of lead paint poisoning.  (Compl. ¶¶ 57–63 ("Children . . . are most susceptible to ingesting lead-based paint. . . . There is . . . no cure or treatment for lead poisoning.  Once a child ingests a certain amount of lead, he or she will be lead poisoned.").)  Discovery will ascertain whether the disparate harm to families that Plaintiffs allege caused them to move out of NYCHA housing or dissuaded others from renting.  Therefore, Plaintiffs may be able to establish that NYCHA's acts caused "significantly adverse or disproportionate impact on persons of a particular type"— families with young children.  See Tsombanidis, 352 F.3d at 575.

Defendants' argument that Plaintiffs must show that lead paint <u>already</u> resulted in a shortage of housing is unpersuasive. It is sufficient that they pled it "predictably <u>will</u> result in under-representation." <u>See</u> <u>Tsombanidis</u>, 352 F.3d at 576 (emphasis added) ("[T]here may be cases where statistics are not necessary," as long as "there [is] some evidence that a significant number of people [of the protected class] needs [the housing in question] and that [the practice] restricts a substantial portion of [people in the class] from doing so.").

In <u>Gashi v. Grubb & Ellis Property Management Services, Inc.</u>, a married couple alleged that their condominium association's policy of not allowing more than two people per bedroom predictably created "a disparate impact on families with children because families with children are more likely to have three or more members." 2010 WL 2977143, at *1 (D. Conn. July 21, 2010). Relying on <u>Tsombanidis</u> and <u>Hack</u>, the district court held that the couple "alleged facts sufficient to make a plausible claim that the policy [was] 'outwardly neutral' [but] has had a 'disproportionate impact' . . . in light of . . . familial status." <u>Gashi</u>, 2010 WL 2977143, at *5.

Similarly, in <u>Crossroads Residents Organized for Stable and Secure ResiDencieS (CROSSRDS) v. MSP Crossroads Apartments LLC</u>, tenants sued an apartment complex based on an increase in rent and upgraded background checks that they alleged caused a disparate impact. <u>Crossroads Residents</u>, 2016 WL 3661146, at *1–2 (D. Minn. July 5, 2016). The court held that "[a]lthough the Complaint d[id] not contain all the data necessary [to calculate a disparate impact], it d[id] contain enough factual allegations to support an inference that [p]laintiffs will ultimate be able to show a disparate impact through statistical analysis." <u>Crossroads Residents</u>, 2016 WL 3661146, at *7.

Plaintiffs' allegations sufficiently support the inference that New York City families may have moved out of or been dissuaded from renting from NYCHA because of expected harm to their children. Although Plaintiffs did not plead that they personally moved out of or were dissuaded from renting from NYCHA, they do allege that "it is entirely predictable that NYCHA's policies related to lead paint activities have and will disproportionately harm families with young children" and that they will "discourage[] families with young children from renting and remaining in NYCHA." (Compl. ¶¶ 136, 189.) That is sufficient at the pleading stage. See Tsombanidis, 352 F.3d at 575. And Plaintiffs adequately plead that such an impact is disparate because NYCHA residents without children have less concern about lead paint.

Defendants question whether Plaintiffs have standing to bring these claims, as none moved out of NYCHA. But the FHA provides a cause of action to any "aggrieved person," which includes any person who "believes that [he or she] will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i). "[A] person who is likely to suffer such an injury need not wait until a discriminatory effect has been felt before bringing suit." LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 425 (2d Cir. 1995). Importantly, it is far from clear that the harms that Plaintiffs allege have abated.

Further, the Supreme Court has interpreted the FHA's definition of "aggrieved person" as reflecting "a congressional intent to confer standing . . . as broadly as is permitted by Article III of the Constitution." See Bank of Am. Corp. v. City of Miami, Fla., 137 S. Ct. 1296, 1303 (2017) (citations and quotation marks omitted). This includes "the alleged injury to existing tenants by exclusion of minority persons from the apartment complex [through] the loss of important benefits from interracial associations." Trafficante v. Metro. Life Ins. Co., 409 U.S.

205, 209 (1972); <u>Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.</u>, 316 F.3d

357, 362 (2d Cir. 2003) ("[A] plaintiff sufficiently establishes standing to bring suit under the

FHA by alleging that a defendant's acts impinge on the plaintiff's right to live in an integrated

community."); <u>Hamad v. Woodcrest Condo Ass'n</u>, 328 F.3d 224, 232 (6th Cir. 2003) (allowing

plaintiffs to sue because "they were members of a community whose familial-status composition

was being manipulated").

      Defendants also assert that disparate impact claims cannot rest on conduct

occurring after a tenant moves in.  While the Second Circuit has not addressed this issue, <u>see</u>

<u>Khalil v. Farash Corp.</u>, 277 F. App'x 81, 84 (2d Cir. 2008), district judges have concluded that

the FHA "is best understood to prohibit post as well as pre-acquisition discrimination in the

provision of housing-related services."  <u>Davis v. City of New York</u>, 902 F. Supp. 2d 405, 435

(S.D.N.Y. 2012) ("Limiting section 3604(b) [to pre-acquisition conduct] would insulate

egregious post-acquisition actions from the law's reach."); <u>see also</u> <u>DeSouza v. Park W.</u>

<u>Apartments, Inc.</u>, 2018 WL 2990099, at *7 n.17 (D. Conn. June 14, 2018) (citing cases).  While

Defendants counter that these decisions arose in the context of disparate treatment, there is no

reason why these holdings are not applicable in disparate impact cases.

II.    <u>Residential Lead-Based Paint Hazard Reduction Act (RLPHRA)</u>

      Plaintiffs bring a RLPHRA claim against the NYCHA Defendants.  Enacted in

1992, RLPHRA was created as part of "a national strategy to build the infrastructure necessary to

eliminate lead-based paint hazards in all housing as expeditiously as possible."  <u>Sweet v.</u>

<u>Sheahan</u>, 235 F.3d 80, 84 (2d Cir. 2000) (citing 42 U.S.C. § 4851a(1)).  The statute directs HUD

and the Environmental Protection Agency ("EPA") to promulgate regulations requiring home

sellers and landlords to disclose lead paint in housing contracts.  42 U.S.C. § 4852d(a).

HUD and the EPA created parallel regulations under RLPHRA.  See 24 C.F.R. § 35.80 et seq.; 40 C.F.R. § 745.100 et seq.  Those regulations require a landlord to disclose "any known lead-based paint and/or lead-based paint hazards in the target housing . . . and the existence of any available records or reports pertaining to lead-based paint and/or lead-based paint hazards," as well as "the basis for the determination that the lead-based paint and/or lead-based paint hazards exist, the location of the lead-based paint and/or lead-based paint hazards, and the condition of the painted surfaces."  24 C.F.R. § 35.88(a)(2)&(3).  These requirements apply to common areas and "other residential dwellings in multifamily target housing, provided that such information is part of an evaluation or reduction of lead-based paint and/or lead-based paint hazards in the target housing as a whole."  24 C.F.R. § 35.88(a)(4).

The regulations also require housing contracts to contain a lead paint warning statement, a statement "disclosing the presence of known lead-based paint . . . or indicating no knowledge" of lead paint, a list of records available to the seller regarding lead paint, and a statement by the purchaser or lessee affirming receipt of the same.  24 C.F.R. § 35.92(b). RLPHRA does not require disclosure at lease renewals, provided that "the lessor has previously disclosed all information required [and] no new information . . . has come into the possession of the lessor."  24 C.F.R. § 35.82(d).

Target housing means "any housing constructed prior to 1978."  24 C.F.R. § 35.86.  These regulations only ensure disclosure of lead paint—they "do not impose a duty on a landlord to inspect or remediate."  G.M.M. v. Kimpson, 92 F. Supp. 3d 53, 71 (E.D.N.Y. 2015) (citing 24 C.F.R. § 35.88(a)).  Further, liability exists only where a landlord or seller knowingly violates RLPHRA.  See 42 U.S.C. § 4852d(b)(3); Smith v. Coldwell Banker Real Estate Servs., 122 F. Supp. 2d 267, 273 (D. Conn. 2000).

"In order to establish a claim under section 4852d, a plaintiff must show that: (1) [s]he or he was a lessee; (2) [the] [d]efendant was a lessor who failed to make the proper disclosures; (3) [t]he leased property was 'target housing'; and (4) [t]he lease contract was signed after the regulations were effective." G.M.M., 92 F. Supp. 3d at 72 (alteration omitted). "The language plainly and expressly limits private recovery to a 'purchaser or lessee' of target housing, and no one else." Roberts v. Hamer, 655 F.3d 578, 583 (6th Cir. 2011). Because no statute of limitations is provided, courts utilize "the four-year, catch-all federal statute of limitations." Gross v. Max, 2012 WL 3234168, at *4 (N.D. Ind. Aug. 2, 2012); 28 U.S.C. § 1658(a). "A violation of the Act occurs when the seller fails to make the necessary disclosures," not when that failure is discovered. Randall v. Laconia, NH, 679 F.3d 1, 6 (1st Cir. 2012).

Plaintiffs allege that NYCHA failed to provide information concerning lead paint in NYCHA units, such as testing, repairs, and abatement. (Compl. ¶¶ 69, 133, 194.) And even if NYCHA made disclosures, Plaintiffs contend those disclosures were knowingly false, incomplete, and inaccurate. (Compl. ¶ 195.)

First, NYCHA contends that Evelyn Gray was never a tenant of record and therefore lacks a cause of action. Plaintiffs appear to concede this point. The plain language of the regulations confer standing only on purchasers or lessees. Therefore, Evelyn Gray's claim is dismissed. See Mason ex rel. Heiser v. Morrisette, 403 F.3d 28, 31 (1st Cir. 2005) ("[T]he plain language of the statute limits recovery . . . to a 'purchaser or lessee.'") (citing 42 U.S.C. § 4852d(b)(3)). Similarly, Paige's minor son K.D. lacks standing to sue. See Brown v. Maple3, LLC, 928 N.Y.S.2d 740, 747 (N.Y. App. Div. 2011) (holding that child lacked standing to bring RLPHRA claim); Roberts, 655 F.3d at 583 (same).

Second, NYCHA avers that the remaining Plaintiffs did not plead that NYCHA "failed to make the proper disclosures." See G.M.M., 92 F. Supp. 3d at 72. Defendants' cramped reading of G.M.M. is unpersuasive. While Plaintiffs may not have used those precise words, they did plead that "NYCHA has a pattern and practice of conducting repairs, renovations and remediation in its units after one tenant moves out and before another moves in, [but] no such statements regarding the work appears in leases executed by new tenants, and NYCHA has universally failed to provide any records of such work to new tenants." (Compl. ¶ 69 (emphasis added).) Importantly, Plaintiffs allege that even if NYCHA provided disclosures, those disclosures were inadequate because they did not disclose what NYCHA knew. (See Compl. ¶¶ 195–196.)

NYCHA also contends that the RLPHRA claims of two Plaintiffs—Sherron Paige and Taneequa Carrington—are barred by the statute of limitations. In making this argument, NYCHA asks this Court to take judicial notice of declarations that Paige and Carrington filed with Plaintiffs' motion for a preliminary injunction. (See Mem. of Law on Behalf of Defs. NYCHA, et al. in Supp. of NYCHA Defs.' Mot. to Dismiss the Second Am. Compl., ECF No. 201 ("NYCHA's Mot. to Dismiss"), Ex. 2, at *2, *7.) Those declarations reveal that Paige lived in NYCHA housing since 2011 and Carrington since 1997. NYCHA argues that because the time to bring an RLPHRA claim begins accruing at commencement of a lease, Paige and Carrington's RLPHRA claims are time-barred.

It is unclear whether judicial notice of those declarations is appropriate. A statute of limitations defense may be raised on a motion to dismiss only "when the defect appears on the face of the complaint." Staehr v. Hartford Fin. Serv. Grp., Inc., 547 F.3d 406, 426 (2d Cir. 2008) (citation omitted). The second amended complaint does not allege when Paige and Carrington

moved into NYCHA housing. NYCHA argues that the declarations may be considered as "documents that the plaintiffs . . . knew about and upon which they relied in bringing suit." Rothman, 220 F.3d at 88. However, NYCHA does not explain how declarations filed in connection with a motion were relied on in drafting the second amended complaint.

Even if this Court agreed to consider those declarations, NYCHA's argument overlooks that landlords must provide new disclosures at lease renewals if they come into new information regarding lead paint. See 24 C.F.R. § 35.82(d); Morris v. Flaig, 511 F. Supp. 2d 282, 301 (E.D.N.Y. 2007) ("[I]f the lease was renewed after defendants acquired knowledge of the regulations, they had a duty to disclose any information set forth in [the regulations] that had not already been disclosed to plaintiff." (emphasis original)). Additionally, the regulations presuppose that a landlord discloses all required information at the start of a lease. See 24 C.F.R. § 35.82(d). If it does not, then the missing information must be provided at lease renewal. Plaintiffs' claims are not time-barred because Plaintiffs allege that NYCHA failed to make complete disclosures and learned new information but failed to disclose it at lease renewal. Whether the facts will support these allegations is a matter for discovery.

NYCHA's reliance on Gross v. Max is misplaced. The Gross court dismissed the complaint because more than four years had elapsed since plaintiffs purchased the home. See Gross, 2012 WL 3234168, at *1, *5. Lease renewals were not an issue. NYCHA's argument that it could not have disclosed any new information because it was not conducting lead paint inspections is beyond the pale. One abject failure does not excuse another. There is a need to ascertain what NYCHA knew and when it knew it. Given recent revelations, this Court cannot credit NYCHA's unadorned statement that it disclosed everything it knew. (See Reply Mem. of Law on behalf of Defendants NYCHA, et al., ECF No. 207, at 7.)

NYCHA concedes that A.P. moved into NYCHA housing in 2016 and that her RLPHRA claim is not time-barred. However, NYCHA offers the lead paint disclosure form that A.P. signed at the start of her lease and argues this renders her claim futile. (See NYCHA's Mot. to Dismiss, Ex. 3.) Again, it is unclear how consideration of that document is proper on a motion to dismiss. But even so, it does not preclude this claim because questions of fact remain concerning the accuracy of NYCHA's lead paint disclosures to A.P.

III.    Procedural Due Process

Plaintiffs bring a claim for deprivation of procedural due process. They aver having a property interest in "a habitable residence . . . free from dangerous and unsafe conditions [and] the right of safe ingress and egress [to] their apartments," and a property interest in the leases themselves. (Compl. ¶¶ 201, 205.) In making this argument, Plaintiffs primarily rely on 42 U.S.C. § 1437d(l)(3), which compels public housing agencies to "utilize leases . . . obligat[ing] the public housing agency to maintain the project in a decent, safe, and sanitary condition." 42 U.S.C § 1437d(l)(3). Plaintiffs contend that NYCHA's failure to inspect and abate lead paint deprived them of these property rights without notice or a hearing. (Compl. ¶ 202.)

"The two threshold questions in any § 1983 claim for denial of procedural due process are whether the plaintiff possessed a liberty or property interest protected by the United States Constitution or federal statutes and, if so, what process was due before the plaintiff could be deprived of that interest." Green v. Bauvi, 46 F.3d 189, 194 (2d Cir. 1995). "Property interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. . . ." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972). However, "[t]he

mere identification of a state law right does not necessarily require a finding that the right identified is protected by the Constitution." Barnes v. Pilgrim Psychiatric Ctr., 860 F. Supp. 2d 194, 201 (E.D.N.Y. 2012). "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property . . . [T]he range of interests protected by procedural due process is not infinite." Bd. of Regents, 408 U.S. at 569. For instance, "a contract dispute, in and of itself, is not sufficient to give rise to a cause of action under section 1983." Walentas v. Lipper, 862 F.2d 414, 418 (2d Cir. 1988); see Costello v. Town of Fairfield, 811 F.2d 782, 784 (2d Cir. 1987) ("A contract dispute . . . does not give rise to a cause of action under section 1983.")

In denying the application for a preliminary injunction, this Court held that there is "no constitutional right of access to a certain quality of housing." Paige, 2018 WL 1226024, at *4 (citing Citizens Comm. for Faraday Wood v. Lindsay, 507 F.2d 1065, 1068 (2d Cir. 1974)); see also Lindsey v. Normet, 405 U.S. 56, 74 (1972). This Court also concluded that Plaintiffs misinterpret 42 U.S.C. § 1437d(l)(3) as providing such a right—that provision only creates a right "to a lease that in turn requires proper maintenance. . . . [It] does not create federal rights to proper maintenance. . . ." Paige, 2018 WL 1226024, at *4–5 (citing Edwards v. District of Columbia, 821 F.2d 651, 653 n.2 (D.C. Cir. 1987)) (emphasis added); see also Concerned Tenants Ass'n of Father Panik Vill. v. Pierce, 685 F. Supp. 316, 322 (D. Conn. 1988) (holding that § 1437d(l)(3) "alone does not create a right enforceable under § 1983 to proper maintenance of [a] housing project").

As this Court previously determined, the troubling allegations in this action do not amount to a constitutional deprivation of due process because Plaintiffs fail to allege a

cognizable property right.  In short, there is no due process right to a certain standard of housing.

As the Supreme Court explained:

> We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill.  We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality. . . . Absent constitutional mandate, the assurance of adequate housing and the definition of landlord-tenant relationships are legislative, not judicial, functions.

Lindsey, 405 U.S. at 74.

In Hurt v. Philadelphia Housing Authority, the district court rejected plaintiffs' due process claim, holding there was no "constitutional right to decent housing" and that the Philadelphia Housing Authority did not have "a constitutional duty to provide for plaintiffs' safety and well-being."  See 806 F. Supp. 515, 519–21 (E.D. Pa. 1992); see also Reaves v. Dep't of Veterans Affairs, 2009 WL 35074, at *3 (E.D.N.Y. Jan. 6, 2009) (holding there is no "government obligation to provide adequate housing.").  Similarly, the district court in Edwards v. District of Columbia addressed a due process claim brought by residents of a housing project challenging the District of Columbia's failure to maintain a housing project "in a decent, safe, and sanitary condition." 628 F. Supp. 333, 336–37 (D.C. Cir. 1985), aff'd 821 F.2d 651 (D.C. Cir. 1987).  The trial judge held that plaintiffs pled only "actions for breach of lease agreements [which] belong in the state courts."  Edwards, 628 F. Supp. at 342.  And in Thomas v. Chicago Housing Authority, the district court ruled that the plaintiff could not bring "a federal cause of action against the [Chicago Housing Authority] for the poor conditions of her apartment," and should pursue the claim under state law.  919 F. Supp. 1159, 1166–68 (N.D. Ill. 1996).

Plaintiffs also contend that they were deprived of the guarantees in their lease agreements that NYCHA would provide safe housing.  But that does not amount to a deprivation

of property because Plaintiffs were not evicted from their apartments and continue to live there. See Hirsch v. City of New York, 300 F. Supp. 3d 501, 511 (S.D.N.Y. 2018) ("Plaintiff has not been deprived of his property and apparently continue to reside in his apartment . . . to this very day."); cf. Holiday v. Martinez, 68 F. App'x 219, 221 (2d Cir. 2003) (summary order) (tenant lacked due process claim where she "never lost legal occupancy of her home"). In Thomas, plaintiff also alleged a due process violation because her landlord filed a "fraudulent eviction" lawsuit against her. 919 F. Supp. at 1167–68. The district court rejected that due process theory as well because plaintiff did "not allege that her lease ever terminated or that she lost leasehold rights in her apartment." Thomas, 919 F. Supp. at 1167–68. Thus, Plaintiffs' reliance on dicta in Ruiz v. New Garden Township is inapposite because there, the court held that tenants who were forced to evacuate their mobile homes would have a due process right. 376 F.3d 203, 206 (3d Cir. 2004).

Plaintiffs' procedural due process claim amounts to a breach of lease agreement claim. While the right to safe and decent housing is undoubtedly substantial, this claim is "an ordinary contract dispute [which does] not implicate due process rights or involve constitutionally protected rights." See Clapp v. LeBoeuf, Lamb, Leiby & MacRae, 862 F. Supp. 1050, 1058 (S.D.N.Y. 1994); see also Rivera v. Phipps Houses Servs., Inc., 2001 WL 740779, at *5 (S.D.N.Y. June 29, 2001) ("[L]andlord-tenant law lies within the traditional province of state law. . . .").

Finally, Plaintiffs analogize their deprivation to certain governmental contracts recognized as providing an "essential service," and therefore a due process right, such as access to water and electricity. See Memphis Light, Gas & Water Div. v. Craft, 436 U.S 1, 18 (1978). Although safe housing is of paramount importance, Plaintiffs' interpretation cannot be squared

with <u>Lindsey</u>'s clear holding that safe housing is not a constitutional right. To construe the provision of decent housing as analogous to the provision of water or electricity would contravene the Supreme Court's holding in <u>Lindsey</u>.

IV.   <u>Substantive Due Process</u>

Plaintiffs' substantive due process claim alleges that Defendants affirmatively created the "dangerous conditions to which Plaintiffs were exposed." (Compl. ¶¶ 211–212.) The due process clause "is phrased as a limitation on the State's power to act, not a guarantee of certain minimal levels of safety and security." <u>DeShaney v. Cty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 197 (1989). For that reason, in most circumstances, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process clause." <u>DeShaney</u>, 489 U.S. at 197. The Supreme Court has expressed "reclutan[ce] to expand the concept of substantive due process." <u>Cty. of Sacramento v. Lewis</u>, 523 U.S. 833, 842 (1998) (citation omitted). "Mindful of the Supreme Court's admonition not to permit the Due Process clause to transform every tort committed by a state action into a constitutional violation," the Second Circuit "recognize[s] two separate and distinct theories of liability under the substantive component of the Due Process Clause: 'special relationship' liability and 'state-created-danger' liability." <u>Benzman v. Whitman</u>, 523 F.3d 119, 127 (2d Cir. 2008) (citation and quotation marks omitted).

"The first step in [a] substantive due process analysis is to identify the constitutional right at stake." <u>Lowrance v. Achtyl</u>, 20 F.3d 529, 537 (2d Cir. 1994). Plaintiffs describe their right as one of bodily integrity and personal security. Although their second amended complaint describes this claim under the "state created danger" theory, they also refer in briefing to the "special relationship" between Plaintiffs and NYCHA Defendants—namely,

landlord and tenant. "[I]n exceptional circumstances a governmental entity may have a constitutional obligation to provide . . . protection . . . because of a special relationship with an individual . . . ." <u>Ying Jing Gan v. City of New York</u>, 996 F.2d 522, 533 (2d Cir. 1993). "Special relationships arise ordinarily if a government actor has assumed an obligation to protect an individual by restricting the individual's freedom in some manner, as by imprisonment." <u>Lombardi v. Whitman</u>, 485 F.3d 73, 79 n.3 (2d Cir. 2007).

To the extent Plaintiffs allege that Defendants had an obligation to protect them based on their status as public housing tenants, they are mistaken. The same contention was raised in <u>Dawson v. Milwaukee Housing Authority</u>, where a public housing resident contended that the housing project failed to protect him from another resident. 930 F.2d 1283, 1284 (7th Cir. 1991). Judge Easterbrook rejected plaintiff's substantive due process claim, holding that "Wisconsin did not take [plaintiff] into custody or suppress the private housing market. [Plaintiff] entered the [public housing] of his own choice and could depart on whim." <u>Dawson</u>, 930 F.2d at 1284. Similarly, NYCHA "provided plaintiffs with housing, but they were not forced to accept it." <u>See</u> <u>Hurt</u>, 806 F. Supp. at 523.

This aversion to creating new due process rights was echoed in <u>Royster v. American Cyanamid Company</u>, in which a public housing tenant sued based on lead paint. 2006 WL 2729496 (N.D. Fla. Sept. 25, 2006). The district court held "[t]he local housing authority may have provided plaintiff with housing, but he was not forced to accept it, as in the case of a prisoner or institutionalized mental patient" meaning that "plaintiff was not restrained to the degree required . . . to trigger an affirmative constitutional duty of care." <u>Royster</u>, 2006 WL 2729496, at *3; <u>see also</u> <u>Carter v. City of New York</u>, 2014 WL 4953641, at *3 (S.D.N.Y. Sept.

30, 2014) (resident of homeless shelter could not bring substantive due process claim from shelter being "infested with insects and rodents").

That Plaintiffs may have lower incomes, impairing their ability to rent from private landlords, is not tantamount to Defendants "restraining [Plaintiffs'] freedom to act on [their] own behalf." See Matican v. City of New York, 524 F.3d 151, 156 (2d Cir. 2008) (citing DeShaney, 489 U.S. at 200). "[I]nvoluntary custody [is] the linchpin of any special relationship exception." Matican, 524 F.3d at 156.

Thus, this Court turns to the thrust of Plaintiffs' substantive due process claim: the "state created danger" theory. A substantive due process claim may arise when state agents "assisted in creating or increasing the danger to the victim." Dwares v. City of New York, 985 F.2d 94, 99 (2d Cir. 1993), overruled on other grounds by Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993). Typically, a state-created danger requires an affirmative act by a government actor creating "an opportunity for a third party to harm a victim." Lombardi, 485 F.3d at 80. "While the boundaries of the state created danger exception . . . are not entirely clear, the exception does require a government defendant to either be a substantial cause of the danger or at least enhance it in a material way." Estate of M.D. by DeCosmo v. New York, 241 F. Supp. 3d 413, 427 (S.D.N.Y. 2017) (citation, quotation marks, and alterations omitted). The government action must also be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Pena v. DePrisco, 432 F.3d 98, 112 (2d Cir. 2005) (citation omitted). Therefore, in Dwares, the Second Circuit allowed a due process claim to proceed against police officers who permitted "skinheads" to assault a group burning the American flag in Washington Square Park, assuring the skinheads that they "would not be impeded or arrested." Dwares, 985 F.2d at 99.

While the grave allegations in the second amended complaint cannot be minimized, they do not reach the threshold for a substantive due process claim. The failure to provide a safe environment is insufficient to state a substantive due process claim. See Naperville Smart Meter Awareness v. City of Naperville, 69 F. Supp. 3d 830, 839 (N.D. Ill. 2014) ("Allegations of . . . risk exposure are insufficient to state a claim for deprivation of bodily integrity. . . ."). Here "Plaintiffs do not allege that the Defendants directly contaminated their homes." See Walker v. City of E. Chi., 2017 WL 4340259, at *6 (N.D. Ind. Sept. 29, 2017) (denying a substantive due process claim arising from lead and arsenic in public housing); see also Kaucher v. Cty. of Bucks, 455 F.3d 418, 424 (3d Cir. 2006) (denying claim that infection arising from unsafe conditions in county correctional facility amounted to a due process violation).

Therefore, Defendants' failure to prevent lead paint poisoning is not tantamount to a violation of substantive due process. So too, it is not enough to allege that Defendants "stood by and did nothing." See Pena, 432 F.3d at 110 (citing DeShaney, 489 U.S. at 202). Plaintiffs contend that Defendants acted affirmatively by failing to disclose what they knew and assuring the public that they were in compliance with lead paint regulations. But that deception did not cause Plaintiffs injuries—the presence of lead paint in Plaintiffs' apartments did. At bottom, Plaintiffs assert a failure to take action, which cannot be transformed into an affirmative act. See Kaucher, 455 F.3d at 429 (county "covering up the extent of the problem" did not amount to a substantive due process claim as it only demonstrated a failure to take corrective action). In Greene v. Plano I.S.D., the plaintiff alleged that her school district "created and exacerbated the risk of harm from toxic mold" by creating buildings in "a manner such that the growth and proliferation of mold was inevitable," and then failed to take "remedial measures."

227 F. Supp. 2d 615, 618–19 (E.D. Tex. 2002), aff'd. Greene v. Plano Indep. Sch. Dist., 103 F.

App'x 542 (5th Cir. 2004).  However, the district court held, and the Fifth Circuit affirmed, that

the county's actions were not the sort of intentional action amounting to a deprivation of due

process.  Greene, 227 F. Supp. 2d at 618–19.

Similarly, judges in this District have rejected due process claims arising from

NYCHA's failure to address mold.  See Allen v. N.Y.C. Hous. Auth., 2012 WL 4794590, at *8

(S.D.N.Y. Sept. 11, 2012), report & recommendation adopted.  There, Chief Judge McMahon

adopted Magistrate Judge Freeman's assessment that the plaintiff did "not describe active,

affirmative conduct that creates a danger. . . . Rather, [he] . . . describe[d] a 'passive' failure to

act, which is not sufficient to state a substantive due process claim."  Allen, 2012 WL 4794590,

at *8; accord Lewis v. Wheatley, 2012 WL 774991, at *7–9 (N.D. Ohio Jan. 5, 2012).  This can

be contrasted with Wright v. City of Philadelphia, where the court allowed a substantive due

process claim to proceed after a housing maintenance crew "caused asbestos to become airborne

in [plaintiff's] basement" and "placed . . . asbestos back into the basement wall and advised

[plaintiff] that she had nothing to worry about[.]"  2015 WL 894237, at *9 (E.D. Pa. Mar. 2,

2015) (emphasis added).

In asserting a substantive due process claim, Plaintiffs rely on Lombardi.  There,

the Second Circuit considered a substantive due process claim arising from injuries sustained by

clean-up crews at Ground Zero in the aftermath of September 11th.  Lombardi, 485 F.3d at 75.

In dicta, the Second Circuit observed that "[d]epending on the circumstances," there was "some

support for the idea that a substantive due process violation can be made out when a private

individual derives a false sense of security from an intentional misrepresentation by an executive

official if foreseeable bodily harm directly results and if the official's conduct shocks the

conscience." <u>Lombardi</u>, 485 F.3d at 81. But the court of appeals recognized that the "point is fairly debatable," noting that complex issues would arise regarding causation. <u>Lombardi</u>, 485 F.3d at 81 & n.5; <u>see also</u> <u>Bright v. Westmoreland Cty.</u>, 443 F.3d 276, 281 (3d Cir. 2006) (holding that the harm caused by state action must be "foreseeable and fairly direct") (citation omitted).

"[T]he Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation." <u>DeShaney</u>, 489 U.S. at 202. It also does not "impos[e] liability whenever someone cloaked with state authority causes harm." <u>Cty. of Sacramento</u>, 523 U.S. at 848; <u>see</u> <u>Allen</u>, 2012 WL 4794590, at *9 ("[E]ven indefensible passivity and nonfeasance do not rise to the level of a constitutional violation.") (citation omitted). What Plaintiffs allege here is bureaucratic dishonesty and inaction at the highest levels. But those claims should be pursued in state court.

V.      <u>First Amendment</u>

Finally, Plaintiffs allege that Defendants' misrepresentations regarding compliance with lead paint inspections and remediation deprived them of their right to free speech. Specifically, Plaintiffs contend that Defendants' false statements "suppress[ed] Plaintiffs' ability to speak out about the actions of the Government," and from "engag[ing] in political activism, and petition[ing] their government representatives." (Compl. ¶¶ 225, 227, 229.) "The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." <u>Nat'l Inst. of Family & Life Advocates v. Becerra</u>, 138 S. Ct. 2361, 2371 (2018). Plaintiffs do not allege a law abridging their speech. Rather, they posit a novel theory that a government entity's misrepresentations prevented tenants from knowing about a danger, which in turn deprived them of the opportunity to speak out.

Plaintiffs do not cite a single decision holding that misrepresentations by government officials deprive citizens of their First Amendment rights. The First Amendment does not confer on citizens the right to alter governmental expression. "When [the] government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 135 S. Ct. 2239, 2245 (2015); see also Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."). Further, "[i]t is not the law that any action by an agent of government that has a collateral deterrent effect on protected speech ipso facto violates the First Amendment." United States v. Stewart, 686 F.3d 156, 172 (2d Cir. 2012). That "collateral deterrent effect" encapsulates what Plaintiffs attempt to do here—shoehorn governmental action into a First Amendment theory.

Plaintiffs contend that their claim presents "a logical and necessary extension" of First Amendment jurisprudence and rely on a 2015 law review article as support. But Plaintiffs do not allege that Defendants restricted anyone's speech. Rather, the thrust of the pleading is that Defendants concealed NYCHA's inaction.

VI.    City Defendants as Proper Parties

City Defendants assert that they are not proper parties to this lawsuit because Plaintiffs rented from NYCHA and NYCHA is distinct from the City. See Montenegro v. City of New York, 2002 WL 500355, at *3 (S.D.N.Y. Apr. 3, 2002) ("The New York City Housing Authority is a legal entity separate from the City of New York.") Many decisions hold that NYCHA and the City are separate entities. See, e.g., Hernandez v. Rosenberg Hous. Grp., 2003 WL 1743898, at *2 (S.D.N.Y. Mar. 31, 2003) (dismissing FHA claim against City alleging harassment based on disability); Romero v. Keeney, 168 F.R.D. 483, 484 (S.D.N.Y. 1996)

(holding that NYCHA "is not an agency of the City of New York," but rather an entity "created by state law").

However, Plaintiffs allege that NYCHA's failure to report and abate lead paint was orchestrated at the highest levels of NYCHA <u>and</u> the City government. For instance, the second amended complaint alleges that Mayor de Blasio "personally approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged NYCHA's non-compliance with federal and New York City lead paint laws and participated in the concealment of these violations." (Compl. ¶ 30.) Similarly, Plaintiffs allege that the Mayor "publicly insisted that he, and therefore the City of New York, was responsible for NYCHA." (Compl. ¶¶ 31–32.) These allegations are far different from those in <u>Hernandez</u>, where the court dismissed a <u>pro se</u> plaintiff's FHA claim based on a single allegation that the City "doesn't stand up to [NYCHA]." <u>Hernandez</u>, 2003 WL 1743898, at *1.

Moreover, under New York Public Housing Law, NYCHA's Chairperson and board members are appointed by the Mayor and serve at his pleasure. <u>See</u> N.Y. Pub. Hous. Law § 402(3). "The power to remove officers . . . is a powerful tool for control." <u>Edmond v. United States</u>, 520 U.S. 651, 664 (1997). In a proposed settlement with the United States regarding NYCHA's actions, the City committed over two billion dollars to remediate the deplorable conditions in NYCHA housing and signed the proposed consent decree as an interested party. Certainly, the City's political decision to stand behind NYCHA in the federal enforcement action demonstrates a unity of interests between NYCHA and the City worthy of further exploration.

Based on Plaintiffs' allegations and this action's current procedural posture, without a factual record of who knew and did what in relation to Plaintiffs' claims, this Court declines to dismiss the City Defendants. Discovery will reveal who belongs in this case.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. Plaintiffs' procedural due process, substantive due process, and First Amendment claims are dismissed. Plaintiffs' claims under the FHA and RLPHRA remain, but the RLPHRA claims brought by Evelyn Gray and K.D. are dismissed. The Clerk of Court is directed to terminate the motion pending at ECF No. 199.

Dated: August 14, 2018
    New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.